## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | |
|---|---|
| TODD MCCAIN, individually and on behalf of all others similarly situated, <br><br> *Plaintiff*, <br><br> v. <br><br> MARY MAHONEY'S, INC. d/b/a MARY MAHONEY'S OLD FRENCH HOUSE, ANTHONY C. CVITANOVICH, QUALITY POULTRY & SEAFOOD, INC., JAMES W. GUNKEL, TODD A. ROSETTI, and DOE DEFENDANTS 1–10, <br><br> *Defendants*. | Case No.: <u>1:24-cv-241-TBM-RPM</u> <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR A JURY TRIAL** |

Plaintiff Todd McCain ("Plaintiff"), by and through his undersigned counsel, brings this action on behalf of himself and all others similarly situated against Defendants Mary Mahoney's, Inc. d/b/a Mary Mahoney's Old French House ("Mary Mahoney's"), Anthony C. Cvitanovich ("Cvitanovich"), Quality Poultry & Seafood, Inc. ("QPS"), James W. Gunkel ("Gunkel"), Todd A. Rosetti ("Rosetti"), and Doe Defendants 1–10 (collectively, "Defendants"), based upon personal knowledge as to himself and his own acts, publicly available records, and upon information and belief, and alleges as follows:

### I.    NATURE OF THIS ACTION

1.    This action arises from Defendants' decade long criminal scheme and conspiracy that targeted and financially victimized thousands of trusting customers, all while blatantly disregarding their health and safety by exposing them to potentially hazardous and toxic inexpensive foreign fish species they unknowingly ingested.

2. During the conspiracy, QPS, the largest seafood wholesaler on the Mississippi Gulf Coast, along with James Gunkel, QPS's business manager, and Todd Rosetti, QPS's sales manager and the son of QPS's co-owner, actively engaged in a criminal scheme with Mary Mahoney's, a prominent seafood restaurant, and its co-owner/manager Anthony Cvitanovich, to import, mislabel, market, price, and ultimately sell inexpensive perch, triggerfish, triple tail, and unicorn filefish sourced from Africa, Suriname, and India to unsuspecting customers all while blatantly disregarding known food safety hazards that posed a multitude of public health and safety risks.

3. Starting as early as 2002, but no later than 2012, Defendants knowingly and willfully imported, mislabeled, marketed, and sold at least 58,750 pounds (over 29 tons) of inexpensive frozen foreign fish to Plaintiff and the putative class as high-priced premium local fresh fish, when in fact the species sold were neither the species marketed or advertised, nor locally caught in the Mississippi Gulf.

4. Instead of purchasing high-priced premium fresh fish, such as red snapper, redfish, grouper, or snapper from the Gulf, Plaintiff and the putative class were fraudulently sold and ingested inexpensive frozen perch from Africa, tripletail from Suriname, unicorn filefish from India, and triggerfish (collectively, the "Foreign Fish").

5. These foreign fish species would not have been marketable if the actual species and origin had been known to Plaintiff and the putative class. Hence, the reason Defendants went to such great lengths to conceal their fraudulent scheme.

6. On May 30, 2024, the criminal scheme was finally revealed to the public when the U.S. Attorney for the Southern District of Mississippi, Todd W. Gee, announced criminal charges and guilty pleas against Mary Mahoney's and Cvitanovich and stated that "[m]islabeling food and **defrauding customers are serious crimes**, and this case will help convince restaurants and

seafood suppliers that **it is not worth lying to customers about what is on the menu**." (Press Release, Ex. A (emphasis added)).

7.     Special Agent in Charge Justin Fielder, with the Food and Drug Administration's ("FDA") Office of Criminal Investigations, emphasized that "[w]hen sellers purposefully substitute one fish species for another, **they deceive consumers and cause potential food safety hazards** to be overlooked or misidentified by processors or end users," and that the FDA will "continue to investigate and bring to justice those who **put profits above public health**." (*Id.* (emphasis added)).

8.     On August 27, 2024, the U.S. Attorney for the Southern District of Mississippi revealed further criminal charges and guilty pleas against co-conspirators QPS, Gunkel, and Rosetti for their participation in the criminal scheme and conspiracy. (Press Release, Ex. B).

9.     Assistant Attorney General Todd Kim, with the Department of Justice, stated that "QPS and company officials went to great lengths in conspiring with others to **perpetuate fraud for more than a decade, even after they knew they were under federal investigation**," and that "[m]islabeling seafood harms local wholesalers and fisherman who compete to sell locally sourced, premium fish in a market unfairly **flooded with less expensive fish, frozen and imported from overseas**." (*Id.* (emphasis added)).

10.     Defendants' collective actions and common course of conduct consisted of numerous racketeering and overt acts in furtherance of the criminal scheme and conspiracy, including wire fraud, mail fraud, conspiracy to commit fraud, misrepresentations, concealment, omissions, and other unlawful conduct—all used to target and directly cause actual monetary injury to Plaintiff and the putative class while bringing about financial gains for themselves.

11.     Plaintiff and the putative class now bring this action against Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and pursuant to common law. Based on Defendants' racketeering scheme, Plaintiff and the putative class seek monetary damages, restitution, disgorgement of funds, treble damages, punitive damages, attorney's fees, and costs.

## II.     PARTIES

### A.     Plaintiff.

12.     Plaintiff TODD MCCAIN is and was at all relevant times a resident of Alabama. On or about July 29, 2013, December 28, 2016, and August 21, 2018, Plaintiff travelled across state lines to Mary Mahoney's where he purchased what Defendants marketed and represented as snapper and red snapper. Had he known that the species of fish were instead inexpensive frozen Foreign Fish, he would not have purchased and ingested them.

### B.     Defendants.

13.     Defendant QUALITY POULTRY & SEAFOOD, INC. is and was at all relevant times a Mississippi corporation with its headquarters and principal place of business located at 895 Division Street, Biloxi, Mississippi 39530. QPS is the largest wholesale supplier of seafood to restaurants, casinos, and retail markets on the Mississippi Gulf Coast, including Mary Mahoney's. QPS is co-owned and managed by Clell M. Rosetti, along with his son, Defendant Todd A. Rosetti.

14.     Defendant JAMES W. GUNKEL is and was at all relevant times QPS's business manager and a certified public accountant, overseeing all of QPS's business operations and reporting directly to QPS's owners. In that position, Gunkel controlled QPS's purchases of seafood from its suppliers, instructed employees how to label fish species, and set the prices that QPS

charged to its wholesale and retail customers, including Mary Mahoney's. Gunkel can be served at 6825 Corto Road, Ocean Springs, Mississippi 39564.

15.     Defendant TODD A. ROSETTI is and was at all relevant times QPS's sales manager and the son of one of QPS's owners. In that position, Rosetti supervised QPS's sales staff, participated in setting prices at which QPS would purchase and sell fish species, and was responsible for QPS's sales to casinos and restaurants, including Mary Mahoney's. Rosetti can be served at 3609 Point Clear Drive, Ocean Springs, Mississippi 39564.

16.     Defendant MARY MAHONEY'S, INC. is and was at all relevant times a Mississippi corporation with its headquarters and principal place of business located at 116 Rue Magnolia Street, Biloxi, Mississippi 39530. Mary Mahoney's does business as Mary Mahoney's Old French House, where it markets and advertises its fresh local seafood throughout the country. Mary Mahoney's is actively managed by its directors and officers: Robert F. Mahoney, Jr., Eileen Mahoney Ezell, and Andrea Cvitanovich Osman.

17.     Defendant ANTHONY C. CVITANOVICH is and was at all relevant times the co-owner and manager of Mary Mahoney's and purchased the fish species that Mary Mahoney's fraudulently advertised, described on its menu, priced, and sold. Cvitanovich is the registered agent for Mary Mahoney's and can be served at 116 Rue Magnolia Street, Biloxi, Mississippi 39530.

18.     Doe Defendants 1–10 are individuals, owners, executives, officers, directors, corporations, limited liability companies, partnerships and/or other entities that participated in the racketeering scheme and conspiracy. Pursuant to Fed. R. Civ. P. 15, Plaintiff reserves the right to seek leave of the Court to add additional Doe Defendants.

### III.    JURISDICTION AND VENUE

19.    This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as Plaintiff's claims arise under 18 U.S.C. § 1964(c), and allege violations of RICO, 18 U.S.C. § 1962.

20.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

21.    This Court has personal jurisdiction over Defendants as they are authorized to conduct business in Mississippi; have transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the scheme and conspiracy in this District; and the scheme and conspiracy was directed at, and has had the intended effect of causing monetary injury to persons residing in, located in, or doing business in this District.

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), (d), and 18 U.S.C. § 1965. Defendants reside, are found, regularly conduct and transact business, committed predicate and overt acts in furtherance of the scheme and conspiracy, and/or have agents in this District. A portion of the events giving rise to Plaintiff's claims occurred in this District, namely Defendants' scheme to import, mislabel, market, and sell the Foreign Fish, which caused actual monetary injury to individuals residing in this District.

### IV.    FACTUAL ALLEGATIONS

**A.    The Purpose of Defendants' Racketeering Scheme and Conspiracy.**

23.    Beginning as early as 2002, and no later than 2012, and continuing through November 2019, Defendants collectively and consensually entered into and participated in a criminal scheme and conspiracy with the objective and purpose of defrauding Plaintiff and the putative class by knowingly and willfully importing, mislabeling, marketing, pricing, and selling

inexpensive frozen perch, triggerfish, triple tail, and unicorn filefish sourced from foreign countries and waters that were not those of the Mississippi Gulf.

24. The purpose of Defendants' scheme and conspiracy was to directly profit from the sale of inexpensive frozen Foreign Fish as high-priced premium local fish at the expense of Plaintiff and the putative class, who would not have otherwise purchased the Foreign Fish, and suffered ascertainable monetary losses based on Defendants' fraudulent scheme.

25. Defendants held themselves out as legitimate wholesalers and retailers of high-priced premium local fish, when in fact Defendants were engaged in a racketeering scheme that directly and foreseeably caused Plaintiff and the putative class to purchase inexpensive foreign fish species. Further, Plaintiff and the putative class members were necessary to the scheme.

**B.      Defendants' Manner and Means of Carrying Out the Scheme and Conspiracy.**

26. To achieve and carry out the criminal scheme and conspiracy, QPS, Gunkel, Rosetti, Mary Mahoney's, and Cvitanovich collectively and knowingly entered into a continuous and ongoing unlawful agreement, using predicate and overt acts, for the purpose of purchasing and importing into the United States inexpensive Foreign Fish, and then mislabeling, marketing, pricing, and selling them as high-priced premium fresh fish to Plaintiff and the putative class.

27. Defendants did not undertake the practices described herein in isolation, but as part of a scheme and conspiracy that was continuous and ongoing for at least a decade. For example, while standing inside QPS's large freezer containing boxes of imported frozen seafood, Rosetti (QPS's sales manager) handed Cvitanovich (Mary Mahoney's co-owner/manager) packages of three different fish suggesting that Cvitanovich sample each and decide which would best substitute for the local premium species on Mary Mahoney's menu.

28. The racketeering scheme and conspiracy was successful because it functioned as an organized unit with continuity of structure, personnel, and a shared purpose that directly and foreseeably targeted Plaintiff and the putative class as its victims.

29. From an organizational standpoint, Defendants each played a distinct and indispensable role in the scheme and conspiracy. The Foreign Fish were imported through QPS, purchased and priced by QPS's business manager, Gunkel, and marketed and sold by QPS's sales manager, Rosetti, to their co-conspirators, Mary Mahoney's and its co-owner/manager, Cvitanovich to mislabel, market, price, and sell to Plaintiff and the putative class.

30. QPS, Gunkel, and Rosetti were able to purchase, import, and price the Foreign Fish because they knew their co-conspirators, Mary Mahoney's and Cvitanovich, would then willfully mislabel, market, and sell the Foreign Fish to Plaintiff and the putative class as high-priced premium fresh fish. Each Defendant knew full well the fish were neither local nor the species they were marketed to be.

31. Defendants' scheme and conspiracy included marketing and advertising high-priced premium fresh fish on Mary Mahoney's menu and through several interstate wire and electronic communications, which were hosted outside of Mississippi, including the publicly-accessible website Yelp®, where the menu was posted.[1] There and elsewhere, Mary Mahoney's stated that "all of our seafood is caught in our bountiful gulf waters" to appeal to individuals throughout the United States seeking premium local Gulf Coast seafood.[2]

32. As part of Defendants' scheme, Mary Mahoney's menu was also posted on the publicly-accessible website www.marymahoney.com, which was hosted outside of Mississippi,

---

[1] Yelp®, https://www.yelp.com/ (last visited July 5, 2024).
[2] *Menu for Mary Mahoney's*, https://www.yelp.com/menu/mary-mahoneys-biloxi-2 (last visited July 5, 2024).

where Defendants advertised the sale of high-priced premium local fish, which QPS, Gunkel, Rosetti, Mary Mahoney's, and Cvitanovich fraudulently substituted with inexpensive frozen fish species imported from Africa, Suriname, and India.

33.     Based on Defendants' continuous activities, relationships, and structure, each directly profited and derived significant revenue and income from the criminal scheme and conspiracy, while the actual monetary losses to Plaintiff and the putative class were the but-for cause and proximately caused by Defendants' racketeering scheme, as the fraud led directly and foreseeably to its intended victims, Plaintiff and the putative class.

34.     To execute their criminal scheme, Defendants knowingly made use of numerous interstate wire communications to organize, execute, facilitate, market, and manage the scheme, in violation of 18 U.S.C. § 1343. Defendants also executed their scheme by causing Foreign Fish to be deposited, delivered, taken, and/or received, via private and/or commercial interstate carrier, in violation of 18 U.S.C. § 1341.

35.     The criminal scheme was successful and economically benefited all Defendants from the sale of Foreign Fish that would not have otherwise been marketable if the actual species and origin of the fish had been known to Plaintiff and the putative class.

**C.     Defendants' Racketeering Activities Related to all RICO Claims.**

36.     Defendants engaged in a wide-ranging scheme or artifice to defraud by using interstate wire communications to knowingly and willfully organize, facilitate, execute, and conceal their racketeering scheme, in violation of 18 U.S.C. § 1343, including:

   a.   On January 26, 2015, Gunkel (QPS's business manager), emailed the following text to Rosetti (QPS's sales manager): "We need to raise the price of perch on Mary Mahoney's perch we are getting 7%."

   b.   In a text message dated July 5, 2017, Rosetti (QPS's sales manager), communicating by wire, sent the following to Cvitanovich (Mary Mahoney's co-

owner/manager): "Still have no triple tail I'm sending you trigger-style fish 8 – 10 to use till we get it back in stock. An employee of [another restaurant] is using it already instead of triple tail at the [restaurant] and said he has used it for grouper snapper and triple tail with no complaints. And it's cheaper than triple tail." Cvitanovich responded, "Ok."

c. In a January 19, 2018 email, a QPS purchasing agent notified Gunkel and Rosetti (QPS's business and sales manager), along with other QPS employees that "Due to the shortage on snapper we will be substituting triple tail for all snapper." Triple tail was not a local fish, but was imported by QPS from Suriname.

d. In an April 16, 2018 email, Gunkel (QPS's business manager), sent the following instructions to Rosetti (QPS's sales manager), along with other members of QPS's sales staff: "I don't understand why we are giving [African] Perch away. This is a replacement for the triple tail which were selling at $8.99 and $9.99. Now we are selling perch at $5.69 if we can't get at least $6.99 or $7.99 then it's not worth bringing it in here. This is a product that no one else has and it is versatile. Raise the price and make money where we can make money!"

e. On September 19, 2018, while an authorized federal search of QPS's premises was underway, Cvitanovich (Mary Mahoney's co-owner/manager), sent an electronic text message to Rosetti (QPS's sales manager), ordering imported frozen African perch, which Mary Mahoney's regularly mislabeled and sold to customers as local Mississippi Gulf Coast snapper.

f. On September 19, 2018, Rosetti (QPS's sales manager) replied to Cvitanovich's text order for African perch, with the following text: "Tomorrow[,] FDA here today." Cvitanovich (Mary Mahoney's co-owner/manager) responded, "Ok."

g. On September 27, 2018, eight days after the FDA's search of QPS's premises, in a text to Rosetti (QPS's sales manager), Cvitanovich ordered 150 pounds of African perch in order to sell it to customers of Mary Mahoney's as snapper.

h. On October 18, 2018, about a month after the FDA's search of QPS's premises, in a text to Rosetti (QPS's sales manager), Cvitanovich ordered 60 pounds of African perch to sale as snapper to customers of Mary Mahoney's.

i. In an October 18, 2018 text, after Rosetti (QPS's sales manager) informed Cvitanovich (Mary Mahoney's co-owner/manager) that QPS was unlikely to obtain more African perch, by stating that "Perch about to be nonexistent," Cvitanovich instructed him to "Get all they have."

j. In a February 21, 2019 text, Rosetti (QPS's sales manager), told Cvitanovich that "We have 110 cases of perch left when that is gone there is no more. FYI we are looking for alternatives. Unicorn, triple tail and parrot fish are always good alternatives."

k. In a responsive text on February 21, 2019, Cvitanovich (Mary Mahoney's co-owner/manager) told Rosetti (QPS's sales manager) not to sell the remaining cases of African perch to any other customers, stating that "I will buy them." Rosetti responded, "You come bring a check and I will set it aside for you."

l. Between May 26, 2019, and August 16, 2019, and longer, Mary Mahoney's advertised on the website Yelp®, which was hosted outside of Mississippi, that "all of our seafood is caught in our bountiful gulf waters . . ."

m. During the relevant time period, Mary Mahoney's advertised on the websites OpenTable® and Tripadvisor®, which are hosted outside of Mississippi, that it specialized in "locally sourced seafood."[3]

n. During the relevant time period, QPS and Mary Mahoney's obtained payments, directly and indirectly, through interstate wire transmissions generated by credit card sales for their fraudulently misbranded Foreign Fish.

37.    Between December 2013 and November 2019, in furtherance of the scheme to defraud, Defendants caused to be deposited, delivered, taken, and/or received, via private and/or commercial interstate carrier, at least 58,750 pounds of frozen foreign perch, triggerfish, triple tail, and unicorn filefish, in violation of 18 U.S.C. § 1341. (Mary Mahoney's Criminal Info., Ex. C, at 11; QPS's Criminal Info., Ex. D, at 12).

38.    In 2019 alone, in furtherance of the scheme, Defendants caused to be deposited, delivered, taken, and/or received, via private and/or commercial carrier, thousands of pounds of African perch, Suriname tripletail, and Indian unicorn filefish, on or about the following dates:

| 1/7/19 | 1/11/19 | 1/15/19 | 1/21/19 | 1/25/19 | 1/31/19 | 2/5/19 | 2/8/19 |
|--------|---------|---------|---------|---------|---------|--------|--------|
| 2/13/19 | 2/20/19 | 2/21/19 | 2/26/19 | 3/4/19 | 3/7/19 | 3/13/19 | 3/16/19 |
| 3/19/19 | 3/20/19 | 3/22/19 | 3/27/19 | 4/1/19 | 4/5/19 | 4/10/19 | 4/15/19 |
| 4/18/19 | 4/25/19 | 5/2/19 | 5/7/19 | 5/10/19 | 5/15/19 | 5/20/19 | 5/28/19 |
| 6/3/19 | 6/5/19 | 6/10/19 | 6/11/19 | 6/12/19 | 6/18/19 | 6/20/19 | 6/24/19 |
| 6/28/19 | 7/2/19 | 7/9/19 | 7/15/19 | 7/18/19 | 7/22/19 | 7/26/19 | 7/30/19 |
| 8/5/19 | 8/8/19 | 8/13/19 | 8/15/19 | 8/22/19 | 8/23/19 | 8/27/19 | 9/3/19 |

---

[3] OpenTable®, https://www.opentable.com/r/mary-mahoneys-old-french-house-biloxi ("locally sourced seafood") (last visited July 5, 2024); Tripadvisor®, https://www.tripadvisor.com/Restaurant_Review-g43686-d2023580-Reviews-Mary_Mahoney_s_Old_French_House-Biloxi_Mississippi.html (same) (last visited July 5, 2024).

| 9/6/19 | 9/16/19 | 9/19/19 | 9/24/19 | 9/27/19 | 10/4/19 | 10/8/19 | 10/11/19 |
|--------|---------|---------|---------|---------|---------|---------|----------|
| 10/16/19 | 10/23/19 | 10/24/19 | 10/29/19 | 10/31/19 | 11/7/19 | 11/12/19 | 11/15/19 |

(Mary Mahoney's Criminal Info., Ex. C ¶¶ 20–92; QPS Criminal Info., Ex. D ¶¶ 21–93).

**D.      Defendants' Efforts to Unlawfully Conceal the Scheme and Conspiracy.**

39.      Defendants went to great efforts to conceal the scheme, through lies, misrepresentations, and material omissions, including when being questioned by federal agents during a search of QPS's premises, where:

a.   Gunkel falsely told federal agents that if anyone in QPS's retail market was labeling a fish with a name other than its true name, it was done without his approval and without his knowledge;

b.   Gunkel told federal agents that QPS does not ship any fish outside of the State of Mississippi;

c.   Gunkel told federal agents that QPS had, in the past, sold fish to Mary Mahoney's restaurant in Biloxi, Mississippi, but not much anymore;

d.   Gunkel falsely told federal agents that he was not aware of any restaurant customer mislabeling and selling fish bought from QPS as something other than what it was, such as selling a cheap fish as an expensive one; and

e.   Rosetti falsely told federal agents that any mislabeling of fish by QPS was inadvertent and he did not know of any mislabeling of fish by the restaurants to which QPS sold seafood.

40.      Defendants' perpetually misrepresented to Plaintiff and the putative class that they were purchasing high-priced premium local fish, when in fact Plaintiff and the putative class were purchasing inexpensive frozen perch, triggerfish, triple tail, and unicorn filefish sourced from Africa, Suriname, and India.

41.      On or about July 29, 2013, December 28, 2016, and August 21, 2018, Plaintiff purchased what Defendants fraudulently marketed and represented as high-priced premium local snapper and red snapper at Mary Mahoney's. This was a direct and foreseeable consequence of Defendants' operation of the racketeering scheme for which Plaintiff was necessary to the scheme.

**E.      Federal Criminal Charges and Guilty Pleas.**

*United States v. Mary Mahoney's* **(Criminal No. 1:24-cr-45-HSO-RPM)**

42.      On April 26, 2024, the U.S. Attorney for the Southern District of Mississippi criminally charged Mary Mahoney's for its participation in the fraudulent scheme and conspiracy. (Criminal Info., Ex. C).

43.      On May 30, 2024, Mary Mahoney's, through unanimous consent of its board of directors, pleaded guilty to felony charges for participating in the 18 U.S.C. § 371 conspiracy to defraud individuals by marketing mislabeled seafood in violation of 21 U.S.C. §§ 331(k) and 333(a)(2), and in using interstate wire transmissions to facilitate the fraud in violation of 18 U.S.C. § 1343. (Plea Agreement, Ex. E; Consent Agreement, Ex. F).

*United States v. Anthony C. Cvitanovich* **(Criminal No. 1:24-cr-46-HSO-BWR)**

44.      On April 26, 2024, the U.S. Attorney for the Southern District of Mississippi criminally charged Cvitanovich for his participation in the fraudulent scheme and conspiracy. (Criminal Info., Ex. G).

45.      On May 30, 2024, Cvitanovich pleaded guilty to felony charges related to the scheme for mislabeling inexpensive imported seafood as local premium species to profit from its fraudulent sale in violation of 21 U.S.C. §§ 331(k) and 333(a)(2). (Plea Agreement, Ex. H).

*United States v. QPS* **(Criminal No. 1:24-cr-89-HSO-RPM)**

46.      On July 31, 2024, the U.S. Attorney for the Southern District of Mississippi criminally charged QPS for its participation in the fraudulent scheme and conspiracy. (Criminal Info., Ex. D).

47.      On August 27, 2024, QPS pleaded guilty to felony charges for participating in the 18 U.S.C. § 371 conspiracy to defraud individuals by marketing mislabeled seafood in violation

of 21 U.S.C. §§ 331(k) and 333(a)(2), and in using interstate wire transmissions to facilitate the fraud in violation of 18 U.S.C. § 1343. (Plea Agreement, Ex. I).

### *United States v. James W. Gunkel* (**Criminal No. 1:24-cr-88-HSO-RPM**)

48.    On July 31, 2024, the U.S. Attorney for the Southern District of Mississippi criminally charged Gunkel for his participation in the fraudulent scheme and conspiracy. (Criminal Info., Ex. J).

49.    On August 27, 2024, Gunkel pleaded guilty to charges related to the scheme for the misbranding of inexpensive imported seafood as local premium species in violation of 21 U.S.C. §§ 331(k) and 333(a)(1). (Plea Agreement, Ex. K).

### *United States v. Todd A. Rosetti* (**Criminal No. 1:24-cr-90-HSO-BWR**)

50.    On July 31, 2024, the U.S. Attorney for the Southern District of Mississippi criminally charged Rosetti for his participation in the fraudulent scheme and conspiracy. (Criminal Info., Ex. L).

51.    On August 27, 2024, Rosetti pleaded guilty to charges related to the scheme for the misbranding of inexpensive imported seafood as local premium species in violation of 21 U.S.C. §§ 331(k) and 333(a)(1). (Plea Agreement, Ex. M).

52.    Plaintiff incorporates by reference all factual allegations as set forth in Ex.'s C–M.

**F.    Harm to Plaintiff and the Putative Class.**

53.    Plaintiff and the putative class suffered ascertainable losses, injury-in-fact, and actual damages proximately caused by and but-for Defendants' unlawful conduct.

54.    Plaintiff and the putative class were the direct and foreseeable victims of Defendants' scheme and conspiracy and would not have otherwise purchased the Foreign Fish had

they known about the criminal scheme. Their damages are the direct and natural consequences of Defendants' actions and were necessary to the scheme.

55.     At no time did Defendants disclose to Plaintiff and the putative class that the fish species they were purchasing and ingesting were not high-priced premium fresh fish, such as red snapper, redfish, grouper, and/or snapper from the Gulf, but instead inexpensive frozen foreign fish from Africa, Suriname, and India. Each Defendant intentionally, knowingly, and willfully misrepresented, concealed, and omitted material facts about the Foreign Fish to induce Plaintiff and the putative class to purchase the inexpensive frozen Foreign Fish.

56.     Defendants blatantly disregarded Plaintiff and the putative classes' safety and health by knowingly deceiving them into purchasing and ingesting potentially hazardous and toxic inexpensive Foreign Fish species. There are numerous public health hazards that arise when fish species are unlawfully substituted, including unknown toxins, life-threatening allergens, or pathogens.[4]

57.     Defendants engaged in sophisticated methods of deception to prevent Plaintiff and the putative class from discovering the criminal scheme and conspiracy. Not surprisingly, Plaintiff and the putative class did not discover, nor could they have discovered, Defendants' scheme and conspiracy on their own.

58.     Defendants pursued a common plan and course of conduct, acted in concert with, aided and abetted, and otherwise conspired with one another, in furtherance of their scheme to defraud Plaintiff and the putative class. Thus, Defendants are jointly and severally liable for all damages caused by the criminal scheme and conspiracy.

---

[4] *Health Risks of Seafood Fraud*, OCEANA, https://usa.oceana.org/health-risks-seafood-fraud/ ("Allergens may be the most **life-threatening risk** of seafood fraud. Fish and shellfish are among the most common food allergies in the U.S., along with peanuts and tree nuts.") (emphasis added).

59. Accordingly, Plaintiff and the putative class have suffered actual monetary damages for all amounts paid as a result of Defendants' unlawful scheme.

## V. TOLLING OF THE STATUTES OF LIMITATION

60. All statutes of limitation applicable to Plaintiff and the putative class are subject to tolling under the doctrines of fraudulent concealment, the discovery rule, and/or equitable estoppel due to Defendants' concealment and omissions, as alleged herein. Plaintiff and the putative class could not have independently discovered the criminal scheme and conspiracy either before purchasing the Foreign Fish, or until after the U.S. Attorney first announced criminal charges against Mary Mahoney's and Cvitanovich on May 30, 2024, or when charges were announced against QPS, Gunkel, and Rosetti on August 27, 2024.

61. As Assistant Attorney General Todd Kim stated, "QPS and company officials went to great lengths in conspiring with others to perpetuate fraud for more than a decade, even after they knew they were under federal investigation[.]" (Press Release, Ex. B). Because Defendants committed fraud and participated in a criminal scheme, not only did they go to great lengths to conceal the fraud, but the fraud itself was self-concealing.

62. **Discovery Rule Tolling:** Plaintiff and the putative class had no means of knowing they were being defrauded, and that Defendants were economically profiting from knowingly and willfully importing, mislabeling, marketing, and selling inexpensive Foreign Fish as high-priced premium fresh fish. Plaintiff and the putative class did not discover until May 30, 2024, and could not have discovered otherwise, about the criminal scheme and conspiracy, which constitutes a cognizable injury. For these reasons, all applicable statutes of limitation have thus been tolled by operation of the discovery rule.

63.     **Fraudulent Concealment:** Far from disclosing the criminal scheme and conspiracy, Defendants took numerous affirmative steps to conceal the scheme and conspiracy from Plaintiff and the putative class. Defendants' concealment comports with common sense, as these types of activities are normally concealed, especially in light of the criminal and civil penalties that may result if they are discovered. Defendants knew that Plaintiff and the putative class would have no reason to suspect they were being sold inexpensive Foreign Fish instead of high-priced premium fresh fish. Defendants possessed special facts regarding the Foreign Fish, which were not known by Plaintiff and the putative class, and thus Defendants had a duty to disclose these facts. Further, Plaintiff and the putative class could not have discovered the fraud earlier through the exercise of reasonable diligence. For these reasons, all applicable statutes of limitation have been tolled by Defendants' active and fraudulent concealment.

64.     **Estoppel:** Defendants were under a continuous duty to disclose to Plaintiff and the putative class the true character, quality, and nature of the fish species they were importing, mislabeling, marketing, and selling. Defendants knowingly, affirmatively, and actively concealed the true character, quality, and nature of the Foreign Fish from Plaintiff and the putative class. Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

## VI.     CLASS ALLEGATIONS

65.     Plaintiff brings this action on behalf of himself and the putative class (the "Class"), pursuant to Fed. R. Civ. P. 23(a) and (b)(3), as representative of the Class defined as follows:

> Nationwide Class
> All persons residing in the United States who purchased the foreign fish species between January 1, 2012, and November 30, 2019.

66.    Excluded from the Class are Defendants and their directors, officers, predecessors, successors, affiliates, agents, co-conspirators, and employees, as well as the immediate family members of such persons; class counsel and their employees; and the Judge(s) to whom this case is assigned and his/her immediate family.

67.    Plaintiff reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time, or to propose subclasses, in response to facts learned through discovery, legal arguments, or otherwise.

68.    Certification of Plaintiff's claims for class treatment are appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

69.    Class members have suffered similar economic injury by reason of Defendants' unlawful scheme and course of conduct.

70.    **Numerosity—Fed. R. Civ. P. 23(a)(1)**. The Class is comprised of thousands of individuals, the joinder of which in one action would be impracticable. While the exact number or identification of the Class is presently unknown, the identity of Class members is ascertainable and can be determined based on Defendants' books and records. Class members may be notified of the pendency of this action by Court-approved notice methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

71.    **Predominance of Common Questions—Fed. R. Civ. P. 23(a)(2) & 23(b)(3)**. The questions of law and fact common to the Class predominate over questions affecting only individual Class members, including, without limitation:

   a.    Whether Defendants' conduct violated RICO;

   b.    Whether Defendants engaged in an association-in-fact enterprise under RICO;

c. Whether Defendants, through a RICO enterprise, committed predicate offenses of wire and mail fraud sufficient to ground a RICO claim;

d. Whether Defendants are liable to Plaintiff and the Class for damages flowing from Defendants' misconduct under RICO, and if so, in what amount;

e. Whether each Defendant participated in the fraudulent scheme and conspiracy;

f. Whether Defendants have been unjustly enriched at the expense of Plaintiff and the Class;

g. Whether Plaintiff and the Class have sustained damages as a result of Defendants' conduct, and if so, what are the appropriate damages; and

h. Whether Defendants' conduct entitles Plaintiff and the Class to recover treble damages, punitive damages, attorney's fees, costs, and/or expenses.

72. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff and the Class. Identical statutory violations, fraudulent acts, and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.[5]

73. **Typicality—Fed. R. Civ. P. 23(a)(3)**. Plaintiff's claims are typical of Class members because, among other things, all Class claims are based on the same underlying facts, events, and circumstances relating to Defendants' conduct and Class members were comparably injured through Defendants' wrongful conduct as described herein.

74. **Adequacy—Fed. R. Civ. P. 23(a)(4); 23(g)(1)**. Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interest incompatible with the interests of

---

[5] The Supreme Court and Fifth Circuit have held that no reliance requirement exists for civil causes of action under RICO for victims of mail or wire fraud. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S.Ct. 2131, 2139-40 (2008); *see also Earl v. Boeing Co.*, 339 F.R.D. 391, 435 (E.D. Tex. 2021) (citing *Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009)) ("'no reliance requirement exists for civil causes of action under RICO for victims of mail' or wire fraud."). As a result, the "the most straightforward way of demonstrating reliance in a classwide manner under the *Bridge* theory is by showing that the [p]laintiffs' losses were caused by reason of the [d]efendants' operation of a fraudulent scheme." *Earl*, 339 F.R.D. 435 (internal quotation marks omitted) (quoting *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 638 (5th Cir. 2016).

the Class, and has retained counsel competent and experienced in class action litigation. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

75. **Superiority—Fed. R. Civ. P. 23(b)(3)**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Such treatment will permit a large number of similarly situated and commonly affected Class members to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would give rise to.

76. Because of the size of each individual Class member's claim, no Class member could afford to seek legal redress for the wrongs identified herein. Without the class action vehicle, the Class would have no reasonable remedy and would suffer losses. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

77. Plaintiff does not anticipate any difficulty in the management of this litigation.

## VII.   CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF RICO – 18 U.S.C. § 1962(c) & (d)

78. Plaintiff incorporates by reference all allegations in Paragraphs 1 through 77 as if fully set forth herein.

79. Plaintiff brings this Count on behalf of the Class against all Defendants.

80. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." (18 U.S.C. § 1962(c)).

81.    RICO also makes it "unlawful for any person to conspire to violate any of the provisions of [Section 1962]." (18 U.S.C. § 1962(d)).

82.    RICO provides that: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]" (18 U.S.C. § 1964(c)).

83.    Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

84.    Plaintiff and the Class are "person[s]" within the meaning of 18 U.S.C. § 1964(c).

85.    QPS, Gunkel, Rosetti, Mary Mahoney's, and Cvitanovich are liable under 18 U.S.C. § 1962(c) because each is a person who conducted and participated, directly or indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity, which affected interstate and foreign commerce, and were the but-for and proximate cause of economic injuries to Plaintiff and the Class.

86.    A RICO "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." (18 U.S.C. § 1961(4)).

87.    Defendants are individuals, corporations, and/or other legal entities that form the "association-in-fact" enterprise, hereinafter referred to as the "Seafood Enterprise". The Seafood Enterprise consists of the following: (a) QPS; (b) Gunkel; (c) Rosetti; (d) Mary Mahoney's; and (e) Cvitanovich. The Seafood Enterprise associated together in fact for the collective purpose of carrying out the criminal scheme and conspiracy. (¶¶ 23–30, *supra*.)

88.    Through the Seafood Enterprise, Defendants knowingly and willfully conducted a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

89.     Beginning no later than 2012, and continuing through November 2019, through the Seafood Enterprise, Defendants used numerous acts of wire and mail fraud to execute the fraudulent scheme of importing, mislabeling, marketing, and selling frozen Foreign Fish to Plaintiff and the Class. (¶¶ 31–32, 34, 36–38, 43, 47, *supra*.). Defendants QPS and Mary Mahoney's have pleaded guilty to using interstate wire transmissions to facilitate the fraud in violation of 18 U.S.C. § 1343. (Plea Agreements, Ex. I ¶ 1; Ex. E ¶ 1).

90.     Defendants fraudulently advertised misbranded seafood on publicly accessible websites hosted on servers outside of Mississippi to appeal to individuals seeking local Gulf Coast seafood. (¶¶ 31–32, 36(m)-(n), *supra.*). Defendants also obtained payments, directly and indirectly, through interstate wire transmissions generated by credit and debit card sales for the fraudulently misbranded Foreign Fish. (¶ 36(n) *supra.*; Criminal Info., Ex. D ¶ 95).

91.     In furtherance of the scheme to defraud, Defendants used numerous acts of mail fraud by causing to be deposited, delivered, taken, and/or received, via private and/or commercial interstate carrier, at least 58,750 pounds of frozen Foreign Fish, in violation of 18 U.S.C. § 1341. (¶¶ 37–38, *supra.*). The Foreign Fish were transported into and through the United States via commercial interstate carrier from Africa, Suriname, and India. (*Id.*).

92.     From an organizational standpoint, QPS, Gunkel, and Rosetti participated in the Seafood Enterprise by importing, pricing, marketing, and mislabeling the inexpensive Foreign Fish, knowing full well that their co-conspirators, Mary Mahoney's and Cvitanovich, were mislabeling, marketing, pricing, and selling the inexpensive Foreign Fish to Plaintiff and the Class as high-priced premium fresh fish. (¶¶ 26–30, *supra.*).

93.     At all relevant times, the Seafood Enterprise had an existence separate and distinct from each Defendant, was separate and distinct from the pattern of racketeering activity in which

Defendants engaged, and was an ongoing organization consisting of legal entities and individuals associated for the collective purpose of importing, mislabeling, marketing, pricing, and selling Foreign Fish through fraudulent, deceptive, and misleading means, all while deriving significant profits and revenue from these activities.

94.     Each member of the Seafood Enterprise shared in the bounty generated by the enterprise—i.e., by sharing the benefits derived from increased sales revenue and substantial profits generated from the scheme. (Criminal Info., Ex. J ¶ 4 ("[D]efendant GUNKEL generated higher proceeds for his customers [Mary Mahoney's], his employer [QPS], and himself than would have been obtained had the seafood QPS sold been accurately identified and sold at its true market value.")); (Criminal Info., Ex. L ¶ 2 ("[D]efendant ROSETTI generated higher proceeds for his customers [Mary Mahoney's], his employer [QPS], and himself than would have been obtained had the seafood he arranged to sell been accurately identified and sold at its true market value.")).

95.     The Seafood Enterprise functioned by selling seafood to the consuming public. Some of the products sold by the Enterprise were legitimate, including other types of seafood and poultry that were not mislabeled and fraudulently sold to consumers. However, through the Seafood Enterprise, Defendants also engaged in a pattern of racketeering activity, which involved a scheme to increase revenue and profits for Defendants through the Enterprise's unlawful activities.

96.     The Seafood Enterprise engaged in commercial activities, and these activities affected interstate and foreign commerce, as the scheme involved activities that crossed state and foreign boundaries, such as importing at least 58,750 pounds of Foreign Fish (¶ 37, *supra.*), and the receipt of money through credit and debit card wire transactions from the sale of same. (Criminal Info., Ex. D ¶ 95 ("On or about August 16, 2019, [Mary Mahoney's] processed a credit

card transaction causing an interstate wire transmission. The transaction was for payment of seafood purchased by a customer from [Mary Mahoney's]. Defendants QPS, [Rosetti], and [Gunkel], supplied the misbranded seafood that [Mary Mahoney's] sold to their customer, falsely representing it to be the local premium species, Snapper.")).

97.     Within the Seafood Enterprise, there was a common communication network by which Defendants shared information through interstate wire communications on a regular basis. (¶ 36, *supra*.). The Seafood Enterprise used this communication network for the purpose of facilitating, executing, and concealing their fraudulent scheme. (*Id.*)

98.     Each participant in the Seafood Enterprise had a systematic linkage to the other participants through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Seafood Enterprise, Defendants functioned as a continuing unit for at least a decade to further the criminal scheme and their common purpose of increasing revenue and profits.

99.     Defendants participated in the operation and management of the Seafood Enterprise by directing its affairs, as described herein. While Defendants participated in, and are members of, the Enterprise, they have a separate existence from the Enterprise, including individuals and distinct entities with different offices and roles, bank accounts, officers, directors, employees, and financial statements.

100.     Defendants worked closely together to further the Seafood Enterprise by and among the following manners and means:

a. Jointly conspiring to import, price, mislabel, market, and sell inexpensive Foreign Fish as high-priced premium fresh fish;

b. Misrepresenting (or causing such misrepresentations to be made) that the fish species were high-priced premium fresh fish;

c.   Omitting (or causing such omissions to be made) that the fish sold were from foreign countries and not from the Gulf;

d.   Concealing the true nature of the Foreign Fish from Plaintiff and the Class;

e.   Illegally mislabeling, marketing, and selling the Foreign Fish; and

f.   Unlawfully collecting revenue and profits from the sale of the Foreign Fish.

101.   To carry out the scheme to defraud, Defendants knowingly conducted and participated directly in the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c), by using wire and mail facilities, in violation of 18 U.S.C. §§ 1343 and 1341 (wire and mail fraud).

102.   Specifically, Defendants conspired to commit, committed, and/or aided and abetted in the commission of numerous predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1343 and 1341), the last of which occurred within ten years of the prior acts. The acts were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by Defendants' continues use of the facilities, services, and distribution channels of the Seafood Enterprise. Defendants knowingly and intentionally participated in the scheme to defraud by wire transmissions through interstate and/or foreign means and by use of private and/or commercial interstate carriers.

103.   Defendants devised and knowingly carried out the scheme and/or artifice to defraud Plaintiff and the Class to obtain money that was not rightfully theirs by using materially false and fraudulent pretenses, representations, and omissions of material facts.

104.   The Seafood Enterprise's use of interstate wire communications and private/commercial interstate carriers foreseeably caused and were in furtherance of the scheme in numerous ways, including:

a. Shipping, importing, delivery, and/or receipt of the Foreign Fish;

b. False and misleading communications to Plaintiff and Class;

c. Sales and marketing materials, including website advertising, product packaging, menus, and labeling; which omitted and concealed the true nature of the Foreign Fish;

d. Documents used to facilitate the sale of the Foreign Fish, including bills of lading, invoices, shipping records, reports, and correspondence;

e. Documents used to process and receive payment for the Foreign Fish from Plaintiff and the Class, including invoices, receipts, credit and debit card transactional documents, and bank documents;

f. Wire payments made to Defendants and deposits of proceeds from the scheme; and

g. Wire transactions and receipts of money from Plaintiff and the Class to Defendants.

105.    The interstate wire transmissions and use of private and/or commercial carriers, as described herein, were made in furtherance of Defendants' scheme and common course of conduct to deceive and fraudulently lure individuals into purchasing the Foreign Fish.

106.    Defendants engaged in a pattern of related and continuous predicate acts for at least a decade. The predicate acts constitute various unlawful acts, each conducted with the common purpose of unlawfully obtaining significant money from Plaintiff and the Class. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were interrelated, and not isolated events, in that they targeted Plaintiff and the Classes' funds and avoided the expenses associated with selling high-priced premium fresh fish.

107.    As a direct and proximate result of Defendants' racketeering scheme, Plaintiff and the Class suffered actual monetary damages.

108.    Other dates regarding certain predicate acts are concealed from Plaintiff and the Class at this time and cannot be alleged without access to Defendants' books and records.

109.    In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Defendants participated in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenue and profits for the Seafood Enterprise through a common course of conduct.

110.    Defendants knowingly, willfully, and unlawfully combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). (¶¶ 23–51, *supra*.).

111.    To achieve their common goals, Defendants actively and intentionally concealed from the general public and federal authorities the conspiracy.

112.    Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and collectively participated in the common course of conduct to commit acts of fraud by importing, mislabeling, marketing, and selling the Foreign Fish.

113.    For the conspiracy to succeed, each Defendant had to agree to implement and use similar devices and fraudulent tactics—specifically, secrecy about the conspiracy and its activities.

114.    Defendants knew and intended that Plaintiff and the Class would incur damages as a result of the conspiracy by purchasing foreign fish that would otherwise have not been marketable.

115.    Plaintiff and the Class were damaged by Defendants' 1962(d) conspiracy to violate 1962(c) and were systematically victimized by Defendants' long-term unlawful conduct.

116.    By reason of and as a result of the Seafood Enterprise's conduct, Plaintiff and the Class have been injured, including but not limited to:

    a.    All payments made for the Foreign Fish, as Plaintiff and the Class would not have paid for the Foreign Fish at the time of purchase had Defendants disclosed the true nature of the fish and the criminal scheme. Alternatively, the significant overpayment for the Foreign Fish at the time of purchase.

b. Plaintiff and the Class have been wrongfully deprived of their property in that deliberate misrepresentations, omissions, and concealment caused them to pay for the Foreign Fish, or at a minimum, pay artificially inflated prices for the Foreign Fish.

117. Defendants' violations of 18 U.S.C. § 1962(c) & (d) have directly and proximately caused damages to Plaintiff and the Class, and as such, are entitled to bring this action for three times their actual damages, reasonable attorney's fees, and costs, all pursuant to 18 U.S.C. § 1964(c).

**COUNT II**
**COMMON LAW FRAUD**

118. Plaintiff incorporates by reference all allegations in Paragraphs 1 through 117 as if fully set forth herein.

119. Plaintiff brings this Count on behalf of the Class against all Defendants.

120. QPS, Gunkel, Rosetti, Mary Mahoney's, and Cvitanovich agreed to, and did participate in, a common scheme to defraud Plaintiff and the Class. Defendants intended to deceive Plaintiff and the Class by fraudulently importing, pricing, mislabeling, marketing, and selling inexpensive Foreign Fish as high-priced premium fresh fish.

121. Defendants concealed, or misrepresented by omission, the existence of the underlying conspiracy.

122. Beginning no later than 2012, and continuing through November 2019, Defendants agreed to participate in the fraudulent scheme and conspiracy to import, price, mislabel, market, and sell Foreign Fish to unlawfully obtain money from Plaintiff and the Class, and in fact did import, price, mislabel, market, and sell at least 58,750 pounds (over 29 tons) of Foreign Fish to Plaintiff and the Class.

123.     Plaintiff and the Class were unaware of the fraud and conspiracy, and Defendants anticipated and knew that Plaintiff and the Class were unaware of the fraud and conspiracy.

124.     As a direct and proximate result of Defendants' fraudulent acts, Plaintiff and the Class have been harmed and have suffered damages, for which demand is made.

## COUNT III
## CIVIL CONSPIRACY

125.     Plaintiff incorporates by reference all allegations in Paragraphs 1 through 124 as if fully set forth herein.

126.     Plaintiff brings this Count on behalf of the Class against all Defendants.

127.     Under Mississippi law, a civil conspiracy occurs when two or more persons combine and commit overt acts to accomplish a purpose that is unlawful or to accomplish a lawful purpose unlawfully which gives rise to damages therefrom.

128.     Defendants' actions constitute a combination or conspiracy of entities to accomplish an unlawful purpose, or to accomplish a lawful purpose unlawfully.

129.     As set forth herein, Defendants committed unlawful acts against Plaintiff and the Class, including acts of racketeering, fraud, and aiding and abetting fraud.

130.     Defendants intentionally participated in a plan and purpose to obtain money from Plaintiff and the Class.

131.     As a direct and proximate result of Defendants' conspiracy and the overt acts committed in furtherance of the conspiracy, Plaintiff and the Class have been harmed and have suffered damages, for which demand is made.

## COUNT IV
## UNJUST ENRICHMENT

132.     Plaintiff incorporates by reference all allegations in Paragraphs 1 through 131 as if fully set forth herein.

133.    Plaintiff brings this Count on behalf of the Class against all Defendants.

134.    Under Mississippi law, unjust enrichment can be found when a party is in possession of money which in good conscience and justice he should not retain, but should deliver to another and the court imposes a duty to refund the money to whom in good conscience it ought to belong.

135.    Defendants willfully, intentionally, and wrongfully retained unjust benefits from Plaintiff and the Class during the scheme used to unlawfully import, price, mislabel, market, and sell millions of dollars of Foreign Fish to Plaintiff and the Class, and therefore, secured and retained a financial windfall.

136.    It is inequitable, unconscionable, and unjust for Defendants to retain these benefits.

137.    Defendants knowingly accepted these unjust benefits.

138.    Accordingly, Defendants should not be permitted to retain the proceeds from the benefits conferred upon them by Plaintiff and the Class. Thus, Plaintiff and the Class seek disgorgement of all ill-gotten funds Defendants received as a result of the unlawful scheme in an amount to be determined at trial.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the putative class, seeks judgment against Defendants, jointly and severally, as follows:

a.  For an order certifying the Class, naming Plaintiff as representative of the Class, and appointing Plaintiff's counsel as class counsel;

b.  For an order declaring Defendants' conduct in violation of the statutes and laws asserted herein;

c.  For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

d.  For actual, statutory, treble, and/or punitive damages;

e.   For and order of restitution against Defendants for all monies paid by Plaintiff and the Class for all Foreign Fish, or alternatively, for their substantial overpayment.

f.   For an order of disgorgement against Defendants in an amount to be determined at trial;

g.   For pre- and post-judgment interest on all amounts awarded;

h.   For an order awarding Plaintiff and the Class reasonable attorney's fees, costs, and expert fees; and

i.   For such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

139.   Pursuant to Fed. R. Civ. P. 38(b), Plaintiff and the Class, hereby demand a jury trial for all claims so triable.

Dated: September 30, 2024.                    Respectfully submitted,

*/s/ W. Bobby Gill, III*
W. Bobby Gill, III, MSB No. 9857
James M. Priest, Jr., MSB No. 99352
**GILL, LADNER & PRIEST, PLLC**
344 Highway 51, Second Floor
Ridgeland, MS 39157
Telephone: (601) 352-5700
bobby@glplawfirm.com
jamie@glplawfirm.com

Gerald M. Abdalla, Jr., MSB No. 101213
**ABDALLA LAW, PLLC**
602 Steed Road, Suite 200
Ridgeland, MS 39157
Telephone: (601) 278-6055
jerry@abdalla-law.com

Joey D. Dumas (*pro hac vice*)
**DUMAS LAW FIRM, LLC**
P.O. Box 3046
Mobile, AL 36652
Telephone: (251) 222-6669
joey@joeydumaslaw.com

*Counsel for Plaintiff and the putative class*