## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

|  |  |
|---|---|
| TODD MCCAIN, individually and on behalf of all others similarly situated,<br><br>        *Plaintiff,*<br><br>    v.<br><br>MARY MAHONEY'S, INC. d/b/a MARY MAHONEY'S OLD FRENCH HOUSE, ANTHONY C. CVITANOVICH, QUALITY POULTRY & SEAFOOD, INC., JAMES W. GUNKEL, TODD A. ROSETTI, and DOE DEFENDANTS 1–10,<br><br>        *Defendants.* | Case No.: <u>1:24-cv-241-LG-BWR</u><br><br>**[PROPOSED] SECOND AMENDED CLASS COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Todd McCain (hereinafter "Plaintiff"), by and through undersigned counsel, brings this action on behalf of himself and all others similarly situated against Mary Mahoney's, Inc. d/b/a Mary Mahoney's Old French House ("Mary Mahoney's"), Anthony C. Cvitanovich ("Cvitanovich"), Quality Poultry & Seafood, Inc. ("QPS"), James W. Gunkel ("Gunkel"), Todd A. Rosetti ("Rosetti"), and Doe Defendants 1–10 (collectively, "Defendants"), based upon personal knowledge as to himself and his own acts, publicly available records, and information and belief, and alleges as follows:

### I. NATURE OF ACTION

1. This action arises from a conspiracy and scheme perpetrated by Defendants which targeted and financially defrauded tens of thousands of individuals who ordered and paid higher prices customary for authentic snapper at Mary Mahoney's. Instead, Plaintiff and the putative class received inexpensive and inferior African perch, Suriname tripletail, and Indian unicorn filefish (collectively, the "Foreign Fish").



2.    The scheme, as summarized by Department of Justice attorney Jeremy F. Korzenik, "involves a financial fraud ... [t]he subject, of course, is seafood ... the purpose was profits." *See* Cvitanovich Sentencing Tr., Case No. 24-cr-00046, Dkt. No. 24 at 7:9–11, attached hereto as **Exhibit A**.

3.    Beginning on January 1, 2016, and continuing repetitiously and regularly through November 18, 2019 (hereinafter, the "Class Period"), QPS, the largest seafood wholesaler on the Mississippi Gulf Coast, James Gunkel, QPS's business manager, and Todd Rosetti, QPS's sales manager, knowingly and actively participated in a scheme with Mary Mahoney's, a prominent Mississippi Gulf Coast restaurant, and its co-owner/manager Anthony Cvitanovich, wherein Defendants collectively imported, mislabeled, and sold approximately 55,500 entrees to Plaintiff and the putative class at higher prices customary for authentic snapper, when in fact, each entree was instead inexpensive Foreign Fish.[1]

4.    When discussing the mislabeling that occurred during the Class Period, U.S. District Judge Halil S. Ozerden described the conduct as "repetitious," "regular," and "similar." *Id.* at 20:1–2.

5.    During the Class Period, Mary Mahoney's and Cvitanovich focused on fraudulently substituting Foreign Fish in two specific entrees that were priced accordingly as authentic local snapper (collectively, the "Snapper Entrees").[2]

---

[1] *See* Cvitanovich Sentencing Tr. at 14:21–24 ("[D]uring that period from 2016 to 2019, roughly 55,500 lunch or dinner entrees were sold that were misbranded at a time when Mr. Cvitanovich was solely responsible for purchasing the fish.").

[2] During the Class Period, Mary Mahoney's was only open six days a week, never on Sundays or holidays. Moreover, Mary Mahoney's offered numerous other entree options for sale that were not part of the scheme. These included Baked Stuffed Shrimp, Stuffed Flounder, Stuffed Catfish, Shrimp & Crab Au Gratin, Grilled Tuna, Broiled or Fried Trout, Broiled Salmon, Broiled Whole Bone-In Flounder, Fried Soft Shell Crab Almondine, Fried Chicken Breast Almondine, Grilled Chicken Breast, Back Room Crab Cakes, Fried Shrimp, Fried Oysters, Crawfish Etouffee, Prime Rib of Beef Aujus, Shrimp & Lump Crabmeat Melba,

6.    During the Class Period, Mary Mahoney's and Cvitanovich received approximately 55,500 total orders for the Snapper Entrees from Plaintiff and the putative class.[3]

7.    Of the 55,500 Snapper Entrees ordered and sold during the Class Period, for which Plaintiff and the putative class paid an accordingly higher price, the overwhelming majority—if not all—were substituted with inexpensive Foreign Fish.[4]

8.    The Foreign Fish were not as marketable pricewise; as they were inferior and accordingly much less expensive in comparison to authentic snapper. Hence, the reason Defendants concealed the scheme.

9.    Plaintiff and the putative class suffered financial losses equal to the difference between what Mary Mahoney's paid QPS for the Foreign Fish and the actual price Mary Mahoney's would have paid for authentic snapper during the Class Period.

---

Shrimp & Lobster Georgo, and Veal Antonio. Taking into consideration the numerous other entree options that customers purchased during the Class Period, it is plausible to infer that the 55,500 Snapper Entrees sold by Mary Mahoney's were the overall total number of Snapper Entrees ordered between January 1, 2016 and November 18, 2019.

[3] *Id.* at 10-15 (the Court and Cvitanovich's attorney discuss an objection to a potential sentencing enhancement regarding the number of victims of the scheme). There, the Court states that "during that period from 2016 to 2019, roughly 55,500 lunch or dinner entrees were sold that were misbranded at a time when Mr. Cvitanovich was solely responsible for purchasing the fish. And I think the argument in the objection is, well, **in the corresponding time after the menu changed, another 50,000 people bought the same dishes.**" *Id.* at 14:21–25, 15:1 (emphasis added). If, for example, 65,000 Snapper Entrees had been sold between 2016 and 2019, this objection could not have been made by Cvitanovich's attorney. Thus, it is plausible to infer that during the Class Period a total of 55,500 Snapper Entrees were ordered and sold by Mary Mahoney's.

[4] *Id.* at 14:21–24 ("[D]uring that period from 2016 to 2019, roughly 55,500 lunch or dinner entrees were sold that were misbranded ...."); *see also* Cvitanovich Plea Tr., Case No. 24-cr-00046, Dkt. No. 16 at 32:12–19, attached hereto as **Exhibit B** ("At that time, if not before, Mr. Cvitanovich was made aware, by the statements of his supplier, the labels on the boxes of frozen fish Mahoney's received, the prices he negotiated, and the invoices he paid, that most of the fish he ordered from his restaurant's primary supplier, primary wholesaler, was not the local species that Mahoney's advertised and identified on its menu.").

10.    On May 30, 2024, the scheme was revealed to the public when the U.S. Attorney for the Southern District of Mississippi, Todd W. Gee, announced criminal charges and guilty pleas by Mary Mahoney's and Cvitanovich and stated that "[m]islabeling food and defrauding customers are serious crimes, and this case will help convince restaurants and seafood suppliers that it is not worth lying to customers about what is on the menu." *See* Press Release, attached hereto as **Exhibit C**.

11.    Special Agent in Charge Justin Fielder, with the Food and Drug Administration's ("FDA") Office of Criminal Investigations, emphasized that the FDA will "continue to investigate and bring to justice those who put profits above public health." *Id.*

12.    On August 27, 2024, the U.S. Attorney for the Southern District of Mississippi revealed similar criminal charges and guilty pleas by QPS, Gunkel, and Rosetti for their participation in the scheme. *See* Press Release, **Exhibit D**.

13.    Assistant Attorney General Todd Kim, with the Department of Justice, stated that QPS and company officials caused the market to be "unfairly flooded with less expensive fish, frozen and imported from overseas." *Id.*

14.    Defendants' collective actions and common course of conduct consisted of numerous predicate and overt acts in furtherance of the scheme, including wire and mail fraud— all used to execute the scheme which targeted and directly caused monetary injury to Plaintiff and the putative class while bringing about financial gains for themselves.

15.    Plaintiff and the putative class now bring this action against Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and seek monetary damages, treble damages, attorney's fees, and costs.

## II.    PARTIES

### A.    Plaintiff.

16.    Plaintiff TODD MCCAIN is and was at all relevant times a resident of Alabama. Within the Class Period, on December 28, 2016, and August 21, 2018, Plaintiff travelled across state lines to Mary Mahoney's where he twice ordered a Snapper Entree. Based on Defendants' widespread, regular, and repetitious scheme—and like the overwhelming majority, if not all, of the individuals who ordered Snapper Entrees during the Class Period, he too received inexpensive Foreign Fish. Accordingly, Plaintiff paid a price customary for authentic snapper, when in fact, he received inexpensive Foreign Fish.

### B.    Defendants.

17.    Defendant QUALITY POULTRY & SEAFOOD, INC. is and was at all relevant times a Mississippi corporation with its headquarters and principal place of business located at 895 Division Street, Biloxi, Mississippi 39530. During the Class Period, QPS imported and supplied the Foreign Fish used by Mary Mahoney's and Cvitanovich to defraud Plaintiff and the putative class.

18.    Defendant JAMES W. GUNKEL is and was at all relevant times QPS's business manager and a certified public accountant, overseeing all of QPS's business operations and reported directly to QPS's owners. During the Class Period, Gunkel controlled QPS's purchases of the Foreign Fish from its foreign suppliers, instructed employees on how to label the Foreign Fish, and set the prices that QPS charged Mary Mahoney's for the Foreign Fish. Gunkel can be served at 6825 Corto Road, Ocean Springs, Mississippi 39564.

19.    Defendant TODD A. ROSETTI is and was at all relevant times QPS's sales manager and one of QPS's owners. During the Class Period, Rosetti supervised QPS's sales staff,

participated in setting prices at which QPS would sell the Foreign Fish, and was responsible for selling the Foreign Fish to Mary Mahoney's. In furtherance of the scheme, Rosetti provided Cvitanovich with several different foreign fish species which Cvitanovich used to determine which fish could best be used to defraud Plaintiff and the putative class. Rosetti can be served at 3609 Point Clear Drive, Ocean Springs, Mississippi 39564.

20.    Defendant MARY MAHONEY'S, INC. is and was at all relevant times a Mississippi corporation with its headquarters and principal place of business located at 116 Rue Magnolia Street, Biloxi, Mississippi 39530. Mary Mahoney's does business as Mary Mahoney's Old French House. During the Class Period it sold approximately 55,500 fraudulent entrees as authentic snapper during the Class Period. Mary Mahoney's is actively managed by its directors and officers: Robert F. Mahoney, Jr., Eileen Mahoney Ezell, and Andrea Cvitanovich Osman.

21.    Defendant ANTHONY C. CVITANOVICH is and was at all relevant times the co-owner and manager of Mary Mahoney's. During the Class Period, Cvitanovich knowingly purchased the Foreign Fish from QPS that Mary Mahoney's priced accordingly and sold as authentic snapper. Cvitanovich is the registered agent for Mary Mahoney's and can be served at 116 Rue Magnolia Street, Biloxi, Mississippi 39530.

22.    Doe Defendants 1–10 are individuals, owners, executives, officers, directors, corporations, limited liability companies, partnerships and/or other entities that participated in the racketeering scheme. Pursuant to Fed. R. Civ. P. 15, Plaintiff reserves the right to seek leave of the Court to add additional Doe Defendants.

### III.    JURISDICTION AND VENUE

23.    This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as Plaintiff's claims arise under 18 U.S.C. § 1964(c), and allege violations of RICO, 18 U.S.C. § 1962.

24.    This Court has personal jurisdiction over Defendants as they are authorized to conduct business in Mississippi; have transacted business, maintained substantial contacts, and/or committed predicate acts in furtherance of the scheme in this District; and the scheme was directed at, and has had the intended effect of causing monetary injury to persons residing in or located in this District.

25.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), (d), and 18 U.S.C. § 1965. Defendants reside, are found, regularly conduct and transact business, committed predicate and overt acts in furtherance of the scheme, and/or have agents in this District. A portion of the events giving rise to Plaintiff's claims occurred in this District, namely importing, mislabeling, and fraudulently selling Foreign Fish as authentic snapper, which caused actual monetary injury to individuals residing in this District.

### IV.    FACTUAL ALLEGATIONS

**A.    The Purpose of Defendants' Scheme.**

26.    During the Class Period, Defendants collectively and consensually entered into and participated in a scheme, with the sole objective and purpose of profiting, by importing, mislabeling, and selling approximately 55,500 entrees to Plaintiff and the putative class at higher prices customary for authentic snapper, when in fact, each entree was fraudulently substituted with inexpensive Foreign Fish.

27.     Mary Mahoney's and Cvitanovich directly profited from the sale of the Foreign Fish at prices customary for authentic snapper at the expense of Plaintiff and the putative class. Plaintiff and the putative class accordingly paid a significantly higher price for authentic snapper.[5]

28.     The scheme directly and foreseeably caused Plaintiff and the putative class to overpay for the Foreign Fish, as they were necessary for the scheme to profit.

29.     Accordingly, Plaintiff and the putative class have suffered ascertainable monetary damages based on Defendants' collective actions.

**B.     Defendants' Manner and Means of Carrying Out the Scheme.**

30.     To carry out the scheme, QPS, Gunkel, Rosetti, Mary Mahoney's, and Cvitanovich collectively and knowingly entered into a continuous and ongoing unlawful agreement during the Class Period, using predicate acts, for the purpose of purchasing and importing the Foreign Fish into the United States, and then mislabeling and selling the Foreign Fish as high-priced authentic snapper to Plaintiff and the putative class.

31.     Defendants did not undertake the practices described herein in isolation, but as part of a widespread scheme that was continuous, repetitious, and regular during the Class Period.[6]

32.     The scheme was successful because it functioned as an organized unit with continuity of structure, personnel, and a shared purpose that directly and foreseeably targeted Plaintiff and the putative class as its victims.

33.     From an organizational standpoint, each Defendant played a distinct and indispensable role in the scheme. During the Class Period, the Foreign Fish were purchased by

---

[5] QPS profited from the scheme by selling the Foreign Fish to Mary Mahoney's. Gunkel and Rosetti profited from the scheme because "[t]hey made bonuses [based on] the profits that the company was making." *See* Rosetti Sentencing Tr., Case No. 24-cr-00090, Dkt. No. 19 at 8:13–14, attached hereto as **Exhibit E.**
[6] *See* ¶ 4, *supra.*

QPS's business manager (Gunkel), imported by QPS, mislabeled by QPS's sales manager (Rosetti), and sold by Mary Mahoney's and Cvitanovich to Plaintiff and the putative class at prices customary for authentic snapper.

34.     QPS, Gunkel, and Rosetti were only able to purchase and import the unmarketable Foreign Fish because they knew their co-conspirators, Mary Mahoney's and Cvitanovich, would sell the Foreign Fish to Plaintiff and the putative class. Each Defendant knew full well the fish were neither local nor authentic snapper.

35.     During the Class Period, Plaintiff and the putative class ordered and paid for approximately 55,500 Snapper Entrees. Of those 55,500 entrees, the overwhelming majority—if not all—were substituted with Foreign Fish by Mary Mahoney's and Cvitanovich.

36.     Based on Defendants' continuous activities, relationships, and structure, each directly profited and derived significant income from the scheme, while the actual monetary losses to Plaintiff and the putative class were the but-for cause and proximately caused by the scheme. Not surprisingly, the fraud led directly and foreseeably to its intended victims, Plaintiff and the putative class.

37.     The scheme was successful and financially benefited Mary Mahoney's and Cvitanovich from the sale of the Foreign Fish at prices that were customary for authentic local snapper. The Foreign Fish were not as marketable pricewise; as they were inferior and accordingly much less expensive in comparison to authentic snapper.

C.    **Defendants' Racketeering Activities Related to all RICO Claims.**

38.     With the intent to defraud, Mary Mahoney's and QPS knowingly made use of numerous interstate wire communications to organize and execute the scheme, in violation of 18 U.S.C. § 1343. Mary Mahoney's and QPS have pleaded guilty to using interstate wire

transmissions to facilitate the fraud in violation of 18 U.S.C. § 1343. *See* Mary Mahoney's and QPS's Plea Agreements ¶ 1, Exhibits G & L.

39.    With the intent to defraud, QPS, Gunkel, Rosetti, Mary Mahoney's, and Cvitanovich caused the Foreign Fish to be deposited, delivered, and/or received—via private and/or commercial interstate carrier—in violation of 18 U.S.C. § 1341. *See* Cvitanovich Plea Tr. at 32:23–25, 33:1–2, Exhibit B.

40.    Defendants wide-ranging scheme or artifice to defraud used interstate wire communications to knowingly and willfully organize, execute, and facilitate the scheme, in violation of 18 U.S.C. § 1343, including:

a. In an April 16, 2018 email, Gunkel (QPS's business manager), sent the following instructions to Rosetti (QPS's sales manager), along with other members of QPS's sales staff: "I don't understand why we are giving [African] Perch away. This is a replacement for the triple tail which were selling at $8.99 and $9.99. Now we are selling perch at $5.69 if we can't get at least $6.99 or $7.99 then it's not worth bringing it in here. This is a product that no one else has and it is versatile. Raise the price and make money where we can make money!"

b. On September 19, 2018, while an authorized federal search of QPS's premises was underway, Cvitanovich (Mary Mahoney's co-owner/manager), sent an electronic text message to Rosetti (QPS's sales manager), ordering imported frozen African perch, which Mary Mahoney's regularly mislabeled and sold to customers as local Mississippi Gulf Coast snapper.

c. On September 19, 2018, Rosetti (QPS's sales manager) replied to Cvitanovich's text order for African perch, with the following text: "Tomorrow[,] FDA here today." Cvitanovich (Mary Mahoney's co-owner/manager) responded, "Ok."

d. On September 27, 2018, eight days after the FDA's search of QPS's premises, in a text to Rosetti (QPS's sales manager), Cvitanovich ordered 150 pounds of African perch in order to sell it to customers of Mary Mahoney's as snapper.

e. On October 18, 2018, about a month after the FDA's search of QPS's premises, in a text to Rosetti (QPS's sales manager), Cvitanovich ordered 60 pounds of African perch to sale as snapper to customers of Mary Mahoney's.

f. In an October 18, 2018 text, after Rosetti (QPS's sales manager) informed Cvitanovich (Mary Mahoney's co-owner/manager) that QPS was unlikely to obtain

more African perch, by stating that "Perch about to be nonexistent," Cvitanovich instructed him to "Get all they have."

g.  In a February 21, 2019 text, Rosetti (QPS's sales manager), told Cvitanovich that "We have 110 cases of perch left when that is gone there is no more. FYI we are looking for alternatives. Unicorn, triple tail and parrot fish are always good alternatives."

h.  In a responsive text on February 21, 2019, Cvitanovich (Mary Mahoney's co-owner/manager) told Rosetti (QPS's sales manager) not to sell the remaining cases of African perch to any other customers, stating that "I will buy them." Rosetti responded, "You come bring a check and I will set it aside for you."

i.  Throughout the Class Period, Mary Mahoney's directly obtained thousands of payments through interstate wire transmissions generated by credit card sales for the fraudulently mislabeled Foreign Fish.

j.  Throughout the Class Period, Mary Mahoney's fraudulently marketed authentic snapper on its menu and through several interstate wire and electronic communications, which were hosted outside of Mississippi, including the website Yelp®.[7]

k.  Throughout the Class Period, Mary Mahoney's fraudulently marketed on the websites OpenTable® and Tripadvisor®, which were hosted outside of Mississippi, that it specialized in "locally sourced seafood."[8]

l.  Throughout the Class Period, Mary Mahoney's menu was posted on the publicly-accessible website, www.marymahoney.com, which was hosted outside of Mississippi, where Mary Mahoney's marketed authentic snapper, which Mary Mahoney's and Cvitanovich substituted with inexpensive Foreign Fish.

**D.    Defendants' Efforts to Unlawfully Conceal the Scheme.**

41.    Defendants concealed the scheme through lies and material omissions, including when being questioned by federal agents, where:

a.  Gunkel falsely told federal agents that if anyone in QPS's retail market was labeling a fish with a name other than its true name, it was done without his approval and without his knowledge;

---

[7] Yelp®, https://www.yelp.com/ (last visited July 5, 2024).

[8] OpenTable®, https://www.opentable.com/r/mary-mahoneys-old-french-house-biloxi ("locally sourced seafood") (last visited July 5, 2024); Tripadvisor®, https://www.tripadvisor.com/Restaurant_Review-g43686-d2023580-Reviews-Mary_Mahoney_s_Old_French_House-Biloxi_Mississippi.html (same) (last visited July 5, 2024).

b. Gunkel falsely told federal agents that QPS does not ship any fish outside of the State of Mississippi;

c. Gunkel falsely told federal agents that QPS had, in the past, sold fish to Mary Mahoney's restaurant in Biloxi, Mississippi, but not much anymore;

d. Gunkel falsely told federal agents that he was not aware of any restaurant customer mislabeling and selling fish bought from QPS as something other than what it was, such as selling a cheap fish as an expensive one; and

e. Rosetti falsely told federal agents that any mislabeling of fish by QPS was inadvertent and he did not know of any mislabeling of fish by the restaurants to which QPS sold seafood.

**E.    Federal Criminal Charges and Guilty Pleas.**

### *United States v. Mary Mahoney's* (Case No. 1:24-cr-45-HSO-RPM)

42.    On April 26, 2024, the U.S. Attorney for the Southern District of Mississippi criminally charged Mary Mahoney's for its participation in the scheme. *See* Criminal Info., attached hereto as **Exhibit F**.

43.    On May 30, 2024, Mary Mahoney's, through unanimous consent of its board of directors, pleaded guilty to felony charges for participating in the 18 U.S.C. § 371 conspiracy to defraud individuals by marketing mislabeled seafood in violation of 21 U.S.C. §§ 331(k) and 333(a)(2), and in using interstate wire transmissions to facilitate the fraud in violation of 18 U.S.C. § 1343. *See* Plea Agreement, attached hereto as **Exhibit G**; Consent Agreement, attached hereto as **Exhibit H**.

### *United States v. Anthony C. Cvitanovich* (Case No. 1:24-cr-46-HSO-BWR)

44.    On April 26, 2024, the U.S. Attorney for the Southern District of Mississippi criminally charged Cvitanovich for his participation in the scheme. *See* Criminal Info., attached hereto as **Exhibit I**.

45.     On May 30, 2024, Cvitanovich pleaded guilty to felony charges related to the scheme for mislabeling inexpensive imported seafood as local premium species to profit from its fraudulent sale in violation of 21 U.S.C. §§ 331(k) and 333(a)(2). *See* Plea Agreement, **Exhibit J**.

### *United States v. QPS* (Case No. 1:24-cr-89-HSO-RPM)

46.     On July 31, 2024, the U.S. Attorney for the Southern District of Mississippi criminally charged QPS for its participation in the scheme. *See* Criminal Info., attached hereto as **Exhibit K**.

47.     On August 27, 2024, QPS pleaded guilty to felony charges for participating in the 18 U.S.C. § 371 conspiracy to defraud individuals by marketing mislabeled seafood in violation of 21 U.S.C. §§ 331(k) and 333(a)(2), and in using interstate wire transmissions to facilitate the fraud in violation of 18 U.S.C. § 1343. *See* Plea Agreement, attached hereto as **Exhibit L**.

### *United States v. James W. Gunkel* (Case No. 1:24-cr-88-HSO-RPM)

48.     On July 31, 2024, the U.S. Attorney for the Southern District of Mississippi criminally charged Gunkel for his participation in the scheme. *See* Criminal Info., attached hereto as **Exhibit M**.

49.     On August 27, 2024, Gunkel pleaded guilty to charges related to the scheme for the misbranding of inexpensive imported seafood as local premium species in violation of 21 U.S.C. §§ 331(k) and 333(a)(1). *See* Plea Agreement, attached hereto as **Exhibit N**.

### *United States v. Todd A. Rosetti* (Case No. 1:24-cr-90-HSO-BWR)

50.     On July 31, 2024, the U.S. Attorney for the Southern District of Mississippi criminally charged Rosetti for his participation in the scheme. *See* Criminal Info., attached hereto as **Exhibit O**.

51.     On August 27, 2024, Rosetti pleaded guilty to charges related to the scheme for the misbranding of inexpensive imported seafood as local premium species in violation of 21 U.S.C. §§ 331(k) and 333(a)(1). *See* Plea Agreement, attached hereto as **Exhibit P**.

**F.     Harm to Plaintiff and the Putative Class.**

52.     Plaintiff and the putative class suffered ascertainable losses and actual damages proximately caused by and but-for Defendants' scheme.

53.     Plaintiff and the putative class were the direct and foreseeable victims of Defendants' scheme and paid an accordingly higher price charged by Mary Mahoney's for authentic snapper. Their damages are the direct and natural consequences of Defendants' actions.

54.     Plaintiff and the putative class suffered financial losses equal to the difference between what Mary Mahoney's paid QPS for the Foreign Fish and the actual price Mary Mahoney's would have paid for authentic snapper during the Class Period.

55.     At no time did Mary Mahoney's or Cvitanovich disclose to Plaintiff or the putative class that the fish species they were purchasing were anything other than authentic snapper.

56.     Defendants engaged in methods of deception to conceal the scheme. *See* ¶¶ 38-41, *supra.*

57.     Defendants pursued a common plan and course of conduct, acted in concert with, aided and abetted, and otherwise conspired with one another, in furtherance of the scheme to defraud Plaintiff and the putative class. Thus, Defendants are jointly and severally liable for all damages caused by the scheme.

58.     Accordingly, Plaintiff and the putative class have suffered monetary damages as a result of Defendants' unlawful scheme.

## V.    TOLLING OF THE STATUTES OF LIMITATION

59.    All statutes of limitation applicable to Plaintiff and the putative class are subject to tolling under the discovery rule and/or equitable estoppel due to Defendants' concealment, as alleged herein. Plaintiff and the putative class could not have discovered the scheme either prior to purchasing the Foreign Fish, or until after criminal charges were announced against Mary Mahoney's and Cvitanovich on May 30, 2024.

60.    Because Defendants committed fraud and participated in a criminal scheme, not only did they go to great lengths to conceal the fraud, but the fraud itself was self-concealing.

61.    **Discovery Rule Tolling:** Plaintiff did not discover until after May 30, 2024, and could not have discovered otherwise, about the scheme, which constitutes a cognizable injury. Thus, all applicable statutes of limitation have been tolled by operation of the discovery rule.

62.    **Estoppel:** Defendants were each under a continuous duty to disclose the fraudulent scheme to Plaintiff and the putative class. Defendants knowingly and actively concealed the scheme. Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

## VI.    CLASS ALLEGATIONS

63.    Plaintiff brings this action on behalf of himself and the putative class (the "Class"), pursuant to Fed. R. Civ. P. 23(a) and (b)(3), as representative of the Class defined as follows:

> All persons residing in the United States who ordered and paid for a mislabeled Snapper Entree at Mary Mahoney's between January 1, 2016, and November 18, 2019.

64.    Excluded from the Class are Defendants and their directors, officers, predecessors, successors, affiliates, agents, co-conspirators, and employees, as well as the immediate family

members of such persons; class counsel and their employees; and the Judge(s) to whom this case is assigned and his/her immediate family.

65.     Plaintiff reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time, or to propose subclasses, in response to facts learned through discovery, legal arguments, or otherwise.

66.     Certification of Plaintiff's claims for class treatment are appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

67.     Class members have suffered similar financial injury by reason of Defendants' scheme and course of conduct.

68.     **Numerosity—Fed. R. Civ. P. 23(a)(1)**. The Class is comprised of tens of thousands of individuals, the joinder of which in one action would be impracticable. While the exact number or identification of the Class is presently unknown, the identity of Class members is ascertainable and can be determined based on Mary Mahoney's books and records. Class members may be notified of the pendency of this action by Court-approved notice methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

69.     **Predominance of Common Questions—Fed. R. Civ. P. 23(a)(2) & 23(b)(3)**. The questions of law and fact common to the Class predominate over questions affecting only individual Class members, including, without limitation:

   a.   Whether each Defendant's conduct violated RICO;

   b.   Whether Defendants engaged in an association-in-fact enterprise under RICO;

   c.   Whether Defendants, through a RICO enterprise, committed predicate offenses of wire and mail fraud sufficient to ground a RICO claim;

    d.    Whether Defendants are liable to Plaintiff and the Class for damages flowing from Defendants' misconduct under RICO, and if so, in what amount;

    e.    Whether each Defendant participated in the fraudulent scheme and conspiracy;

    f.    Whether Plaintiff and the Class have sustained damages as a result of Defendants' conduct, and if so, what are the appropriate damages; and

    g.    Whether Defendants' conduct entitles Plaintiff and the Class to recover treble damages, attorney's fees, costs, and expenses.

70.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff and the Class. Identical statutory violations, fraudulent acts, and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.[9]

71.    **Typicality—Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of Class members because, among other things, all Class claims are based on the same underlying facts, events, and circumstances relating to Defendants' conduct and Class members were comparably injured through Defendants' wrongful conduct as described herein.

72.    **Adequacy—Fed. R. Civ. P. 23(a)(4); 23(g)(1).** Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interest incompatible with the interests of the Class, and has retained counsel competent and experienced in class action litigation. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

---

[9] The Supreme Court and Fifth Circuit have held that no reliance requirement exists for civil causes of action under RICO for victims of mail or wire fraud. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S.Ct. 2131, 2139-40 (2008); *see also Earl v. Boeing Co.*, 339 F.R.D. 391, 435 (E.D. Tex. 2021) (citing *Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009) ("'no reliance requirement exists for civil causes of action under RICO for victims of mail' or wire fraud."). As a result, the "the most straightforward way of demonstrating reliance in a classwide manner under the *Bridge* theory is by showing that the [p]laintiffs' losses were caused by reason of the [d]efendants' operation of a fraudulent scheme." *Earl*, 339 F.R.D. 435 (internal quotation marks omitted) (quoting *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 638 (5th Cir. 2016)).

73.    **Superiority—Fed. R. Civ. P. 23(b)(3)**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Such treatment will permit a large number of similarly situated and commonly affected Class members to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would give rise to.

74.    Because of the size of each individual Class member's claim, no Class member could afford to seek legal redress for the wrongs identified herein. Without the class action vehicle, the Class would have no reasonable remedy and would suffer losses. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

75.    Plaintiff does not anticipate any difficulty in the management of this litigation.

## VII.    CLAIMS FOR RELIEF

### COUNTS I & II

### VIOLATIONS OF RICO – 18 U.S.C. § 1962(c) & (d)

76.    Plaintiff incorporates by reference all allegations in Paragraphs 1 through 75 as if fully set forth herein.

77.    Plaintiff brings these Counts on behalf of himself and the Class against all Defendants.

78.    RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...." 18 U.S.C. § 1962(c).

79.     RICO also makes it "unlawful for any person to conspire to violate any of the provisions of [Section 1962]." 18 U.S.C. § 1962(d).

80.     RICO provides that: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]" 18 U.S.C. § 1964(c).

81.     Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

82.     Plaintiff and the Class are "person[s]" within the meaning of 18 U.S.C. § 1964(c).

83.     QPS, Gunkel, Rosetti, Mary Mahoney's, and Cvitanovich are liable under 18 U.S.C. § 1962(c) because each is a person who conducted and participated directly in the conduct of the affairs of an enterprise through a pattern of racketeering activity, which affected interstate and foreign commerce, and was the but-for and proximate cause of economic injuries to Plaintiff and the Class. *See* ¶¶ 1–14, 17–21, 26–51, *supra*.

84.     A RICO "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

85.     Defendants are individuals, corporations, and/or other legal entities that form the "association-in-fact" enterprise, hereinafter referred to as the "Foreign Fish Enterprise." The Foreign Fish Enterprise consisted of the following: (a) QPS; (b) Gunkel; (c) Rosetti; (d) Mary Mahoney's; and (e) Cvitanovich. The Foreign Fish Enterprise associated together in fact for the collective purpose of carrying out the scheme. *See* ¶¶ 30–40, *supra*.; *see also* Exhibits F–P.

86.     Through the Foreign Fish Enterprise, Defendants knowingly and willfully conducted a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

87. During the Class Period, through the Foreign Fish Enterprise, Defendants committed numerous acts of wire and mail fraud. *See* ¶¶ 38–40, *supra*. Mary Mahoney's and QPS have pleaded guilty to using interstate wire transmissions to facilitate the fraud in violation of 18 U.S.C. § 1343. *See* Mary Mahoney's and QPS's Plea Agreements ¶ 1, Exhibits G & L.

88. Mary Mahoney's fraudulently marketed authentic snapper on its menu that was publicly accessible through websites hosted on servers located outside of Mississippi. *See* ¶ 40(j)-(l), *supra.*

89. Mary Mahoney's directly obtained payments through interstate wire transmissions generated by credit card sales for the fraudulently mislabeled Foreign Fish. *See* ¶ 40(i), *supra.*; QPS Criminal Info. ¶ 95, Exhibit K.

90. In furtherance of the scheme to defraud, Defendants collectively used numerous acts of mail fraud by causing to be deposited, delivered, and/or received—via private and/or commercial interstate carrier—thousands of pounds of Foreign Fish, in violation of 18 U.S.C. § 1341. *See* ¶ 39, *supra*. The Foreign Fish were transported into and through the United States via commercial interstate carrier from Africa, Suriname, and India. *Id.*

91. From an organizational standpoint, QPS, Gunkel, and Rosetti participated in the Foreign Fish Enterprise by importing and mislabeling the Foreign Fish, knowing full well that Mary Mahoney's and Cvitanovich were selling the Foreign Fish to Plaintiff and the Class at prices customary for authentic snapper.

92. At all relevant times, the Foreign Fish Enterprise had an existence separate and distinct from each Defendant, was separate and distinct from the pattern of racketeering activity in which Defendants engaged, and was an ongoing organization consisting of legal entities and

individuals associated for the collective purpose of importing, mislabeling, and selling Foreign Fish through fraudulent means, all while deriving significant profits from these activities.

93.     Each member of the Foreign Fish Enterprise shared in the bounty generated by the enterprise—i.e., by sharing the benefits derived from increased sales revenue and substantial profits generated from the scheme. *See, e.g.*, Criminal Info. ¶ 4, Exhibit M ("[D]efendant GUNKEL generated higher proceeds for his customers [Mary Mahoney's], his employer [QPS], and himself than would have been obtained had the seafood QPS sold been accurately identified and sold at its true market value.")); Criminal Info. ¶ 2, Exhibit O ("[D]efendant ROSETTI generated higher proceeds for his customers [Mary Mahoney's], his employer [QPS], and himself than would have been obtained had the seafood he arranged to sell been accurately identified and sold at its true market value.").

94.     Through the Foreign Fish Enterprise, Defendants engaged in a pattern of racketeering activity, which involved a scheme to increase profits for each Defendant through the Enterprise's unlawful activities.

95.     The Foreign Fish Enterprise engaged in commercial activities, and these activities affected interstate and foreign commerce, as the scheme involved activities that crossed state and foreign boundaries, such as importing the Foreign Fish, and the receipt of money through credit card wire transactions from the sale of same during the Class Period. *See* ¶¶ 39, 40(i), *supra.*

96.     Within the Foreign Fish Enterprise, there was a common communication network by which Defendants shared information through interstate wire communications on a regular basis. *See* ¶ 40(a)-(h), *supra.* The Foreign Fish Enterprise used this communications network for the purpose of facilitating and executing the scheme. *Id.*

97.     Each participant in the Foreign Fish Enterprise had a systematic linkage to the other participants through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Foreign Fish Enterprise, Defendants functioned as a continuing unit during the Class Period to further the scheme and their common purpose of increasing profits.

98.     Defendants participated in the operation and management of the Foreign Fish Enterprise by directing its affairs, as described herein. While Defendants participated in, and were members of, the Enterprise, they have a separate existence from the Enterprise, including individuals and distinct entities with different offices and roles, bank accounts, officers, directors, employees, and financial statements.

99.     Defendants worked together closely to further the Foreign Fish Enterprise by and among the following manners and means:

     a.  Jointly conspiring to import and mislabel the Foreign Fish as high-priced authentic snapper;

     b.  Omitting (or causing such omissions to be made) that the fish sold were from foreign countries and not authentic local snapper;

     c.  Concealing the true nature of the fraud from Plaintiff and the Class;

     d.  Fraudulently pricing and selling the Foreign Fish as authentic snapper; and

     e.  Unlawfully collecting revenue and profits from the sale of the Foreign Fish.

100.    To carry out the scheme to defraud, Defendants knowingly conducted and participated directly in the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c), by using wire and mail facilities, in violation of 18 U.S.C. §§ 1343 and 1341.

101.    Specifically, Defendants conspired to commit, committed, and/or aided and abetted in the commission of numerous predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1343 and 1341), the last of which occurred within four years of the prior acts. The acts were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by Defendants continues use of the facilities, services, and distribution channels of the Foreign Fish Enterprise. Defendants knowingly and intentionally participated in the scheme to defraud by wire transmissions through interstate and/or foreign means and by use of private and/or commercial interstate carriers.

102.    Defendants devised and knowingly carried out the scheme and/or artifice to defraud Plaintiff and the Class to obtain money that was not rightfully theirs by using materially false and fraudulent pretenses and predicate acts.

103.    The Foreign Fish Enterprise's use of interstate wire communications and private/commercial interstate carriers foreseeably caused and were in furtherance of the scheme in numerous ways, including:

    a.    Importing and receiving the Foreign Fish by QPS, Gunkel, and Rosetti;

    b.    Documents used to facilitate the sale of the Foreign Fish, including bills of lading, invoices, shipping records, reports, and correspondence by QPS, Gunkel, Rosetti, Mary Mahoney's, and Cvitanovich;

    c.    Documents used to process and receive payment for the Foreign Fish from Plaintiff and the Class, including invoices, receipts, credit card transactional documents, and bank documents by Mary Mahoney's and Cvitanovich;

    d.    Wire payments made to and deposits of proceeds from the scheme by Mary Mahoney's and Cvitanovich; and

    e.    Wire transactions and receipts of money from Plaintiff and the Class to Mary Mahoney's.

104.    The interstate wire transmissions and use of private and/or commercial carriers, as described herein, were made in furtherance of the scheme to defraud.

105.    Defendants engaged in a pattern of related and continuous predicate acts during the Class Period. The predicate acts constitute various unlawful acts, each conducted with the common purpose of unlawfully obtaining money from Plaintiff and the Class. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were interrelated, and not isolated events, in that they targeted Plaintiff and the Classes' funds and avoided the expense associated with paying for authentic snapper.

106.    As a direct and proximate result of the scheme, Plaintiff and the Class suffered actual monetary damages as stated herein.

107.    Other dates regarding certain predicate acts are concealed from Plaintiff and the Class at this time and cannot be alleged without access to QPS and Mary Mahoney's books and records.

108.    In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Defendants participated in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenue and profits for the Foreign Fish Enterprise through a common course of conduct.

109.    Defendants knowingly, willfully, and unlawfully combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). *See* ¶¶ 1–9, 26–41, *supra*.

110.    To achieve their common goals, each Defendant actively and intentionally concealed the scheme from the public and authorities.

111.    Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and collectively participated in the common course of conduct to commit acts of fraud by importing, mislabeling, and selling the Foreign Fish at prices customary for authentic snapper.

112.    For the conspiracy to succeed, each Defendant had to agree to implement and use similar devices and tactics—specifically, secrecy about the conspiracy and its activities.

113.    Mary Mahoney's and Cvitanovich knew and intended that Plaintiff and the Class would incur damages as a result of the conspiracy by purchasing Foreign Fish priced accordingly as authentic snapper.

114.    Plaintiff and the Class were damaged by Defendants' 1962(d) conspiracy to violate 1962(c) and were systematically victimized by Defendants' unlawful conduct within the Class Period.

115.    As a direct result of the Foreign Fish Enterprise, Plaintiff and the Class suffered financial losses equal to the difference between what Mary Mahoney's paid QPS for the Foreign Fish and the actual price Mary Mahoney's would have paid for authentic snapper during the Class Period.

116.    Defendants' violations of 18 U.S.C. § 1962(c) & (d) have directly and proximately caused damages to Plaintiff and the Class, and as such, they are entitled to bring this action for three times their actual damages, reasonable attorney's fees, and costs, all pursuant to 18 U.S.C. § 1964(c).

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the putative class, seeks judgment against Defendants, jointly and severally, for the following:

      a.    An order certifying the Class, naming Plaintiff as class representative, and appointing Plaintiff's counsel as class counsel;

b. An order declaring that Defendants' scheme violated RICO;

c. An order finding in favor of Plaintiff and the Class on its RICO causes of action;

d. An order awarding actual and treble damages;

e. An order awarding pre- and post-judgment interest on all amounts awarded;

f. An order awarding Plaintiff and the Class reasonable attorney's fees, costs, and expenses; and

g. For such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

117.    Plaintiff and the Class demand a jury trial for all claims so triable.

Dated: _____, 2025.                    Respectfully submitted,

*/s/ W. Bobby Gill, III*
W. Bobby Gill, III, MSB No. 9857
James M. Priest, Jr., MSB No. 99352
**GILL, LADNER & PRIEST, PLLC**
344 Highway 51, Second Floor
Ridgeland, MS 39157
Telephone: (601) 352-5700
bobby@glplawfirm.com
jamie@glplawfirm.com

Gerald M. Abdalla, Jr., MSB No. 101213
**ABDALLA LAW, PLLC**
602 Steed Road, Suite 200
Ridgeland, MS 39157
Telephone: (601) 278-6055
jerry@abdalla-law.com

Joey D. Dumas (*pro hac vice*)
**DUMAS LAW FIRM, LLC**
P.O. Box 3046
Mobile, AL 36652
Telephone: (251) 222-6669
joey@joeydumaslaw.com

*Counsel for Plaintiff and the putative class*

1          UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF MISSISSIPPI
2               SOUTHERN DIVISION

3

4

   UNITED STATES OF AMERICA                    PLAINTIFF
5
   V.                        CRIMINAL ACTION NO: 1:24cr46
6
   ANTHONY CHARLES CVITANOVICH                 DEFENDANT
7

8

9   _____

10            TRANSCRIPT OF SENTENCING

11     BEFORE HONORABLE HALIL S. OZERDEN
         UNITED STATES DISTRICT JUDGE

12            NOVEMBER 18, 2024

13    DAN M. RUSSELL, JR., UNITED STATES COURTHOUSE
            GULFPORT, MISSISSIPPI

14  _____

15

16

17

18

19

20            COURT REPORTER:

21        Kati Vogt, RPR, RMR, RDR, CRR
             Official Court Reporter
22  U.S. District Court, Southern District of Mississippi
            2012 15th Street, Suite 403
23         Gulfport, Mississippi  39501
              (228) 563-1780
24         kati_vogt@mssd.uscourts.gov

25

PLAINTIFF'S
EXHIBIT
1.A

1                    **A P P E A R A N C E S**

2

3

4    REPRESENTING THE GOVERNMENT:

5         ANDREA JONES, ESQ.
          Office of the United States Attorney
6         1575 20th Avenue
          Gulfport, Mississippi  39501
7
          JEREMY F. KORZENIK, ESQ.
8         U.S. Department of Justice
          Environmental Crimes Section
9         150 M. Street, NE
          Room 4.208
10        Washington, DC  20002

11

12

13   REPRESENTING THE DEFENDANT:

14        TIM C. HOLLEMAN, ESQ.
          Boyce Holleman and Associates, P.A.
15        1720 23rd Avenue
          Gulfport, Mississippi  39501
16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Please be seated.  All right.  We're here

2     this morning in Case Number 1:24CR46, United States versus

3     Anthony Charles Cvitanovich, scheduled for sentencing.

4          Would counsel please enter their appearances for the

5     record.

6          MS. JONES:  Your Honor, Andrea Jones for the United

7     States, and co-counsel Jeremy Korzenik for Environmental

8     Crimes and Natural Resources Division at Main Justice.  The

9     government's ready to proceed, Your Honor.

10          THE COURT:  All right.  Good morning.

11          MR. HOLLEMAN:  Tim Holleman for Mr. Cvitanovich, Your

12     Honor.  We're ready to proceed.

13          THE COURT:  All right.  Good morning, Mr. Holleman.

14     For the record, is your client present and in the courtroom?

15          MR. HOLLEMAN:  Yes, he is, Your Honor.

16          THE COURT:  All right.  For the record, I have to

17     ask, Ms. Jones, pursuant to the Crime Victims Rights Act, are

18     there any victims of this offense?

19          MS. JONES:  Your Honor, there were victims, but it

20     was impractical to, and nominal amounts, to try to identify

21     all of them, so there is no restitution being sought under

22     366A (verbatim), Title 18.

23          THE COURT:  I think the Court addressed that issue as

24     well at the plea hearing, and it's also addressed in the

25     Presentence Report, and there's been a finding that the

1    identification of the victims would involve too complex a

2    process to identify, locate, and notify all of them; so

3    therefore, restitution is not an issue in this case, and I

4    find that for those reasons, the provisions of the Crime

5    Victims Rights Act have been complied with, and the government

6    has done what it should under these circumstances.

7              Did the government receive the Presentence Report --

8    I guess it's the revised Presentence Report and any addendum

9    and have a chance to review them?

10             **MS. JONES:**  Yes, Your Honor, we received it.

11             **THE COURT:**  Does the government have any objections?

12             **MS. JONES:**  No, Your Honor.

13             **THE COURT:**  Mr. Holleman, did you receive the revised

14   Presentence Report and any addendum and have a chance to

15   review them with your client?

16             **MR. HOLLEMAN:**  Yes, Your Honor.

17             **THE COURT:**  Were you able to explain it to your

18   client and answer any questions he had about them?

19             **MR. HOLLEMAN:**  Yes, Your Honor.

20             **THE COURT:**  Does he understand the revised

21   Presentence Report?

22             **MR. HOLLEMAN:**  Yes, Your Honor.

23             **THE COURT:**  And I understand there are some

24   objections; is that right?

25             **MR. HOLLEMAN:**  Yes, sir, as stated in the pleadings.

1              **THE COURT:**  I've read them and I'm familiar with

2    them, but just briefly, for the record, state what they are.

3              **MR. HOLLEMAN:**  Okay.  I think, Your Honor, one of the

4    objections was that we were being charged with two years, and

5    the loss calculation included four years.

6              **THE COURT:**  Right.

7              **MR. HOLLEMAN:**  One of the objections dealt with the

8    victim -- the enhancement for ten victims or more, and no

9    evidence has been presented at this point about any -- no

10   victim impact statements and things of that nature.

11            **THE COURT:**  Okay.

12            **MR. HOLLEMAN:**  And so we objected to that two-level

13   enhancement.

14            **THE COURT:**  For ten or more victims.

15            **MR. HOLLEMAN:**  I think that covers it, Your Honor.

16            **THE COURT:**  Okay.  Yeah.  That summarizes what was in

17   the written submissions, which I've read and am familiar with.

18          Mr. Cvitanovich, please stand, raise your right hand,

19   and take the oath, please, sir.

20       **(Oath administered.)**

21            **THE COURT:**  Sir, have you heard everything your

22   attorney has just said?

23            **THE DEFENDANT:**  Yes, sir.

24            **THE COURT:**  Did you understand everything he said?

25            **THE DEFENDANT:**  Yes, sir.

1           THE COURT:  Do you agree with everything he said?

2           THE DEFENDANT:  Yes, sir.

3           THE COURT:  Did he review the revised Presentence

4    Report with you?

5           THE DEFENDANT:  Yes, sir.

6           THE COURT:  Was he able to explain it to you and

7    answer any questions you had about it?

8           THE DEFENDANT:  Yes, sir.

9           THE COURT:  Do you understand the revised Presentence

10   Report?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  And you heard him summarize briefly there

13   the objections to the Presentence Report.  Did you understand

14   that?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  And do you agree with those?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  Are there any other objections you think

19   your attorney should have made that were not made?

20          THE DEFENDANT:  No, sir.

21          THE COURT:  All right.  Thank you.

22          All right.  I guess at this point, then, will there

23   be any evidence to offer on the objections, or strictly

24   argument?

25          MS. JONES:  No, Your Honor.  Only argument.

1          **MR. HOLLEMAN:**  Just argument, Your Honor.

2          **THE COURT:**  All right.  Let me hear from the

3    government first, then.

4          Ms. Jones?

5          **MS. JONES:**  Yes, sir.  Mr. Korzenik is going to

6    address those issues, Your Honor.

7          **THE COURT:**  All right.  Mr. Korzenik, you may

8    proceed.

9          **MR. KORZENIK:**  Your Honor, this case involves a

10   financial fraud.  The subject, of course, is seafood.  The

11   purpose was profits.  There are a few considerations we want

12   to bring to the Court's attention in its determination of

13   sentence.

14         As Your Honor knows, there's been a plea here,

15   calculations of loss, and recommendations as to the guidelines

16   themselves.  We ask the Court to consider that leniencies in

17   this case have already been provided and sort of baked into

18   the agreements we've -- we've reached.  One was certainly in

19   the charging document itself.  The loss calculations are based

20   upon a smaller number of years of the defendant's supervision

21   of the purchasing of seafood than actually was -- was the

22   case; and he served in that capacity, ordering seafood that

23   was misbranded, for about twice as long, as is noted and

24   charged in the information, so that would diminish the sum

25   that the government used and was -- and the probation office

 1  used in its calculations.

 2          Further, the species, the identification of the

 3  species that was purchased and misbranded, according to the

 4  information, was not all of the full volume of seafood that

 5  the defendant ordered and was subsequently misbranded.  So

 6  that also is leniency that's not calculated and not taken into

 7  account in the charges here.

 8          Further, the indictment or the charging document

 9  refers to simply one supplier of seafood that it was

10  misbranded.  The evidence was, of course, that there were

11  other sources of the seafood.  Those are also not taken into

12  account in the loss calculations.

13          In terms of the objections, the government has not

14  formally made any because that was -- the government had

15  agreed that there would be a certain limit set and that the --

16  if terms of the estimation of the loss, and that the defense

17  could argue down from that; so we didn't feel it was

18  appropriate to contradict ourselves by making objections

19  where -- where the defense had argued for a lower sum of the

20  loss.

21          **THE COURT:**  All right.  But you're not saying that

22  under the doctrine of relevant conduct, it allows the Court,

23  in appropriate circumstances, to consider time frames outside

24  what's in the charging document.

25          **MR. KORZENIK:**  We're saying that that would come in

```
 1    as relevant conduct.

 2            THE COURT:  Okay.  All right.  Anything further on

 3    the victim increase?  Anything on that, the two-level increase

 4    for ten or more victims?  Anything else on that?

 5            MS. JONES:  Yes, Your Honor.  There were multiple

 6    victims.  He -- Mr. Cvitanovich's conduct helped perpetuate

 7    the fraud that his employer misbranded the inferior fish,

 8    selling it as higher.  So there were victims.  Again, they

 9    were impractical to -- and they were nominal amounts, but

10    there were definitely more than ten victims.

11            THE COURT:  All right.  Mr. Holleman, any argument,

12    sir?

13            MR. HOLLEMAN:  Your Honor, just a couple.

14            First off, on the loss calculation, if Your Honor

15    recalls in the Presentence -- or objections to the Presentence

16    Report, it didn't really have to do with the total loss

17    calculation.  It was the failure to account for the value that

18    was received, and that -- that is what changed the loss.

19            THE COURT:  Right.

20            MR. HOLLEMAN:  And Your Honor is familiar with that

21    situation.  So that is what reduced the loss.  And, of course,

22    the government just said they had agreed that it would only

23    prosecute these two years, yet the loss calculation includes

24    four years.  And I understand the relevant conduct issue.  We

25    just think that violates what the government agreed to do, is
```

1    those two years.

2         As to the numbers of victims, there's been no

3    concrete evidence presented of any victims.  And the -- we're

4    not -- this is a little bit -- as you noticed in -- our

5    objections to the PSR has to do with after the raid in

6    November of 2019, the misbranding stopped.  In other words,

7    they -- there was no further misbranding.  The sales of the

8    seafood that was involved in this case continued to be

9    purchased by customers at the same or higher rates and at

10   higher prices than before, and the concern of that is whether

11   or not there were actual victims that were defrauded at all

12   when you consider that the sales continue.

13        Now, when I say that, Your Honor, '20 was COVID, so

14   they were closed down in '20; and '21 was -- still COVID was

15   still going on, so we used the years when COVID was over with

16   and produced those sales data that showed that the sales of

17   those dishes involved continued to be just at the same rate or

18   even higher, at higher prices than occurred before, so the

19   question became whether or not there were victims that relied

20   upon the alleged misbranding.  And that was the basis for it.

21   We're not really saying that somebody that purchased seafood

22   before November of 2019, whether they -- we don't know whether

23   or not they relied upon the so-called misbranding in

24   purchasing those meals at all.  What we do know is after the

25   misbranding was changed, those menus were changed, that those

1     sales of those dishes remained just as strong as before, and

2     therefore, that brings into question whether or not there's a

3     cognizable evidence of actual victims that would require a

4     two-level enhancement.  That's the issue.  That's what we

5     raised in our briefs.

6                **THE COURT:**  All right.  All right.

7                **MR. KORZENIK:**  Your Honor, may I respond?

8                **THE COURT:**  Yes, sir.

9                **MR. KORZENIK:**  Given the advertising that the

10    defendant made both online and elsewhere, it was clear that

11    the intent was to induce people who wanted a specific local

12    fresh fish to come to his restaurant.  That was the intent.

13    That was the pitch.  That was what the defendant was offering.

14    That's not what he provided.  So the defense that nobody cared

15    much about it anyway, that they bought fish at a higher price

16    that wasn't the local stuff that they had advertised, may be

17    of limited significance here.  It was certainly the intent of

18    the defendant and his organization to appeal to those who

19    wanted something that they, in fact, did not supply.

20                **THE COURT:**  All right.  Anything else, Mr. Holleman?

21                **MR. HOLLEMAN:**  Judge, the only thing is I think at

22    this stage -- and I understand the law, and believe me, I'm

23    not a big fan of the guidelines and what they -- trying to

24    read them is difficult for me sometimes, like many federal

25    regulations, but the question is whether or not proof is being

1   presented to support that enhancement, and that's what

2   we're -- we're saying, that there's not been proof of that,

3   that there were more than ten victims.

4          So I understand the inherent argument they're making,

5   but the problem is that when these -- when the misbranding

6   ceased in November of 2019, and hasn't occurred since, that

7   the customers continued to purchase those at the same price or

8   higher prices -- because price went up with inflation -- but

9   they continued to purchase them without any change in price

10  and at the same rate or higher rates than had been purchased

11  before November of 2019 when misbranding was occurring.  So

12  that brings into question whether or not there's proof of ten

13  or more victims to require the enhancement.  It's -- it's an

14  argument on the enhancement only.

15          **MS. JONES:**  Your Honor, there's proof because there

16  were -- that's what the wire fraud was based on.  All those

17  wire transactions were victims who were reading on the menu

18  that it was caught in the waters of the beautiful bountiful

19  Coast, and on Yelp.  Those were the victims.  And those were

20  up to the date of the search warrant.  It's great that they

21  changed their menus after that.  I don't know if there were

22  undercovers after that.  And I understand what Mr. Holleman is

23  saying about going forward, but there were victims, and if we

24  had gone to trial, we would have been prepared to present all

25  those wire transactions of those victims.  So there were more

1    than ten victims.  Thank you, Your Honor.

2         **THE COURT:**  Well, I think it's -- anything else,

3    Mr. Holleman?

4         **MR. HOLLEMAN:**  No, Your Honor.

5         **THE COURT:**  Okay.  I think the issue or the -- the

6    distinction between what y'all are arguing here is that -- and

7    I'll address this in a few minutes, but, you know, there's the

8    intent to defraud by Mr. Cvitanovich, which is, I think,

9    undisputed.  That's what he pled guilty to and, you know,

10   that's what he admitted in the factual basis when he, under

11   oath, at the plea hearing admitted to the facts that the

12   government presented.  So the intent of Mr. Cvitanovich is not

13   in question.  There was an intent to deceive or mislead.

14        The question, as I appreciate Mr. Holleman's

15   argument, is that when you look at the question of a victim

16   under the guidelines, what was in the victim's mind, did they

17   rely upon these misrepresentations in their decision to go and

18   purchase this misbranded fish.  And that's why he's saying

19   that after the menus changed in 2019, 2020, whenever it was,

20   the same number of people came, which he argues would suggest

21   that it was not the misbranding that was motivating people to

22   come.

23        So I think the argument he's trying to make is what

24   evidence is there of the intent of the victims and that they

25   actually relied upon this representation to then purchase

1    fish -- meals, but they included the fish that were misbranded

2    and incurred a loss of -- natural loss, I think, ended up

3    being calculated as $2.62 per meal, I believe.

4         So I guess, you know, one of the things the probation

5    officer points out in the addendum is that there are actually

6    -- and I know the parties were supplied with these -- social

7    media posts of individuals out there who were saying that they

8    would not have chosen to eat at the restaurant had they known

9    they were being served imported fish or that part of their

10   reason for going to the restaurant was wanting to support

11   local fisherman and so therefore, they relied on those

12   representations in making the decision to go there.  So that's

13   all out there.  It's been supplied to the parties.  It seems

14   to me that that would be evidence that the Court could

15   consider in terms of what the patrons were relying on.

16        And I think probation -- you know, I read this and it

17   seems to me that we're talking about -- and this, of course,

18   feeds back in the relevant conduct calculation, which, of

19   course, I'll have to address that, but I think it's

20   Paragraph 43 of the Presentence Report that says that, you

21   know, during that period from 2016 to 2019, roughly 55,500

22   lunch or dinner entrees were sold that were misbranded at a

23   time when Mr. Cvitanovich was solely responsible for

24   purchasing the fish.  And I think the argument in the

25   objection is, well, in the corresponding time after the menu

1    changed, another 50,000 people bought the same dishes.  But it

2    just seems that when you have evidence of these social media

3    posts of victims or individuals saying that it did factor into

4    their decision, to say that there aren't at least ten of them

5    out of $55,000 seems highly unlikely to the Court.  And the

6    50,000 after that period of time, we don't know.  Maybe they

7    all came because they wanted to eat in a certain atmosphere, a

8    very historic location, or maybe it didn't -- maybe it didn't

9    matter to some of them where the fish came from.  We don't

10   really know why those individuals -- what their motivations

11   were for going there.  There's no evidence at all of that

12   other than the fact that the same number of people kept

13   coming.  And, you know, you balance that against some evidence

14   we do have of folks who took the affirmative step of posting

15   online that they wouldn't have come there and they were trying

16   to support local fisherman and that it did factor into their

17   decision, you know, at this point, to me that seems to be the

18   crux of this question on this particular objection.

19            All right.  Anything else before I rule on the

20   objections?

21            **MS. JONES:**  No, Your Honor.  Thank you.

22            **THE COURT:**  Mr. Holleman?

23            **MR. HOLLEMAN:**  Your Honor, the only thing is the

24   postings, we don't know when those occurred, whether it was

25   after -- before November of 2019 or after.  They're not dated

1    as to when they came or when they said they wouldn't come.  So

2    they're relying on the newspaper reports that are now being

3    done and responding to that.  So, I mean, the question is

4    not -- and Your Honor, I think, stated it correctly, it's

5    whether or not there's been actual proof offered on ten or

6    more victims for the purpose of that enhancement only.  That's

7    what we're concerned about.  But, of course, we rely on the

8    Court to rule based on the evidence.

9         **THE COURT:**  All right.  This matter is before the

10   Court on the objections to the Presentence Report.  Of course,

11   I've considered the record in this matter, the pertinent

12   provisions of the advisory sentencing guideline calculations,

13   and the submissions of the parties and the arguments of

14   counsel here today.

15        The first objection pertains to whether the time

16   frames for calculating loss were properly included.  The

17   Presentence Report calculated the loss using the time period

18   of 2016 to 2019, which is the time period during which

19   Mr. Cvitanovich was solely responsible for ordering the

20   kitchen products or fish in this case.  The defense's argument

21   is that the charging instrument in this case, the information,

22   only incorporated a time period of 2018 to 2019 so that the

23   loss calculation, in terms of the quantity of meals, sold

24   should be limited to that time frame, which would lower the

25   total loss amount and therefore lower the offense level and

1       the guideline range calculation.

2              So this turns upon the question of the doctrine of

3       relevant conduct.  In this case, the probation officer, after

4       reviewing the information submitted by the parties, including

5       the defendant's arguments to the original loss calculation,

6       concurred with the defendant that the appropriate method for

7       calculating the loss was the $2.62 loss per meal multiplied by

8       the number of meals served during the pertinent time period.

9       And the dispute is whether or not that time period should

10      be 2018 to 2019, as charged by the government, or whether it

11      should include the time period of 2016 to 2019, the entire

12      time period during which Mr. Cvitanovich was responsible for

13      ordering fish products for the kitchen under the doctrine of

14      relevant conduct under the U.S. sentencing guidelines.

15             So in any case, in determining a defendant's base

16      offense level for purposes of calculating the guidelines, the

17      Court may consider other offenses in addition to the acts

18      underlying the offense of conviction as long as those offenses

19      constitute what is referred to as relevant conduct as that

20      phrase is defined in the sentencing guidelines.  That was

21      according to the Fifth Circuit in the 2019 case of *United*

22      *States v. Barfield*, 941 F.3d 757, quoting from *United States*

23      *v. Rhine*, 583 F.3d 878, Fifth Circuit case from 2009.  We have

24      a more recent case, *United States v. Moore*, found at WL --

25      2024 WL 4635419, decided October 31st of this year.  The Court

1    of Appeals said that a defendant need not have been convicted

2    of or even charged with the other offenses for them to be

3    considered relevant conduct for sentencing guidelines

4    purposes.

5              So the sentencing guidelines define relevant conduct

6    in this particular situation as all acts and omissions

7    committed, aided, abetted, counseled, commanded, induced,

8    procured, or willfully caused by the defendant that were part

9    of the same course of conduct or common scheme or plan as the

10   offense of conviction.  That's at Section 1B1.3(A) of the

11   guidelines.  What that means is any acts or omissions

12   committed by the defendant that were part of the same course

13   of conduct or common scheme as the offense of conviction, the

14   offense of conviction being the misbranding or fraudulent

15   misbranding from 2018 to 2019 -- that's the offense of

16   conviction -- any acts or omissions that were committed that

17   were part of the same course of conduct would qualify as

18   relevant conduct.  So the Court first has to address whether

19   Mr. Cvitanovich's uncharged conduct, the earlier period of

20   ordering fish, are either part of the same course of conduct

21   or part of a common scheme as the actual offense of

22   conviction.  If so, the Court can consider that conduct in

23   determining the sentencing guideline range.

24             Under the sentencing guidelines, acts are considered

25   part of the same course of conduct if they are sufficiently

1    connected or related to each other as to warrant the

2    conclusion that they are part of a single episode or ongoing

3    series of offenses.  That's Comment Note 5B2 to Section 1B1.3.

4    Factors that are appropriate for the Court to consider to make

5    this determination of whether the offenses are sufficiently

6    connected or related as part of the same course of conduct

7    include:  The degree of similarity of the offenses, the

8    regularity or repetitions of the offenses, and the time

9    interval between the offenses.

10          So here when the Court compares the time frame

11   encompassed by the charging instrument, to which the defendant

12   pled guilty, with the earlier time period included in the

13   Presentence Report, 2016, 2017, it seems fairly clear that the

14   conduct in that earlier time period was part of the same

15   course of conduct as that which occurred during the time

16   period covered by the bill of information.  As is stated in

17   the Presentence Report, when the previous head chef retired

18   in 2016, Mr. Cvitanovich assumed all responsibility for

19   ordering seafood and fish products for the kitchen.  And the

20   scheme was apparently preexisting and he was aware of it, but

21   he continued it knowing what was going on.  So in other words,

22   there was essentially an unbroken chain of either identical or

23   substantially similar conduct that occurred from the time the

24   defendant began ordering the seafood products for the kitchen

25   and continuing through the time period covered by the bill of

 1    information.  The conduct was repetitious, it was regular, it

 2    was similar, and it was at regular and rather small time

 3    intervals.  So it would appear to the Court that the record

 4    supports the conclusion by a preponderance of the evidence

 5    that all of the mislabeling that occurred during this

 6    period, 2016 to 2019, both charged and uncharged, was in fact

 7    part of the same course of conduct, making it relevant conduct

 8    under Section 1B1.3.

 9         The Court will also pause to note that with respect

10    to a charging instrument, in this case, for whatever reason --

11    I think Mr. Korzenik has articulated some of them -- the

12    government chose to limit the time frame in the charging

13    instrument to 2018, 2019.  That is a determination that is

14    solely within the discretion of the executive branch of the

15    government.  Under the doctrine of separation of powers, the

16    Court has no authority or control over that.  But it's also

17    clear, and Congress has said this, the Court may consider any

18    evidence that's pertinent to sentencing, and that's even

19    articulated in the plea agreement; so the Court is not bound,

20    and the sentencing guidelines make this clear, by whatever

21    time frame the government chose to limit.  And under the facts

22    here, it does seem clear to the Court by a preponderance of

23    the evidence that this was the same course of conduct.

24         Now, in the alternative, the uncharged time frame of

25    the mislabeling was also likely part of a common scheme with

1  that charged in the information.  For two or more offenses to

2  constitute part of a common scheme or plan, they must be

3  substantially connected to each other by at least one common

4  factor such as common victims, common accomplices, common

5  purpose, or similar modus operandi.  That's Section 1B1.3 of

6  the guidelines at the Comment Note 5B1, also the *Moore* case

7  from the Fifth Circuit cited previously.  Again, in this case,

8  based upon a preponderance of the evidence before the Court,

9  it seems clear to the Court that this mislabeling was part of

10  a common scheme or plan, because given the unbroken pattern of

11  identical or substantially similar behavior, the charged and

12  uncharged mislabeling shared, at the very least, a common

13  purpose and a similar modus operandi, and while the victims

14  may not have been identical, they were certainly similarly

15  situated.

16        So based upon all of the foregoing, the Court finds

17  that the uncharged period of time does qualify as relevant

18  conduct under the sentencing guidelines and is supported by a

19  preponderance of the evidence.  Therefore, it was properly

20  included by the probation office in calculating the overall

21  loss and the resulting offense level, and that objection will

22  be overruled.

23        Turning to the two-level enhancement applied under

24  the guidelines for the offense involving ten or more victims,

25  Section 2B1.1(B)(2) of the guidelines states that if the

```
 1    offense involved ten or more victims, then increase the
 2    offense level by two levels.  Here, the guidelines define a
 3    victim as any person who sustained any part of the actual loss
 4    determined under Subsection (b)(1).  Here, the actual loss
 5    determined under Subsection (b)(1) in the Presentence Report
 6    according to the defendant's calculations, which the Court and
 7    the probation office accepted, each individual who purchased
 8    one of these meals sustained an actual loss of $2.62 per meal.
 9    Actual loss is defined as the reasonably foreseeable pecuniary
10    harm that resulted from the offense.  I think, again, it's
11    essentially undisputed, or could not be disputed from the
12    record here, that that loss was reasonably foreseeable.
13         Pecuniary harm means harm that is monetary or that
14    otherwise is readily measurable in money.  That's also a
15    definition that is satisfied here based upon the undisputed
16    facts as they exist in the record and otherwise by a
17    preponderance of the evidence.  And reasonably foreseeable
18    pecuniary harm means pecuniary harm that the defendant knew or
19    under the circumstances reasonably should have known was a
20    potential result of the offense.  The record supports the
21    conclusion that that definition is also satisfied.
22         The Fifth Circuit has stated that a finding under the
23    guidelines must be based on reliable information under a
24    preponderance of the evidence.  That's U.S. v. Conner,
25    537 F.3d 480, a 2008 case, and also the commentary to
```

1    Section 6A1.1 of the guidelines where the Commission stated
2    its belief that the use of a preponderance of the evidence
3    standard was appropriate in addressing these issues.

4         Now, circling back, then, to the discussion which the
5    Court touched on earlier about the state of mind, for lack of
6    a better term, the Fifth Circuit has not clearly spoken on
7    this issue, but the defense has pointed to a case out of the
8    Eleventh Circuit, *United States v. Stein*, 846 F.3d 1135,
9    which, while not controlling, certainly would be considered as
10   persuasive authority where that Court stated that an actual
11   loss evaluation incorporates a determination of both factual
12   and legal causation, which the defense argues supports its
13   position that because the number of sales did not change after
14   the menu was changed during the corresponding time period,
15   that indicates nobody was victimized; therefore, there should
16   not be a two-level increase.

17        The Court would first observe that the *Stein* case is
18   not exactly on all fours with this one.  Some of the facts
19   there were different.  In that case, the dispute was over the
20   calculation of the actual loss figure to be used.  Here,
21   there's really no dispute as to the actual loss figure.  It
22   was $2.62 per meal.  It also had to do with determination of
23   victims under the Mandatory Victim Restitution Act, so the
24   other issue in that case was restitution, which is also not an
25   issue here.  That case did not address the guideline provision

 1    at issue here, 2B1.1(B)(2), and that was a securities fraud

 2    case involving investors' purchases of stock.  So while it

 3    does offer some information that may be useful or instructive,

 4    it is not controlling here and is not exactly the situation

 5    that we're dealing with here.

 6              So here when the Court looks to the record in this

 7    matter, the factual basis that was read into the record at the

 8    time of the plea hearing, which Mr. Cvitanovich agreed to,

 9    stated that beginning in 2015 he assumed responsibilities for

10    purchasing much of the food that Mahoney's prepared or served;

11    that thousands of pounds of fish per year were ordered that

12    did not bear the names of those native to local waters even

13    though they were represented to be local premium seafood on

14    the menu; and in 2018 to 2019, the defendant intentionally

15    misled and defrauded customers by mislabeling approximately

16    17,000 pounds of fish held for sale at the restaurant after it

17    had been shipped in interstate commerce.  The sale was of

18    inexpensive foreign frozen imported fish, including Lake

19    Victoria Perch from Africa, tripletail from Suriname, and

20    Unicorn Filefish from India.  So those are all the facts that

21    were acknowledged, and they're not disputed.

22              And again, as was noted previously, when we look at

23    the corresponding time periods pre menu-change and post

24    menu-change, the 50,000-or-so that continued to purchase the

25    meals after the menu was changed, we really don't have any

1    evidence, other than the fact that they purchased the meals,

2    as to what was in those individuals' minds, what motivated

3    them to come and purchase those meals.  It could have been

4    that they didn't care what kind of fish they were eating; it

5    could have been they wanted to eat in a historic location; it

6    could have been the atmosphere that attracted them.  We just

7    don't know, and it is really just an assumption that they were

8    all relying often the representations, or lack thereof, about

9    whether the fish was locally sourced or not.

10          But here we do have some evidence that's been

11   supplied that indicates as to the time period previous to

12   that, and the social media posts were prompted by the

13   publication in this case of the mislabeling charges, so they

14   were in response to that, and individuals did post that they

15   would not have purchased their meals there had they known, or

16   that one of the reasons they went to the restaurant was to

17   support local fisherman, and had they known the truth, they

18   would not have gone there.  And as the Court noted earlier,

19   the Court find that this is sufficient evidence for it to

20   consider and that it's also sufficient for the Court to

21   conclude that out of the 50,000 or so meals that are properly

22   counted in this case, there were at least ten who were

23   motivated by that misrepresentation.  So based upon the record

24   as it exists before the Court and the evidence available to

25   it, I'm satisfied that that enhancement was also properly

1    applied, and that objection would be overruled or will be

2    overruled.

3            So based on that, the guideline calculations in this

4    case would be as follows:  The total offense level would be an

5    11.  The criminal history category is a I.  The defendant has

6    no prior criminal history.  The guideline range for

7    imprisonment would be eight to 14 months.  The supervised

8    release range would be one year.  The defendant is eligible

9    for probation of one to five years under the sentencing

10   guidelines but is in Zone B, which would mean that if the

11   Court imposed a term of probation, at least half of that

12   period of time -- or at least the minimum period of time,

13   eight months, would have to be served on home detention under

14   the guidelines.  The fine range would be $4,000 to $10,000.

15   Restitution is not applicable.  There would be a $100 special

16   assessment.

17           And I note that those would be the guideline

18   calculations prior to any departures or variances the Court

19   were to grant.  So do the parties agree that those are the

20   correct guideline computations prior to any departures or

21   variances and based upon the Court's rulings on the

22   objections?

23           **MS. JONES:**  Yes, Your Honor.

24           **MR. HOLLEMAN:**  Yes, Your Honor.

25           **THE COURT:**  All right.  The Court agrees with that

1   and finds that those are the proper guideline calculations

2   prior to any departures or any variances.

3          All right.  So at this point, then, I would observe

4   that there have been some submissions.  The Court has

5   considered a lot of material that's been presented to it in

6   this case.

7          And, Mr. Cvitanovich, you have what's now known as

8   the right of allocution.  That's your opportunity to address

9   the Court and say anything you would like to say on your own

10   behalf before the Court imposes a sentence.  You may address

11   the Court yourself if you wish.  If you would rather your

12   attorney speak for you, that's fine, too.  It is entirely your

13   choice.  But if you do choose to speak, I remind you you're

14   under oath.  So at this time, if you and your attorney will

15   come up here to the podium, I'll hear anything you may wish to

16   say.  Whenever you're ready, sir.

17          **THE DEFENDANT:**  Your Honor, I want to apologize to

18   the Court, to my family, and our customers.  I'm truly

19   responsible to be in this situation, and I accept my

20   responsibility.  I understand what I've done, and I'm sorry

21   for my actions and for the people that were affected,

22   considering my wife Ellen, my daughters Emily, and especially

23   Mary Beth.  It would be especially difficult for Ellen and a

24   detrimental effect on Mary Beth if I was not with them.  I

25   would be grateful for any consideration from the Court.

1           **THE COURT:**  All right.  Thank you, sir.

2           Mr. Holleman, do you want to add anything?

3           **MR. HOLLEMAN:**  Briefly, Your Honor.

4           I've known this family all my life.  I mean, as a

5    small child, coming down from Wiggins, we would sometimes on a

6    Sunday, after going to the First Baptist Church of Biloxi, Dad

7    would make us go to Mary Mahoney's, and we ran around.  I'm

8    sure Mary Mahoney's personnel didn't like us running around,

9    but we caused a little havoc of our own.  They're good people.

10   The whole family's good people.  They are a stalwart of the

11   community of Biloxi.  They made a mistake, an unfortunate

12   mistake.  This is an icon in Biloxi.

13          Tony was -- took over when his cousin retired as

14   executive chef, took over the kitchen, and he continued a

15   practice that was already going.  He knows he shouldn't have

16   done that.  When the agents came in in November of 2019, he

17   was completely truthful with them, never tried to avoid

18   anything.  They complimented him on being forthright about

19   what was going on and being as honest as he was about what

20   occurred.  It was immediately stopped, as we've already

21   discussed.

22          Your Honor, at the 11 level, as I appreciate it, he

23   is, and under the guidelines, that a probationary sentence is

24   certainly within the guidelines and, in fact, advisable,

25   especially with a potential departure, and we would think that

1   he would qualify for that. Tony is -- is a good father. He

2   and Ellen have a daughter that is disabled, Mary Beth. She is

3   severely disabled. It takes both of them to take care of her.

4   She has seizures, and quite frankly, Ellen would not be able

5   to handle it by herself if Tony was not available. Their

6   other daughter lives in Huntsville and is unable to assist

7   with Mary Beth. It is a difficult situation. We would ask

8   Your Honor to consider a probationary sentence instead of

9   imprisonment. These -- this is -- this is something that

10  would weigh heavy on this family if Tony was sentenced to

11  imprisonment.

12          His wife, Ellen, would like to say something if His

13  Honor is okay with her.

14          **THE COURT:** All right.

15          **MR. HOLLEMAN:** And his sister Joanna.

16          **THE COURT:** Let's have them come up one at a time.

17          Come on up, ma'am. Ma'am, if you would, please,

18  raise your right hand and take the oath.

19      **(Oath administered.)**

20          **THE COURT:** Ma'am, would you please state your full

21  name for the court reporter.

22          **MS. CVITANOVICH:** I'm Ellen Cvitanovich.

23          **THE COURT:** All right. Go ahead.

24          **MS. CVITANOVICH:** I'm the wife of Anthony

25  Cvitanovich, and, Your Honor, I know you've read my heartfelt

1   letter about Tony.  Everything I wrote was true.  I want to

2   assure the Court that Tony is deeply remorseful to be in this

3   situation.  He accepted full responsibility immediately and

4   has not backed down from assisting to correct mistakes.

5           In our 30-year marriage, Tony has been a loving,

6   kind, hardworking father, and as you know, we have dedicated

7   our life to our special 29-year-old daughter, Mary Beth.  We

8   are very private and protective of her.  It would be most

9   difficult for me to be without Tony for any length of time in

10  our home.  It would also be a situation for Mary Beth that

11  could turn dire as Tony is able to assist me with things that

12  I freely admit I am not capable of doing by myself.  I

13  respectfully ask the Court to consider this, and I thank you

14  for your time, Your Honor.

15          **THE COURT:**  All right.  Thank you, ma'am.

16          Who else, Mr. Holleman?

17          **MR. HOLLEMAN:**  Joanna Cvitanovich.  His other sisters

18  want to speak also, Your Honor.

19          **THE COURT:**  That's fine.  We'll do it one at a time.

20          Ma'am, please raise your right hand and take the

21  oath.

22      **(Oath administered.)**

23          **THE COURT:**  Could you please state your full name for

24  the court reporter.

25          **MS. MCADAMS:**  Joanna Cvitanovich McAdams.

1          **THE COURT:** All right. Go ahead, ma'am.

2          **MS. MCADAMS:** Your Honor, as I said, my name is

3   Joanna McAdams, and I'm standing here with my two sisters,

4   Andrea Osman and Margaret Montgomery. We are the siblings of

5   Tony and are here to express our love and support for our

6   brother.

7          Tony has not only been a loving brother to us, but a

8   devoted husband and father to his two daughters. In addition,

9   he has been a wonderful uncle to his many nieces and nephews.

10  Tony has never been in any trouble in the past, and we

11  respectfully ask the Court for probation for our brother so

12  that he may remain at home with his family who needs him.

13  Thank you.

14          **THE COURT:** Thank you, ma'am.

15          **MR. HOLLEMAN:** She's speaking for all of them. The

16  other sisters don't need to speak.

17          **THE COURT:** Okay. Anything else, Mr. Holleman?

18          **MR. HOLLEMAN:** Your Honor, I will say this:

19  Mr. Cvitanovich has never been in trouble in his entire life.

20  I mean not a -- not a speeding ticket, I don't even believe,

21  that we could find. He's a good person. He stepped into a

22  mistake that was made before he was there, before he took over

23  that position in the business. He unfortunately continued

24  something he shouldn't have done and is paying a difficult

25  price.

1      This case has gone on since 2019.  This family has

2    lived with this upheaval since November of 2019 because the

3    case has gone on for so long.  It has been very difficult for

4    him.  It has caused him to have medical issues in the sense of

5    anxiety and insomnia and things of that nature.  It's affected

6    their family already.  They immediately ceased the practice.

7    Fortunately for them, their restaurant continued, and people

8    continued to come to Mary Mahoney's.

9      Tony is worthy of a chance at probation, and we would

10   ask Your Honor to consider that.  We believe that's not only

11   allowed under the guidelines, but it's also preferred at the

12   level of 11, and potentially 10, that his guidelines will

13   provide.

14         **THE COURT:**  All right.  Thank you.

15         Anything on behalf of the government at this time?

16         **MR. KORZENIK:**  Your Honor, just briefly, the

17   government wants to address the impact of this kind of fraud

18   on the community which occurred and certainly put others who

19   were honestly marketing their seafood at a competitive

20   disadvantage.  And not only did it affect the retailers and

21   other restaurants, but also the fishing community whose --

22   whose livelihoods were affected by reducing the amount that

23   they could charge for the actual authentic product when it was

24   in competition with a substitute; and that's something that

25   should be considered as well.

1         In terms of the application of the guidelines, the

2    Court has a wide range of options here, and it appears the

3    government feels in this case, with the duration of the fraud

4    and the impact, that some deterrent has to be -- has to be

5    made clear; and that, the government suggests, would best be

6    done with some -- some period of confinement along with

7    whatever other sentence the Court feels is just.

8         **THE COURT:**  All right.  Before I go any further, one

9    thing I do need to explain to you, Mr. Cvitanovich, is that as

10   part of your plea agreement in this case, you've waived the

11   right to appeal your conviction and sentence, with a couple of

12   exceptions.  You did reserve the right to raise ineffective

13   assistance of counsel claims.  You also reserved the right to

14   appeal if the Court departed from the sentencing guidelines.

15   But aside from that, you did waive the right to appeal.  If

16   you decided you wanted to try to appeal, you can ask your

17   attorney to file a notice of appeal for you.  If for some

18   reason he cannot or will not do that, you can file one

19   yourself.  All you have to do is write on a piece of paper

20   that you wish to appeal, sign it, and mail it in to the clerk

21   of court; but you only have 14 days to do that from the date I

22   enter a written judgment in your case.  Do you understand

23   that, sir?

24         **THE DEFENDANT:**  Yes, sir.

25         **THE COURT:**  Also if for some reason you could not

1  afford to pay the costs of an appeal, you can request

2  permission to proceed on appeal without paying those costs.

3  You can also, if you wish, request that an attorney be

4  appointed for you on appeal, and if you qualify, one would be

5  appointed for you.  But again, you have to put those requests

6  in writing and mail them in to the clerk.  Do you understand

7  that?

8       **THE DEFENDANT:**  Yes, sir.

9       **THE COURT:**  All right.  I'm going to take a short

10  recess and consider the appropriate sentence.  Court will

11  stand in recess for a few minutes.

12     **(Recess taken.)**

13     **THE COURT:**  Please be seated.

14     All right.  Mr. Holleman, if you and your client

15  would come back to the podium.

16     Anything else before the Court proceeds?

17     **MS. JONES:**  No, Your Honor.

18     **THE COURT:**  Anything else, Mr. Holleman?

19     **MR. HOLLEMAN:**  No, Your Honor.

20     **THE COURT:**  All right.  This matter is before the

21  Court for sentencing.  In this case I've considered the record

22  in this matter including the revised Presentence Report and

23  addendum, the advisory sentencing guideline calculations, and

24  the record of this proceeding here today including the

25  arguments of counsel for the parties and the written

1    submissions.  I also have taken into account the statements of

2    Mr. Cvitanovich and those who have spoken on his behalf.  The

3    Court always appreciates input from family or friends.  So

4    those are all things the Court has to take into account, and

5    has.

6         I'm also required to take into account the pertinent

7    statutory sentencing factors that Congress has set forth at

8    Title 18, United States Code, Section 3553, and in this case,

9    I find the following of those factors are relevant:

10        The nature and circumstances the offense and the

11   history and characteristics of the defendant.  This is an

12   offense in which Mr. Cvitanovich pled to a fraudulent course

13   of conduct of misbranding and mislabeling thousands of

14   meals -- or the fish in these thousands of meals for a time

15   period of 2016 to 2019.  It is true that he is not the one who

16   originated this practice, but he did continue it and knew he

17   was continuing it and over that period of time served a large

18   number of meals, which are documented in the Presentence

19   Report and have been set forth on the record here today.  He

20   engaged in a pattern of misleading customers in an effort to

21   reduce costs.

22        He is in a criminal history category of a 1, has no

23   prior criminal history.  And certainly the Court notes the

24   family issues or circumstances that have been set forth, and,

25   of course, for purposes of medical privacy, the Court will not

1    get into great detail on that, but it's been referenced here

2    today and it is significant in this case.

3            The sentence needs to reflect the seriousness of the

4    offense, promote respect for the law, and afford just

5    punishment.  This is a very serious offense.  It involves the

6    mislabeling of large quantities of fish over an extended

7    period of time.  There was a breach of trust with the

8    community.  As the government pointed out, it impacted local

9    fishermen, and theoretically, we don't know this for a fact,

10   but it's not hard to believe that it created a competitive

11   advantage as between this restaurant and others in the area.

12   And it shows a lack of respect for the law.

13           Sentencing is also in part about punishment.  The

14   punishment must be sufficient but not greater than necessary

15   to accomplish the goals of sentencing.  The Court would

16   observe that as has been noted, once the defendant was

17   confronted with the evidence of this pattern of conduct, they

18   did correct it, took steps to correct it very early on, and

19   did cooperate early on.  So that's another factor the Court

20   takes into account.

21           The sentence needs to afford adequate deterrence to

22   criminal conduct, not just to deter Mr. Cvitanovich from

23   engaging of conduct of this nature in the future, that's part

24   of it, but it's also to deter others who may be inclined to

25   engage in similar conduct.  As the government pointed out,

1   this type of criminal conduct is difficult to detect and

2   difficult to prosecute, so it's important that any sentence

3   imposed send the appropriate message to others who may be

4   inclined to engage in similar conduct.

5          It needs to afford the defendant with any

6   correctional treatment in terms of any medical or other mental

7   health issues he may be experiencing.

8          And another factor, of course, is disparity, avoiding

9   unwarranted disparities in sentencing among similarly situated

10  defendants.  In this case, Mr. Cvitanovich is the only

11  individual defendant in this case, but, of course, the Court

12  is certainly aware of the other cases involving individuals

13  from Quality Seafood who were part and parcel of this scheme

14  as well.  It's evident from the Presentence Report that Mary

15  Mahoney's was not the only restaurant Quality was engaging in

16  this conduct with, that they were engaged in this similar

17  practice with respect to other buyers; and so in that respect,

18  the conduct was -- their conduct was more widespread in terms

19  of its place in the community as opposed to Mahoney's which

20  was simply limited to their own operations and their own

21  customers.  I would also observe that in those cases -- and

22  this is public record, obviously -- the individual defendants

23  from Quality Seafood were permitted to plead to misdemeanors

24  which would carry maximum potential sentence of 12 months, and

25  certainly a lower one would be possible, too -- and the Court

1    expresses no opinion on that at this point -- whereas in

2    Mr. Cvitanovich's case, he stands convicted of a felony

3    which, irrespective of any period of incarceration, carries

4    with it a number of other burdens or limitations going

5    forward. And as noted, he did immediately cooperate when

6    confronted and took steps to correct what was taking place,

7    and all indications are that this conduct has not been

8    repeated since. So the Court factors that in as well in terms

9    of disparity, relative responsibility, and finds that those

10   are the appropriate factors to be considered under 3553 in

11   fashioning a sentence.

12        So having said all of that, the Court will impose

13   sentence in this case as follows:

14        The Court has considered the advisory sentencing

15   guideline computations and the sentencing factors found at

16   Title 18, United States Code, Section 3553, and it is hereby

17   the judgment of this Court that the defendant, Anthony Charles

18   Cvitanovich, is hereby sentenced to a term of probation for

19   three years as to Count 1 of the bill of information. The

20   Court finds this to be an appropriate sentence based upon the

21   facts and circumstances of the case, the history and

22   characteristics of the defendant, and the other 3553 factors

23   as the Court has just discussed them on the record here today.

24   The Court finds that this is a sufficient but not greater than

25   necessary punishment to accomplish the goals of sentencing.

1           It is further ordered that the defendant shall pay a

2 fine of $10,000 as to Count 1 of the bill of information.

3 Payment of the fine is due immediately and must be paid in

4 full no later than 30 days after entry of the judgment in this

5 case.  The fine shall be made payable to the U.S. District

6 Court Clerk for the Southern District of Mississippi.

7           While on probation, the defendant shall comply with

8 the mandatory conditions of supervision set forth as Title 18,

9 United States Code, Section 3563(b).

10           Further, the Court finds the standard conditions of

11 supervision listed on the judgment order and in Part G of the

12 Presentence Investigation Report, which have been adopted by

13 the Court and have not been objected to by the defendant, are

14 reasonably related to the factors set forth at Title 18,

15 United States Code, Section 3553(a)(1), (a)(2)(A), (B), (C),

16 and (D), and involve no greater deprivation of liberty than

17 reasonably necessary for the purposes set forth in that

18 section.  Further, in the Court's view, these conditions are

19 consistent with the policy statements issued by the Sentencing

20 Commission pursuant to Title 28, United States Code,

21 Section 994(a).  Therefore, the defendant shall comply with

22 the standard conditions of probation listed on the judgment

23 order, and this includes a prohibition on the possession of a

24 firearm.

25           In addition, the following special conditions are

1    imposed:

2            Number one:  The defendant shall provide the

3    probation office with access to any requested financial

4    information and must notify the Court of any material change

5    in economic circumstances which would affect payment of the

6    imposed monetary penalties.

7            Number two:  The defendant shall pay all criminal

8    monetary penalties in accordance with the schedule of payments

9    listed on the judgment order.  These conditions are imposed in

10   light of the fine in this case and to ensure the defendant

11   remains in compliance with that part of the sentence and to

12   facilitate probation office supervision and enforcement

13   regarding the same.

14           Number three:  If deemed necessary by the probation

15   office, the defendant shall participate in a program of

16   testing and/or outpatient treatment, or inpatient treatment if

17   separately ordered or approved by the Court, during the term

18   of supervision for drug abuse as directed by the probation

19   office.  If the defendant is enrolled in a drug treatment

20   program, he shall abstain from consuming alcoholic beverages

21   during treatment and shall continue abstaining for the

22   remaining period of probation.  The defendant shall contribute

23   to the cost of treatment in accordance with the probation

24   office co-payment policy.

25           Number four:  The defendant shall not possess,

1    ingest, or otherwise use a synthetic narcotic or synthetic

2    cannabinoid.

3         Number five:  In the event the defendant resides in

4    or visits a jurisdiction where marijuana or marijuana products

5    have been approved, legalized, or decriminalized, the

6    defendant shall not possess, ingest, or otherwise use

7    marijuana or marijuana products.  These three conditions are

8    imposed in light of the information set forth in the

9    Presentence Report regarding some use of medical marijuana

10   that will hopefully assist the defendant to the extent he has

11   any issues with that.  It does not appear that he does, but

12   should anything develop along those lines, these conditions

13   will allow probation to assist him in addressing that problem

14   if necessary.

15        Finally, the defendant will be placed on home

16   detention for a period of four months to be monitored by RF

17   monitoring equipment and shall abide by all technology

18   requirements of the location monitoring program.  As part of

19   this program, the defendant shall be restricted to his

20   approved residence at all times except for employment,

21   education, religious services, medical, substance abuse, or

22   mental health treatment, attorney visits, court appearances,

23   court-ordered obligations, or essential leave activities as

24   preapproved by the U.S. Probation Office.  The defendant shall

25   pay all or part of the costs of participation in the location

1    monitoring program, including equipment loss and damage, as

2    directed by the Court and/or supervising probation officer.

3    This is imposed as a part of the term of probation and as an

4    alternative to incarceration as permitted by Title 18, United

5    States Code, Section 3563(b)(1)(9) and Sections 5B1.1(a)(2)

6    and 5C1.1(c)(3) and (e) of the sentencing guidelines.  The

7    Court finds that this will serve as some additional measure of

8    punishment that is commensurate and appropriate to the facts

9    and circumstances of the case while allowing rather than an

10   incarcerative sentence, Mr. Cvitanovich to remain on

11   probation, and the Court further finds it is consistent with

12   its evaluation of the 3553 factors as the Court has discussed

13   them in this case.  So to the extent any variance from the

14   guidelines is necessary to reach that sentence, the Court does

15   so vary for the reasons it stated in evaluating those factors

16   previously.

17            It is further ordered the defendant shall pay a

18   mandatory special assessment of $100, which is due

19   immediately.

20            The defendant is ordered to report immediately to the

21   U.S. Probation Office for processing for his term of

22   probation.

23            That will be the judgment of the Court.  Anything

24   further at this time?

25            **MS. JONES:**  No, Your Honor.

1          **MR. HOLLEMAN:**  No, Your Honor.

2          **THE COURT:**  All right.  In that case, the Court is

3    going to take a short recess before the next matter.  You're

4    excused.

5                         (Hearing concluded.)

6                              -  -  -

CERTIFICATE OF COURT REPORTER

I, Kati Vogt, RPR, RMR, RDR, CRR, Official Court Reporter for the United States District Court for the Southern District of Mississippi, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenographic reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

s/ Kati Vogt
KATI VOGT, RPR, RMR, RDR, CRR
OFFICIAL COURT REPORTER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION



UNITED STATES OF AMERICA                                    PLAINTIFF

V.                                    CRIMINAL ACTION NO: 1:24cr46

ANTHONY CHARLES CVITANOVICH                                 DEFENDANT

---

TRANSCRIPT OF PLEA

BEFORE HONORABLE HALIL S. OZERDEN
UNITED STATES DISTRICT JUDGE

MAY 30, 2024

DAN M. RUSSELL, JR., UNITED STATES COURTHOUSE
GULFPORT, MISSISSIPPI

---

COURT REPORTER:

Kati Vogt, RPR, RMR, RDR, CRR
Official Court Reporter
U.S. District Court, Southern District of Mississippi
2012 15th Street, Suite 403
Gulfport, Mississippi  39501
(228) 563-1780
kati_vogt@mssd.uscourts.gov

PLAINTIFF'S
EXHIBIT
1.B

```
1                    A P P E A R A N C E S

2

3

4    REPRESENTING THE GOVERNMENT:

5        ANDREA JONES, ESQ.
         Office of the United States Attorney
6        1575 20th Avenue
         Gulfport, Mississippi  39501
7

8        JEREMY F. KORZENIK, ESQ.
         U.S. Department of Justice
9        Environmental Crimes Section
         150 M. Street, NE
10       Room 4.208
         Washington, DC  20002
11

12

13

14   REPRESENTING THE DEFENDANT:

15       TIM C. HOLLEMAN, ESQ.
         Boyce Holleman and Associates, P.A.
16       1720 23rd Avenue
         Gulfport, Mississippi  39501
17

18

19

20

21

22

23

24

25
```

 1          **THE COURT:**  All right.  This next case is 1:24CR46,

 2    United States versus Anthony Charles Cvitanovich, scheduled

 3    for a change of plea.

 4          Would counsel please make their appearances.

 5          **MR. HOLLEMAN:**  Tim Holleman for Mr. Cvitanovich, Your

 6    Honor.

 7          **THE COURT:**  For the record, is your client present in

 8    the courtroom?

 9          **MR. HOLLEMAN:**  Yes, he is, Your Honor.

10          **THE COURT:**  All right.

11          **MS. JONES:**  Andrea Jones, Your Honor, for the United

12    States, Southern District.

13          **MR. KORZENIK:**  Jeremy Korzenik, Environmental Crimes,

14    Department of Justice.

15          **THE COURT:**  Pursuant to the Crime Victims Rights Act,

16    Ms. Jones, are there any victims of this offense?

17          **MS. JONES:**  There are victims, Your Honor, but they

18    are so numerous and much time has passed, and the amounts were

19    small as to each, so we would say that under Title 18,

20    3663A(c)(3)(A), that we're not identifying any victims,

21    although we do have receipts and evidence to substantiate

22    those -- that they were victims.

23          **THE COURT:**  All right.  The Court finds that pursuant

24    to the Crime Victims Rights Act, the government has made its

25    best effort to identify victims but that there are multiple

1 victims over a long period of time, making it impractical to

2 provide notice, and that any further proceedings or efforts to

3 notify victims would unduly complicate or prolong this

4 proceeding.  Therefore, the Court finds the government has

5 complied with the Crime Victims Rights Act in this case.

6   I understand this is going to be a change of plea to

7 guilty to a one-count bill of information.  Is that right,

8 Ms. Jones?

9   **MS. JONES:**  Yes, Your Honor.

10   **THE COURT:**  Mr. Holleman?

11   **MR. HOLLEMAN:**  That's correct, Your Honor.

12   **THE COURT:**  All right.  I've been presented with an

13 original plea agreement and plea supplement, both of which I

14 have reviewed.  They've both been executed by counsel for the

15 government as well as counsel for the defense.

16   So at this time, Mr. Holleman, if your client will

17 please raise his right hand, take the oath, and we will begin.

18   **(Oath administered.)**

19   **THE COURT:**  Sir, would you please state your full

20 name for the record.

21   **THE DEFENDANT:**  Anthony Charles Cvitanovich.

22   **THE COURT:**  Mr. Cvitanovich, do you understand that

23 you are now under oath, and if you answer any of my questions

24 today falsely, your answers may later be used against you in

25 another prosecution for perjury or making a false statement?

1   Do you understand that?

2            **THE DEFENDANT:**  Yes, sir.

3            **THE COURT:**  Are you able to read, speak, and

4   understand the English language?

5            **THE DEFENDANT:**  Yes, sir.

6            **THE COURT:**  Are you a citizen of the United States?

7            **THE DEFENDANT:**  Yes, sir.

8            **THE COURT:**  If at any point this morning you do not

9   understand something I say or a question I ask, please let me

10  know.  I'm happy to repeat myself.  Also if at any point you

11  would like to stop and consult with your attorney, I'm happy

12  to let you do that as well.  You just need to let me know.  Do

13  you understand all of that?

14           **THE DEFENDANT:**  Yes, sir.

15           **THE COURT:**  The first thing I have to do this morning

16  is establish that what you are doing here today is a knowing

17  and a voluntary act and that you understand what it is you're

18  doing; so I need to begin with some questions along those

19  lines.

20           How old are you, sir?

21           **THE DEFENDANT:**  55.

22           **THE COURT:**  And how far did you go in school?

23           **THE DEFENDANT:**  High school.

24           **THE COURT:**  And did you graduate?

25           **THE DEFENDANT:**  Yes.

1         **THE COURT:** And are you able to read and write?

2         **THE DEFENDANT:** Yes, sir.

3         **THE COURT:** Have you been treated recently for any

4 mental illnesses or addictions to alcohol or narcotic drugs of

5 any kind?

6         **THE DEFENDANT:** No, sir.

7         **THE COURT:** Have you ever been treated for any mental

8 illnesses or addictions to alcohol or narcotic drugs of any

9 kind?

10         **THE DEFENDANT:** No, sir.

11         **THE COURT:** As you stand here today, are you

12 presently under the influence of any alcoholic beverage, drug,

13 prescription medication, or any other substance that would

14 affect your ability to understand what is taking place here?

15         **THE DEFENDANT:** No, sir.

16         **THE COURT:** And are you capable of consulting with

17 your attorney and understanding what he is telling you?

18         **THE DEFENDANT:** Yes, sir.

19         **THE COURT:** Do you understand why we are here and

20 what is happening today?

21         **THE DEFENDANT:** Yes, sir.

22         **THE COURT:** Do you understand the seriousness of this

23 proceeding?

24         **THE DEFENDANT:** Yes, sir.

25         **THE COURT:** Do you understand that the purpose of

1    your appearance in court this morning is to change your plea

2    in this case from not guilty to guilty to the one-count

3    information?  Do you understand that?

4              **THE DEFENDANT:**  Yes, sir.

5              **THE COURT:**  Mr. Holleman, have you met with your

6    client?

7              **MR. HOLLEMAN:**  Yes, Your Honor.

8              **THE COURT:**  In your opinion, is he capable of

9    understanding these proceedings and your advice?

10             **MR. HOLLEMAN:**  Yes, sir.

11             **THE COURT:**  Is there any question in your mind about

12   his competence to enter a plea?

13             **MR. HOLLEMAN:**  No, sir, Your Honor.

14             **THE COURT:**  Ms. Jones, is the government aware of any

15   issues with respect to the defendant's competence to enter a

16   plea?

17             **MS. JONES:**  No, Your Honor.

18             **THE COURT:**  Now, Mr. Cvitanovich, the next thing I

19   need to talk with you about is something you've probably

20   already gone over with the magistrate, but I have to review it

21   with you again to make sure you understand it, is your

22   willingness or desire to waive your right to give up grand

23   jury presentment and indictment and proceed today based on

24   this information.

25             Now, under our system of justice, no person can be

1   charged with a felony offense unless a grand jury first hears

2   evidence and, based upon that evidence, decides there is

3   probable cause to believe that a crime has been committed and

4   that you committed that crime.

5          You can, if you wish, waive or give up the right to

6   grand jury presentment and indictment and permit a charge to

7   be brought against you by way of an information, which is what

8   has occurred in your case.  If you were to decide that you did

9   not wish to waive the right to grand jury presentment and

10  indictment, there is nothing that would prevent the government

11  from presenting your case to the grand jury and seeking an

12  indictment.

13         Now, a grand jury is a group of people, not less than

14  16 and not more than 23, and at least 12 of those people,

15  after hearing evidence, would have to agree that based upon

16  that evidence, there is probable cause to believe that a crime

17  has been committed and that you committed that crime before

18  you could be indicted.

19         No one can presume to know what a grand jury will do

20  in any particular case.  Their proceedings are secret.  Their

21  deliberations are secret as well.  You could be indicted; on

22  the other hand, you might not be.  But if you permit this case

23  to proceed on the information, it will proceed just as though

24  the grand jury had actually met and just as though the grand

25  jury had actually returned an indictment.

1           Have you discussed your right to grand jury

2     presentment and indictment with your attorney?

3           **THE DEFENDANT:**  Yes, sir.

4           **THE COURT:**  Have you asked him any questions you had

5     about it?

6           **THE DEFENDANT:**  Yes, sir.

7           **THE COURT:**  Did you understand his answers?

8           **THE DEFENDANT:**  Yes, sir.

9           **THE COURT:**  Do you understand the right to grand jury

10    presentment and indictment?

11          **THE DEFENDANT:**  Yes, sir.

12          **THE COURT:**  Mr. Holleman, have you fully counseled

13    with your client regarding his understanding and willingness

14    to give up the right to grand jury presentment and indictment?

15          **MR. HOLLEMAN:**  Yes, sir.

16          **THE COURT:**  And did he undergo this colloquy with the

17    magistrate judge?

18          **MR. HOLLEMAN:**  Yes, sir.

19          **THE COURT:**  And was there a waiver of indictment

20    executed?

21          **MR. HOLLEMAN:**  Yes, sir.

22          **THE COURT:**  Now, has anyone in any way,

23    Mr. Cvitanovich, offered promises or inducements to persuade

24    you to waive this right or threatened or tried to force you to

25    waive this right?

1              THE DEFENDANT:  No, sir.

2              THE COURT:  Are you doing this of your own free will?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  And based upon the rights I've just

5     described to you, do you wish to waive the right to grand jury

6     presentment and indictment?

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  It is the finding of the Court that

9     Mr. Cvitanovich has knowingly and voluntarily waived the right

10    to grand jury presentment and indictment, and the Court will

11    therefore proceed based upon that.

12             Now, Mr. Cvitanovich, have you received a copy of the

13    information pending against you in this case?  That is the

14    written charge brought against you by the government.

15             THE DEFENDANT:  Yes, sir.

16             THE COURT:  Have you had an opportunity to review the

17    charge in the information with your attorney and fully discuss

18    that charge with your attorney?

19             THE DEFENDANT:  Yes, sir.

20             THE COURT:  Were you able to ask your attorney any

21    questions you had about the charge in the information?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  Did you understand his answers to your

24    questions?

25             THE DEFENDANT:  Yes, sir.

```
 1              THE COURT:  Do you understand the charge against you
 2    in the information?
 3              THE DEFENDANT:  Yes, sir.
 4              THE COURT:  Did your attorney discuss with you
 5    possible defenses, if any, that you might have to this charge?
 6              THE DEFENDANT:  Yes, sir.
 7              THE COURT:  Were you able to ask your attorney any
 8    questions you had about that subject?
 9              THE DEFENDANT:  Yes, sir.
10              THE COURT:  And did you understand his answers?
11              THE DEFENDANT:  Yes, sir.
12              THE COURT:  Did he also discuss with you possible
13    witnesses, if any, who could be called to testify in your
14    defense to this charge?
15              THE DEFENDANT:  Yes, sir.
16              THE COURT:  Were you able to ask him any questions
17    you had about that subject?
18              THE DEFENDANT:  Yes, sir.
19              THE COURT:  And did you understand his answers?
20              THE DEFENDANT:  Yes, sir.
21              THE COURT:  Did your attorney also review and discuss
22    with you the evidence that the government intended to produce
23    at trial to support the charge against you?
24              THE DEFENDANT:  Yes, sir.
25              THE COURT:  Were you able to ask your attorney any
```

1    questions you had about that subject?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  Did you understand his answers?

4              THE DEFENDANT:  Yes, sir.

5              THE COURT:  Are you satisfied with the amount of time

6    you've been able to spend with your attorney?

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  Are you satisfied with the amount of time

9    your attorney has spent working on your case?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  Are you fully satisfied with the counsel,

12   representation, and advice given to you in this case by your

13   attorney?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  If you have any complaints or objections

16   whatsoever regarding the services provided to you by your

17   attorney, now is the time to make those objections.  Do you

18   have any?

19             THE DEFENDANT:  No, sir.

20             THE COURT:  Now, I understand your willingness to

21   plead guilty today is the result of some discussions that

22   either you or your attorney have had with the attorney for the

23   government which have resulted in these two documents I have

24   here, the plea agreement and the plea supplement; is that

25   correct?

1    **THE DEFENDANT:**  Correct.

2    **THE COURT:**  Is this your signature on the plea

3    agreement and the plea supplement?

4    **THE DEFENDANT:**  Yes, sir.

5    **THE COURT:**  Did you have an opportunity to read and

6    discuss the plea agreement and the plea supplement with your

7    attorney before you signed those two documents?

8    **THE DEFENDANT:**  I did.

9    **THE COURT:**  And were you able to ask your attorney

10   any questions you had about the plea agreement and the plea

11   supplement?

12   **THE DEFENDANT:**  Yes.

13   **THE COURT:**  Did you understand his answers?

14   **THE DEFENDANT:**  Yes.

15   **THE COURT:**  Do you fully understand the terms of the

16   plea agreement and the plea supplement?

17   **THE DEFENDANT:**  Yes.

18   **THE COURT:**  Mr. Holleman, are you satisfied your

19   client understands the terms of the plea agreement and the

20   plea supplement?

21   **MR. HOLLEMAN:**  Yes, Your Honor.

22   **THE COURT:**  Now, at this time, I'm going to ask the

23   attorney for the government to state into the record some of

24   the key terms or highlights of your agreement with the

25   government.  I want you to listen to what she has to say,

1   because when she's finished, I'm going to ask if you

2   understand and agree to these terms and conditions.  All

3   right?

4        Ms. Jones?

5        **MS. JONES:**  Thank you, Your Honor.

6        If the defendant tenders a plea of guilty to the

7   one-count felony information pending in this case, Your Honor,

8   charging the defendant with misbranding in violation of

9   Title 21, United States Code, Sections 331(k), and the penalty

10  333(a)(2) for a felony with intent to mislead and defraud, the

11  government will recommend that the Court accept the

12  defendant's plea.  At sentencing, the government will

13  recommend that the defendant be sentenced in accordance with

14  the supplemental plea agreement.

15       The plea agreement document itself includes various

16  waivers.  That would be items 8, which in these documents is

17  in the plea agreement in pages 5 through 6, which includes

18  waivers of the defendant's right to appeal and to seek

19  post-conviction relief.  The waiver provision also includes

20  the standard exception for ineffective assistance of counsel

21  claims.

22       The plea supplement, which we anticipate Your Honor

23  will be filing under seal, also provides a recommendation

24  range on page 1 in Section 2A, commensurate with the conduct

25  of Mr. Cvitanovich in reaching this plea agreement, and we

1  would recommend that applicable range of imprisonment under

2  the sentencing guidelines in accordance with this plea, Your

3  Honor.  Thank you.

4       **THE COURT:**  All right.  Mr. Cvitanovich, did you hear

5  everything the attorney for the government had to say?

6       **THE DEFENDANT:**  Yes, sir.

7       **THE COURT:**  Did you understand everything she had to

8  say?

9       **THE DEFENDANT:**  Yes, sir.

10      **THE COURT:**  And do you agree with those terms and

11 conditions?

12      **THE DEFENDANT:**  Yes, sir.

13      **THE COURT:**  Now, you understand what she read there

14 are just the highlights; your complete agreement with the

15 government is controlled by all of the terms and conditions

16 that are contained in these two documents, the plea agreement

17 and the plea supplement?  Do you understand that?

18      **THE DEFENDANT:**  Yes, sir.

19      **THE COURT:**  Now, has anyone made any other or

20 different promises or assurances of any kind to you, other

21 than the ones in the plea agreement and plea supplement, in an

22 effort to induce you to plead guilty in this case?

23      **THE DEFENDANT:**  No, sir.

24      **THE COURT:**  Let me inquire, was this the only formal

25 offer exchanged, Ms. Jones?

1         **MS. JONES:** It is, Your Honor. And it was -- it had

2 the term of supervision included from the original that

3 Mr. Cvitanovich -- to say that it did not exceed one year.

4 There's also no forfeiture, Your Honor. Misbranding, the

5 statute, Title 21, 331(k), does not carry any forfeiture.

6         And would you like me to address the waiver of rights

7 that are highlighted in his plea agreements?

8         **THE COURT:** I'll go over those with him.

9         **MS. JONES:** Okay. Thank you.

10         **THE COURT:** Is that correct, Mr. Holleman? That was

11 the only formal offer exchanged?

12         **MR. HOLLEMAN:** That's correct, Your Honor.

13         **THE COURT:** All right. Now, Mr. Cvitanovich, has

14 anyone attempted in any way to force you or threaten you to

15 plead guilty in this case?

16         **THE DEFENDANT:** No, sir.

17         **THE COURT:** Are you pleading guilty of your own free

18 will because you are, in fact, guilty?

19         **THE DEFENDANT:** Yes, sir.

20         **THE COURT:** Now, do you understand that the terms of

21 the plea agreement and the plea supplement are merely

22 recommendations to the Court, that I can reject those

23 recommendations without permitting you to withdraw your plea

24 of guilty and then impose a sentence that is more severe than

25 the one you may anticipate? Do you understand that?

```
 1              THE DEFENDANT:  Yes, sir.

 2              THE COURT:  Now, for instance, Ms. Jones just

 3   referenced in the plea supplement paragraph 2A, the government

 4   will make a recommendation of a sentence within a certain

 5   range of the guidelines.  Do you understand that that's just a

 6   recommendation; the Court does not have to follow that

 7   recommendation?  Do you understand that?

 8              THE DEFENDANT:  Yes, sir.

 9              THE COURT:  Also at paragraph 10 of the plea

10   supplement there's a stipulation as to the amount of financial

11   harm or loss the Court would consider in calculating the

12   sentencing guideline range.  You're familiar with that

13   stipulation in paragraph 10?

14              THE DEFENDANT:  Yes, sir.

15              THE COURT:  Do you understand if I find the facts do

16   not support that stipulation or that amount, I'm not required

17   to accept it or follow it?  Do you understand that?

18              THE DEFENDANT:  Yes, sir.

19              THE COURT:  I could go with a higher number or lower

20   number.  Do you understand that?

21              THE DEFENDANT:  Yes, sir.

22              THE COURT:  All right.  Now, you're also waiving some

23   rights by entering into this plea agreement.  Do you

24   understand that?

25              THE DEFENDANT:  Yes, sir.
```

1      **THE COURT:**  I want to go over those with you again to
2      make sure you understand them.
3          Now, do you understand that by entering into this
4      plea agreement and pleading guilty today, you're going to
5      waive the right to appeal your conviction and your sentence
6      imposed in this case or the manner in which the sentence is
7      imposed, on any grounds whatsoever, except for ineffective
8      assistance of counsel claims?  You are also retaining the
9      right to exercise a direct appeal of the sentence if the Court
10     departs from the guidelines, but that's the only instance
11     you're reserving a right of direct appeal.  Do you understand
12     that?
13         **THE DEFENDANT:**  Yes, sir.
14         **THE COURT:**  You're also waiving the right to contest
15     the conviction and sentence, or the manner in which the
16     sentence is imposed, in any post-conviction proceeding,
17     including, but not limited to, a motion brought under Title
18     28, United States Code, Section 2255, except for any
19     ineffective assistance of counsel claims.  Do you understand
20     that?
21         **THE DEFENDANT:**  Yes, sir.
22         **THE COURT:**  You're waiving the right to seek
23     attorney's fees or costs in this case, and you're
24     acknowledging that the government's position in this case or
25     prosecution of this case was not vexatious, frivolous, or in

1   bad faith.  Do you understand that?

2           **THE DEFENDANT:**  Yes, sir.

3           **THE COURT:**  You're waiving all rights, whether

4   asserted by you or through a representative, to request or

5   receive from any department or agency of the United States any

6   records pertaining to the investigation or the prosecution of

7   this case.  Do you understand that?

8           **THE DEFENDANT:**  Yes, sir.

9           **THE COURT:**  You're also acknowledging and agreeing

10  that any factual issues regarding your sentencing will be

11  decided by the sentencing judge under a preponderance of the

12  evidence standard, which is a lower standard of evidence than

13  would apply at a jury trial.  Do you understand that?

14          **THE DEFENDANT:**  Yes, sir.

15          **THE COURT:**  And you're waiving or giving up any right

16  to have a jury decide any of these sentencing issues.  Do you

17  understand that?

18          **THE DEFENDANT:**  Yes, sir.

19          **THE COURT:**  You're also agreeing that in making its

20  sentencing decision, the Court may consider any relevant

21  evidence, without regard to whether that evidence would be

22  admissible under the rules of evidence that would apply at a

23  trial.  Do you understand that?

24          **THE DEFENDANT:**  Yes, sir.

25          **THE COURT:**  Have you read each and every one of these

 1    waivers?

 2              **THE DEFENDANT:**  Yes, sir.

 3              **THE COURT:**  Have you discussed them with your

 4    attorney and asked him any questions you may have had about

 5    them?

 6              **THE DEFENDANT:**  Yes, sir.

 7              **THE COURT:**  Did you understand his answers to your

 8    questions?

 9              **THE DEFENDANT:**  Yes, sir.

10              **THE COURT:**  Do you understand what these waivers mean

11    and what their consequences are?

12              **THE DEFENDANT:**  Yes, sir.

13              **THE COURT:**  And do you fully and completely

14    understand and knowingly and voluntarily agree to all these

15    waivers along with all the other terms of the plea agreement

16    and the plea supplement?

17              **THE DEFENDANT:**  Yes, sir.

18              **THE COURT:**  Mr. Holleman, are you satisfied your

19    client fully and completely understands and knowingly and

20    voluntarily agrees with all the waivers along with all the

21    other terms of the plea agreement and the plea supplement?

22              **MR. HOLLEMAN:**  Yes, Your Honor.

23              **THE COURT:**  All right.  In that event, then, the

24    Court will accept the plea agreement and plea supplement and

25    direct that they be filed into the record.  Pursuant to local

```
 1    court rule, the plea supplement will be filed under seal.

 2              Now, Mr. Cvitanovich, do you understand that the

 3    offense to which you're seeking to plead guilty today is a

 4    felony offense, and that if your plea is accepted by the

 5    Court, you will be adjudged guilty of that offense; and such

 6    adjudication of guilt may deprive you of valuable civil

 7    rights, such as the right to vote, the right to hold public

 8    office, the right to serve on a jury, and the right to possess

 9    any kind of firearm?  Do you understand that, sir?

10              THE DEFENDANT:  Yes, I do.

11              THE COURT:  I'm required to inform you of the maximum

12    possible penalties to which you would be exposed by pleading

13    guilty to this charge.  You're seeking to plead guilty to the

14    one-count information which charges you with violating

15    Title 21, United States Code, Sections 331(k) and 333(a)(2),

16    misbranding.

17              If you plead guilty to this charge, the maximum

18    possible penalties to which you would be exposed would be as

19    follows:  A term of imprisonment of not more than three

20    years; a fine of up to $10,000; a term of supervised release

21    of not more than one year; and a $100 special assessment.  Do

22    you understand that those are the maximum possible penalties

23    to which you would be exposed by pleading guilty to this

24    charge?

25              THE DEFENDANT:  Yes, sir.
```

```
 1            THE COURT:  Have you discussed those with your
 2    attorney and asked him any questions you had about them?
 3            THE DEFENDANT:  Yes, sir.
 4            THE COURT:  Did you understand his answers?
 5            THE DEFENDANT:  Yes, sir.
 6            THE COURT:  Now, do you understand that a term of
 7    supervised release is or may be imposed in addition to any
 8    sentence of imprisonment?  Do you understand that?
 9            THE DEFENDANT:  Yes, sir.
10            THE COURT:  And what supervised release is, is a
11    period of time following your release from any term of
12    imprisonment during which your activities would be monitored
13    and supervised by the U.S. Probation Office.  Do you
14    understand that?
15            THE DEFENDANT:  Yes, sir.
16            THE COURT:  And if you violate any of the conditions
17    of your supervised release, you could be subjected to
18    imprisonment for the entire term of supervised release,
19    without credit for any time you might have already served on
20    that term of supervised release.  Do you understand that?
21            THE DEFENDANT:  Yes, sir.
22            THE COURT:  Do you understand that if applicable, the
23    Court may order you to make restitution to any victims of this
24    offense?  Do you understand that?
25            THE DEFENDANT:  Yes, sir.
```

1          THE COURT:  And, Ms. Jones, you said forfeiture is

2     not applicable in this case; is that correct?

3          MS. JONES:  Yes, Your Honor.

4          THE COURT:  Also if the offense involved fraud or

5     other intentionally deceptive practices, the Court may order

6     that you provide notice of your conviction to any victims of

7     the offense.  Do you understand that?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  Finally, for each offense, you must pay a

10    special assessment of $100 per count, which in this case,

11    because you're pleading guilty to one count, would be $100.

12    Do you understand that?

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  Do you understand all of these possible

15    consequences of your guilty plea?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  Have you discussed them with your

18    attorney and asked him any questions you had about them?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  Did you understand his answers?

21         THE DEFENDANT:  Yes, sir.

22         THE COURT:  Now, under the Sentencing Reform Act of

23    1984, the United States Sentencing Commission has issued

24    sentencing guidelines for judges to follow to determine the

25    sentence in a criminal case.  Your sentence in this case will

1    be determined by considering a combination of these advisory

2    sentencing guidelines, possible authorized departures from

3    those guidelines, and other statutory sentencing factors that

4    have been set forth by Congress at Title 18, United States

5    Code, Section 3553.  Have you and your attorney talked about

6    how the sentencing guidelines might apply to your case?

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  Now, do you understand that the Court

9    will not be able to determine the guideline sentence range for

10   your case until after the probation office has prepared a

11   Presentence Report and you and the government have both had an

12   opportunity to review that report and to challenge or object

13   to the reported facts and proposed application of the

14   sentencing guidelines that are recommended by the probation

15   officer?  Do you understand that?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  And do you understand that the sentence

18   ultimately imposed by the Court may be different from any

19   estimate that your attorney may have given you?  Do you

20   understand that?

21             THE DEFENDANT:  Yes, sir.

22             THE COURT:  Also after your initial advisory

23   sentencing guideline range has been determined, the Court does

24   have the authority under some circumstances to depart upward

25   above the guideline range or downward below the guideline

1  range. The Court will also consider statutory sentencing

2  factors found at Title 18, United States Code, Section 3553,

3  that could result in the imposition of a sentence that is

4  either greater than or lesser than the advisory guideline

5  sentence range. Do you understand that?

6  **THE DEFENDANT:** Yes, sir.

7  **THE COURT:** Do you understand that the Court, in its

8  discretion, could sentence you up to the maximum prison

9  sentence provided by statute, which in this case is three

10  years? Do you understand that?

11  **THE DEFENDANT:** Yes, sir.

12  **THE COURT:** Finally, parole has been abolished, and

13  if you are sentenced to prison, you will not be released on

14  parole. Do you understand that?

15  **THE DEFENDANT:** Yes, sir.

16  **THE COURT:** You're also waiving some constitutional

17  rights by pleading guilty. I want to review those with you as

18  well to make sure you understand them.

19  Now, do you understand that you have a right to plead

20  not guilty to any offense charged against you and to persist

21  in that not guilty plea? Do you understand that?

22  **THE DEFENDANT:** Yes, sir.

23  **THE COURT:** You would then have the right to a trial

24  by a jury. Do you understand that?

25  **THE DEFENDANT:** Yes, sir.

```
 1              THE COURT:  And at that trial, you would be presumed
 2     to be innocent, and the government would have to prove your
 3     guilt beyond a reasonable doubt.  Do you understand that?
 4              THE DEFENDANT:  Yes, sir.
 5              THE COURT:  You'd have the right to the assistance of
 6     counsel for your defense at trial and at every stage of the
 7     proceeding, and if necessary, the Court would appoint an
 8     attorney for you.  Do you understand that?
 9              THE DEFENDANT:  Yes, sir.
10              THE COURT:  You'd have the right to see and hear all
11     of the witnesses who testify and have them cross-examined in
12     your defense.  Do you understand that?
13              THE DEFENDANT:  Yes, sir.
14              THE COURT:  You'd have the right to the issuance of
15     subpoenas or compulsory process to compel witnesses to attend
16     the trial and testify in your defense.  Do you understand
17     that?
18              THE DEFENDANT:  Yes, sir.
19              THE COURT:  You'd have the right on your own part to
20     refuse to testify unless you voluntary elected to do so in
21     your own defense.  Do you understand that?
22              THE DEFENDANT:  Yes, sir.
23              THE COURT:  And if you decided not to testify or not
24     to put on any evidence whatsoever, those facts cannot be used
25     against you.  Do you understand that?
```

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Do you further understand that by

3   entering a plea of guilty today, if that plea is accepted by

4   the Court, there will not be a trial, and you will have waived

5   or given up your right to a trial as well as all of the other

6   rights associated with a trial as I have just described them?

7   Do you understand that?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  I'm required to inform you of the charge

10   to which you're seeking to plead guilty in this case.

11          You're seeking to plead guilty to the one-count

12   information which charges as follows:  At all times relevant

13   to the allegations of this information, defendant Anthony

14   Charles Cvitanovich was a co-owner of Mary Mahoney's Old

15   French House, or Mahoney's, a Mississippi corporation

16   operating as a restaurant in Biloxi, Mississippi, prominently

17   advertising on its menu, in the Southern Division of the

18   Southern District of Mississippi and elsewhere, that it served

19   local seafood to its customers.  Defendant Cvitanovich

20   purchased fish that his restaurant advertised, described on

21   its menu, and sold to its customers.

22          It is a felony violation of Title 21, United States

23   Code, Sections 331(k) and 333(a)(2), knowingly to cause the

24   misbranding of fish held for sale after shipment in interstate

25   commerce in order to facilitate its fraudulent sale as a

1     premium higher priced local species. A food is misbranded if

2     its labeling and description is false and misleading.

3           On September 19, 2018, a federal search warrant was

4     executed upon Anthony Charles Cvitanovich's chief seafood

5     supplier from whom he purchased inexpensive imported fish for

6     his restaurant to sell as higher priced local premium species.

7     While they were arranging such a sale, the supplier's sales

8     manager informed the defendant Cvitanovich of the presence of

9     federal investigators and suggested that they postpone their

10     further discussion of seafood sales until federal agents

11     departed.

12           Thereafter, defendant Cvitanovich knowingly and

13     willfully continued to purchase imported and other inexpensive

14     seafood from the same supplier and then to advertise and sell

15     it at his restaurant as premium local species, when they were

16     neither premium nor local.

17           During 2018 and 2019, with the intent to mislead and

18     defraud consumers and thereby to profit, defendant Cvitanovich

19     knowingly and willfully caused the mislabeling of

20     approximately 17,190 pounds of the following fish held for

21     sale after shipment in interstate commerce in order to

22     facilitate its fraudulent sale as a premium higher priced

23     local species: Lake Victoria perch from Africa, tripletail

24     from Suriname, and Unicorn filefish from India, all in

25     violation of Title 21, United States Code, Sections 331(k) and

1    333(a)(2).

2              Have you seen the information against you in this

3    case?

4              THE DEFENDANT:  Yes, sir.

5              THE COURT:  And have you read this charge to which

6    you are seeking to plead guilty?

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  Did you have a full opportunity to

9    discuss this charge with your attorney and ask him any and all

10   questions you had about it?

11             THE DEFENDANT:  Yes, sir.

12             THE COURT:  Did you understand his answers?

13             THE DEFENDANT:  Yes, sir.

14             THE COURT:  Do you understand the charge against you

15   in the information?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  Mr. Holleman, are you satisfied your

18   client understands the charge against him in the information?

19             MR. HOLLEMAN:  Yes, sir.

20             THE COURT:  I also need to explain to you the

21   essential elements of the charge in the information.  These

22   are the things the government would have to prove, and it

23   would have to prove them beyond a reasonable doubt before you

24   could be found guilty.

25             The information charges a violation of Title 21,

1    United States Code, Section 331(k), which prohibits any act

2    with respect to a food which is done while such food is held

3    for sale, whether or not the first sale, after shipment in

4    interstate commerce and which results in such article being

5    misbranded.

6         In order for you to be found guilty of this charge,

7    the government must prove each of these following elements

8    beyond a reasonable doubt:  First, that the act in question

9    occurred while the food was held for sale after shipment in

10   interstate commerce; second, that the act resulted in the

11   article being misbranded; and third, that the act in question

12   was done with the intent to mislead or defraud.

13        A food is deemed misbranded if its labeling is false

14   or misleading in any particular or its advertising is false or

15   misleading in any material respect.

16        So those are the essential elements of the charge

17   contained in the one-count information.  Do you understand

18   those, Mr. Cvitanovich?

19        **THE DEFENDANT:**  Yes, sir.

20        **THE COURT:**  Have you discussed those with your

21   attorney and asked him any questions you may have had about

22   them?

23        **THE DEFENDANT:**  Yes, sir.

24        **THE COURT:**  Did you understand his answers to your

25   questions?

```
 1           THE DEFENDANT:  Yes, sir.

 2           THE COURT:  Do you understand what the government

 3    must prove beyond a reasonable doubt before you could be found

 4    guilty?

 5           THE DEFENDANT:  Yes, sir.

 6           THE COURT:  And do you fully and completely

 7    understand the nature of the charge against you, including its

 8    essential elements?

 9           THE DEFENDANT:  Yes, sir.

10           THE COURT:  Mr. Holleman, are you satisfied your

11    client fully and completely understands the nature of the

12    charge against him, including its essential elements?

13           MR. HOLLEMAN:  Yes, sir.

14           THE COURT:  Now, at this time, what I'm going to do,

15    Mr. Cvitanovich, is I'm going to ask the attorney for the

16    government to state into the record those facts the government

17    would be prepared to prove if the case went to trial.  I want

18    you to listen very carefully to what he has to say, because

19    when he's finished, I'm going to ask you if you understand and

20    agree with everything he has to say.  All right?

21           Counsel?

22           MR. KORZENIK:  Yes, Your Honor.  If the case were to

23    go to trial, the government would have provided proof in the

24    form of testimony and exhibits to establish beyond a

25    reasonable doubt the allegations made in the information at
```

1    issue here.  The evidence supporting these charges include his

2    own statements, the defendant's own statements, and testimony

3    of others for the period relevant to the charges in the

4    information.

5        Mr. Cvitanovich has been a part-owner of Mary

6    Mahoney's Old French House, Incorporated, a well-known

7    restaurant that has operated in Biloxi for over 60 years.  In

8    its website, advertisements, and menus, Mahoney's was promoted

9    as a trusted source of fresh local Gulf Coast seafood.

10       The evidence shows that in the beginning of 2015,

11   Mr. Cvitanovich assumed the responsibilities of purchasing

12   much of the food that Mahoney's prepared and served.  At that

13   time, if not before, Mr. Cvitanovich was made aware, by the

14   statements of his supplier, the labels on the boxes of frozen

15   fish Mahoney's received, the prices he negotiated, and the

16   invoices he paid, that most of the fish he ordered from his

17   restaurant's primary supplier, primary wholesaler, was not the

18   local species that Mahoney's advertised and identified on its

19   menu.  The evidence shows that the defendant ordered thousands

20   of pounds per year of fish that did not bear the names of

21   those native to local waters, even though they were

22   represented to be local premium seafood on the Mahoney's menu.

23       Specifically during the years 2018 and 2019,

24   Mr. Cvitanovich intentionally misled and defrauded customers

25   by mislabeling approximately 17,100 pounds of fish held for

1    sale at the restaurant after it had been shipped in interstate

2    commerce.  The labeling facilitated its fraudulent sale as a

3    premium higher priced local species, when, in fact, the sale

4    was of an inexpensive foreign frozen imported fish, including

5    Lake Victoria perch from Africa, tripletail from Suriname, and

6    Unicorn filefish from India.  The evidence would show that

7    defendant Cvitanovich participated with others in the

8    substitution of these inexpensive foreign frozen fish imported

9    from -- from elsewhere, from Africa, South America, and Asia,

10   and that he advertised and facilitated the advertisement at

11   his restaurant as local premium species.  In so doing,

12   Mr. Cvitanovich, with intent to defraud and mislead customers,

13   knowingly received imported fish that he and others had held

14   for sale, after shipment in interstate commerce, to facilitate

15   its misbranding and its sale as a premium higher priced local

16   species.

17          Again, the definition of misbranding is included in

18   the charges.  It's under Title 21, Sections 343(a) and (b).  A

19   food is misbranded if its labeling and description is false

20   and misleading in any particular, and specifically if it is

21   offered for sale under the name of another food.

22          All of the acts would be shown to have occurred in

23   the Southern District of Mississippi and elsewhere on the

24   alleged dates identified.

25          Again, your Honor, the elements have been established

1  already here and read, and I will not repeat them, except to

2  say that the evidence that the government would put on at

3  trial would satisfy each one of them.

4       **THE COURT:** All right. Mr. Cvitanovich, did you hear

5  everything the attorney for the government had to say?

6       **THE DEFENDANT:** Yes, sir.

7       **THE COURT:** Did you understand everything he had to

8  say?

9       **THE DEFENDANT:** Yes, sir.

10       **THE COURT:** Do you agree with those facts?

11       **THE DEFENDANT:** Yes, sir.

12       **THE COURT:** And is that what happened in this case?

13       **THE DEFENDANT:** Yes, sir.

14       **THE COURT:** All right. In a moment, then, I'm going

15  to ask you for your plea to the charge in the one-count

16  information, whether it's guilty or not guilty. Before I do

17  that, though, is there anything at all that you have not

18  understood or that you would like to discuss further with your

19  attorney?

20       **THE DEFENDANT:** No, sir.

21       **THE COURT:** All right. Then, Mr. Cvitanovich, how do

22  you now plead to the charge contained in the one-count

23  information? Guilty or not guilty?

24       **THE DEFENDANT:** Guilty.

25       **THE COURT:** It is the finding of the Court in the

1   case of United States versus Anthony Charles Cvitanovich that

2   having viewed the defendant in court and considered his

3   demeanor and responses, the defendant is fully competent and

4   capable of entering an informed plea, that the defendant is

5   aware of the nature of the charges and the consequences of the

6   plea, and that the plea of guilty to the one-count information

7   is a knowing and voluntary plea, supported by an independent

8   basis in fact containing each of the essential elements of the

9   offense.  The plea is therefore accepted, and the defendant is

10  now adjudged guilty of that offense.

11          As I mentioned, a written Presentence Report will

12  need to be prepared by the probation office to assist the

13  Court in sentencing.  You'll be asked to give information to

14  the probation officer for that report.  It's important you

15  provide complete and truthful answers to the probation officer

16  when you meet with him or her.  You may have your attorney

17  present with you, if you wish, when you meet with the

18  probation officer.  And you and your attorney will be allowed

19  to read the Presentence Report and file any objections you

20  have to the Presentence Report before the sentencing hearing.

21  You and your attorney will also have an opportunity to speak

22  on your behalf at the sentencing hearing before the Court

23  imposes any sentence.

24          So at some point after we finish today, someone from

25  probation will be in touch with you or your attorney to begin

1 that process.

2     Sentencing will be on Thursday, September 12, 2024,

3 at 10:00 a.m. here in this courtroom.  Thursday,

4 September 12, 2004, at 10:00 a.m. here in this courtroom.

5     And one thing I want to remind you of,

6 Mr. Cvitanovich, is you've now been adjudged guilty of a

7 felony.  One consequence of that is you no longer have the

8 right to possess a firearm of any kind for any purpose.  Do

9 you understand that, sir?

10     **THE DEFENDANT:**  Yes, sir.

11     **THE COURT:**  I understand the defendant has been

12 placed on terms of release.  Any issues with him remaining on

13 his conditions of release pending sentencing?

14     **MR. HOLLEMAN:**  No, Your Honor.

15     **MS. JONES:**  No, Your Honor.

16     **THE COURT:**  Probation aware of any issues?

17     **PROBATION OFFICER:**  Probation has no issue.

18     **THE COURT:**  All right.  Under the facts and

19 circumstances of the case and pursuant to the Bail Reform Act,

20 the Court finds there is sufficient evidence in the record to

21 conclude that the defendant is not likely to flee or pose a

22 danger to the safety of any other person in the community;

23 therefore, the Court will permit him to remain on his current

24 conditions of release pending sentencing.

25     Mr. Cvitanovich, you are to appear here in this

1   courtroom on Thursday, September 12, 2024, at 10:00 a.m. for

2   sentencing.  Failure to appear at the sentencing hearing as

3   required is a criminal offense for which you could be

4   sentenced to imprisonment.  All conditions of your current

5   release are still in place and must be followed completely;

6   and the penalties for violating those conditions can be

7   severe, including incarceration.  Do you understand that, sir?

8           **THE DEFENDANT:**  Yes, sir.

9           **THE COURT:**  All right.  Anything further at this

10  time?

11          **MS. JONES:**  No, Your Honor, not from the government.

12          **MR. HOLLEMAN:**  No, Your Honor, not from the

13  defendant.

14          **THE COURT:**  All right.  Counsel, then, are excused,

15  and court will stand in recess.

16                  (Hearing concluded.)

17                      - - -

18

19

20

21

22

23

24

25

## CERTIFICATE OF COURT REPORTER

I, Kati Vogt, RPR, RMR, RDR, CRR, Official Court Reporter for the United States District Court for the Southern District of Mississippi, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.


s/Kati Vogt
KATI VOGT, RPR, RMR, RDR, CRR
OFFICIAL COURT REPORTER

9/27/24, 10:23 AM    Southern District of Mississippi | Biloxi Restaurant and its Co-Owner Plead Guilty to Conspiracy to Misbrand Seafood | United St…

Case 1:24-cv-00241-LG-RPM   Document 73-1   Filed 07/02/25   Page 109 of 204



**PLAINTIFF'S EXHIBIT**

**1. C**

**PRESS RELEASE**

# Biloxi Restaurant and its Co-Owner Plead Guilty to Conspiracy to Misbrand Seafood

Thursday, May 30, 2024

> **For Immediate Release**
>
> U.S. Attorney's Office, Southern District of Mississippi

Gulfport, MS – A Mississippi corporation operating as Mary Mahoney's Old French House restaurant in Biloxi, Mississippi, pled guilty today to conspiracy to misbrand seafood and wire fraud. A co-owner/manager of the restaurant also pled guilty to misbranding of seafood.

According to court documents, Mary Mahoney's Old French House, Inc., pled guilty to a felony Information, filed April 26, 2024, charging the corporation with conspiracy to misbrand seafood and wire fraud in connection with a scheme that began as early as 2002 and continued through November of 2019. Mahoney's, founded in 1962, admitted that between December 2013 and November 2019, it and its co-conspirators, fraudulently sold as local premium species, approximately 58,750 pounds (over 29 tons) of fish that was frozen and imported from Africa, India, and South America. Additionally, Anthony Charles Cvitanovich, 55, a co-owner/manager at the restaurant, pled guilty to a felony Information, also filed April 26, 2024, charging him with misbranding of seafood during 2018 and 2019.

Cvitanovich admitted that between 2018 and 2019 alone, he was involved in mislabeling approximately 17,190 pounds of fish sold at the restaurant. The scheme involved the fraudulent sale of fish by Mahoney's and its wholesale supplier that was described on Mahoney's menu as premium higher priced local species, such as snapper and grouper from the Gulf of Mexico, when the fish was actually other species from abroad, including Lake Victoria Perch from Africa, Triple Tail from Suriname, and Unicorn Filefish from India. Genetic testing of fish by the Food and Drug Administration (FDA) confirmed the fraudulent scheme.

"When people spend their hard-earned dollars to enjoy the incredible local seafood on the Mississippi Gulf Coast, they should get what they paid for, not frozen fish from overseas," said U.S. Attorney Todd W. Gee of the Southern District of Mississippi. "Mislabeling food and defrauding customers are serious crimes, and this case will help convince restaurants and seafood suppliers that it is not worth lying to customers about what is on the menu."

"U.S. consumers expect their seafood to be correctly identified. When sellers purposefully substitute one fish species for another, they deceive consumers and cause potential food safety hazards to be overlooked or misidentified by processors or end users," said Special Agent in Charge Justin Fielder, FDA Office of Criminal Investigations Miami Field Office. "We will continue to investigate and bring to justice those who put profits above public health."

Mary Mahoney's Old French House, Inc. and Anthony Charles Cvitanovich are scheduled to be sentenced on September 12, 2024. Mary Mahoney's Old French House, Inc. faces a maximum penalty of five years' probation and a

$500,000 fine, or not more than the greater of twice the gross gain or twice the gross loss, whichever is greater. Cvitanovich faces a maximum penalty of three years of prison and a $10,000 fine. A federal district court judge will determine any sentence after considering the U.S. Sentencing Guidelines and other statutory factors.

U.S. Attorney Todd W. Gee of the Southern District of Mississippi made the announcement.

The Food and Drug Administration - Office of Criminal Investigations is investigating the case.

Assistant U.S. Attorney Andrea Jones and Senior Trial Attorney Jeremy F. Korzenik of the Justice Department's Environment and Natural Resources Division are prosecuting the case.

*Updated May 30, 2024*



**PLAINTIFF'S EXHIBIT 1. D**

PRESS RELEASE

# Mississippi Seafood Distributor and Managers Plead Guilty to Conspiracy and Misbranding of Seafood

Tuesday, August 27, 2024

**For Immediate Release**

Office of Public Affairs

## Company Agrees to Pay More than $1.1M in Criminal Penalties

A Mississippi seafood distributor and two company managers pleaded guilty today to conspiring with others to mislabel seafood and to commit wire fraud by marketing inexpensive and frozen imported substitutes as more expensive and premium local species.

Quality Poultry and Seafood Inc. (QPS), the largest seafood wholesaler on the Mississippi Gulf Coast, has agreed to pay the United States $1 million in forfeitures and a criminal fine of $150,000. QPS sales manager Todd A. Rosetti and business manager James W. Gunkel, both of Ocean Springs, Mississippi, also pleaded guilty to misbranding seafood to facilitate QPS' fraud.

QPS admitted to participating in this fish substitution scheme from as early as 2002 and continuing through November 2019. The indictment alleges that QPS recommended and sold to its restaurant customers foreign-sourced fish that could serve as convincing substitutes for the local species the restaurants advertised on their menus. QPS also labeled the cheap imports that it sold to customers at its own retail shop and café as premium local fish.

"QPS and company officials went to great lengths in conspiring with others to perpetuate fraud for more than a decade, even after they knew they were under federal investigation," said Assistant Attorney General Todd Kim of the Justice Department's Environment and Natural Resources Division. "Mislabeling seafood harms local wholesalers and fishermen who compete to sell locally sourced, premium fish in a market unfairly flooded with less expensive fish, frozen and imported from overseas."

"When imported substitutes are marketed as local domestic seafood, it depresses the value of authentic Gulf Coast seafood, which means that honest local fishermen and wholesalers have a harder time making a profit," said U.S. Attorney Todd W. Gee for the Southern District of Mississippi. "This kind of mislabeling fraud hurts the overall local seafood market and rips off restaurant customers who were paying extra to eat a premium local product. These convictions should serve as a warning: restaurants and wholesalers will face criminal prosecution if they are not honest with customers about what they are actually buying."

"U.S. consumers expect their seafood to be correctly identified. When sellers purposefully substitute one fish species for another, they deceive consumers and cause potential food safety hazards to be overlooked or misidentified by

9/27/24, 1:23 PM    Office of Public Affairs | Mississippi Seafood Distributor and Managers Plead Guilty to Conspiracy and Mislabeling of Seafood | ...

Case 1:24-cr-00044-LG-BWR    Document 72-1    Filed 07/03/25    Page 112 of 204

processors or end users," said Special Agent in Charge Justin Fielder of the Food and Drug Administration (FDA)'s Office of Criminal Investigations, Miami Field Office. "We will continue to investigate and bring to justice those who put profits above public health."

The indictment alleges that even after agents from the FDA executed a criminal search warrant at QPS to investigate its sale of mislabeled fish, QPS continued for over a year to sell frozen fish imported from Africa, South America and India for use as substitutes for local premium species.

Mary Mahoney's, which pleaded guilty in May, admitted that between December 2013 and November 2019, it fraudulently sold, as local premium species, approximately 58,750 pounds (over 29 tons) of fish that was not the species identified on its menu. QPS supplied seafood to Mary Mahoney's and many other restaurant restaurants and retailers.

QPS, Rosetti and Gunkel will be sentenced on Dec. 11. A federal district court judge will determine any sentence after considering the U.S. Sentencing Guidelines and other statutory factors.

FDA's Office of Criminal Investigations is investigating the case.

Senior Trial Attorney Jeremy F. Korzenik of the Environment and Natural Resources Division's Environmental Crimes Section and Assistant U.S. Attorney Andrea Jones for the Southern District of Mississippi are prosecuting the case.

*Updated August 27, 2024*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

UNITED STATES OF AMERICA

VS.                                    1:24CR00090

TODD ANTHONY ROSETTI


### SENTENCING HEARING

BEFORE THE HONORABLE HALIL S. OZERDEN
UNITED STATES DISTRICT JUDGE

DECEMBER 11, 2024
GULFPORT, MISSISSIPPI


(APPEARANCES FOLLOWING)


REPORTED BY:   SHERRI L. PENNY, RPR, FCRR
               2012 15TH STREET, SUITE 403
               GULFPORT, MISSISSIPPI  39501
               (228)563-1781


PLAINTIFF'S
EXHIBIT
1. E

1  APPEARANCES:

2  FOR THE GOVERNMENT:
   ANDREA C. JONES, ESQUIRE
3  U.S. ATTORNEY'S OFFICE - GULFPORT
   1575 20TH AVENUE
4  GULFPORT, MISSISSIPPI  39501
                AND
5  JEREMY F. KORZENIK, ESQUIRE
   U. S. DEPARTMENT OF JUSTICE
6  Environmental Crimes Section
   150 M Street, NE    Room 4.208
7  WASHINGTON, DC  20002

8

   FOR THE DEFENDANT:
9  JOSEPH M. HOLLOMON, ESQUIRE
   JOE M. HOLLOMON & ASSOCIATES, PA
10 107 North State Street
   JACKSON, MISSISSIPPI  39201

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          - - -

1        **THE COURT:**  This is case number 1:24cr90, United

2   States versus Todd Anthony Rosetti, scheduled for sentencing.

3   Would counsel please make their appearances.

4        **MS. JONES:**  Good morning, Your Honor.  Andrea Jones

5   for the United States, along with Jeremy Korzenik from the

6   Environmental Crimes and Natural Resources Division.  Thank

7   you.

8        **THE COURT:**  Good morning.

9        **MR. HOLLOMON:**  Good morning, Your Honor.  Joe

10  Hollomon for Todd Rosetti.  My client is present beside me here

11  in court.

12       **THE COURT:**  Good morning, Mr. Hollomon.

13       **MR. HOLLOMON:**  Morning, Your Honor.

14       **THE COURT:**  Ms. Jones, again, pursuant to the Crime

15  Victims' Rights Act, are there any victims of this offense?

16       **MS. JONES:**  There were multiple victims, Your Honor,

17  but as we have indicated previously at the plea and as accepted

18  by the Court under Title 18, United States Code, Section

19  3663(a), it would be impractical as to the number of victims

20  and the nominal amounts, and also needlessly delay court

21  proceedings and reaching ends of justice in the procession of

22  the case.

23       **THE COURT:**  Court concurs with that assessment.  As

24  it has found for the companion cases, the location and

25  identification of the potential victims in this case would be

- - -

1    unduly complex and time consuming, and indeed, the victims

2    would be very difficult to identify.  For those reasons, the

3    Court finds that the government has complied with the

4    provisions of the Crime Victims' Rights Act.

5        Pursuant to -- let me ask this, Ms. Jones, has the

6    government received the presentence report and any addendum and

7    had a chance to review them?

8             **MS. JONES:**  Yes, Your Honor.

9             **THE COURT:**  Are there any objections?

10            **MS. JONES:**  No, Your Honor.

11            **THE COURT:**  Mr. Hollomon, did you receive the

12    presentence report and any addendum and have a chance to review

13    them with your client?

14            **MR. HOLLOMON:**  We did, Your Honor.

15            **THE COURT:**  Were you able to explain them to your

16    client and answer any questions he had about them?

17            **MR. HOLLOMON:**  I did.

18            **THE COURT:**  Did he understand them?

19            **MR. HOLLOMON:**  He did, Your Honor.

20            **THE COURT:**  Are there any objections?

21            **MR. HOLLOMON:**  There were no objections, Your Honor.

22    We contacted the presentence investigating writer to elaborate

23    on his educational background.  That was taken care by the

24    addendum.

25            **THE COURT:**  I see that in the addendum.

- - -

1      Mr. Rosetti, would you please stand, raise your right hand
2  and take the oath.
3      (Oath Administered)
4          THE COURT:  Mr. Rosetti, have you heard everything
5  your attorney has just said?
6          THE DEFENDANT:  Yes, Your Honor.
7          THE COURT:  Have you understood everything he said?
8          THE DEFENDANT:  Yes, Your Honor.
9          THE COURT:  Do you agree with what he said?
10          THE DEFENDANT:  Yes, Your Honor.
11          THE COURT:  Did he review the presentence report with
12  you?
13          THE DEFENDANT:  Yes, Your Honor.
14          THE COURT:  Was he able to explain it to you and
15  answer any questions you had about it?
16          THE DEFENDANT:  Yes, Your Honor.
17          THE COURT:  Do you understand the presentence report?
18          THE DEFENDANT:  Yes, Your Honor.
19          THE COURT:  And do you agree with your attorney that
20  you do not have any objections?
21          THE DEFENDANT:  Yes.
22          THE COURT:  Thank you, you may be seated.  Based upon
23  that, then, the sentencing guideline calculations in this case
24  would be as follows:  The total offense level is an 18.  Mr.
25  Rosetti's criminal history category is a I.  That would

                        - - -

1   ordinarily yield a guideline range of imprisonment under the
2   guidelines of 27 to 33 months; however, because he was
3   permitted to plead to a charge with a 12-month statutory
4   maximum, the guideline range is capped at 12 months and is
5   therefore 12 months.

6       The supervised release range is one year.  The defendant
7   is not eligible for probation under the guidelines absent a
8   variance.  The fine range would ordinarily be $10,000 to
9   $100,000, but, again, it is statutorily capped by the count of
10  conviction at $1,000.  Restitution is not applicable, and there
11  is a $25 special assessment.

12      Do the parties agree that those are the correct guideline
13  computations in this case?

14          **MS. JONES:**  Yes, Your Honor.

15          **MR. HOLLOMON:**  Yes, Your Honor.

16          **THE COURT:**  The Court agrees and will adopt those as
17  the guideline computations.  The Court will further adopt the
18  presentence report and addendum in their entirety as the
19  Court's findings of fact.

20      At this time, Mr. Rosetti, you have what is known as the
21  right of allocution.  That is your opportunity to address the
22  Court and say anything you would like to say on your behalf
23  before the Court imposes a sentence.  You may address the Court
24  yourself if you wish.  If you would rather your attorney speak
25  for you, that's fine, too, it is entirely your choice.  Either

- - -

 1   way, I am going to ask you both to come up here to the podium.
 2   And if you do choose to speak, I remind you that you are under
 3   oath.
 4       Anything you would like to say, sir?
 5       **THE DEFENDANT:**  Yes, Judge.  I am very sorry for my
 6   actions and involvement, and it will never happen again.
 7       **THE COURT:**  All right.  Mr. Hollomon, do you want to
 8   add anything?
 9       **MR. HOLLOMON:**  Your Honor, I would simply add that I
10   know my client, for working with him over the past year and a
11   half to two years on this case, I do know that he is sincere in
12   what he says to the Court, and deeply regrets his involvement
13   in this.  That's all we have to say at this time, Your Honor.
14       **THE COURT:**  Anything from the government?
15       **MR. KORZENIK:**  Yes, Your Honor, if I may.  As the
16   Court has already recognized, there was a search warrant
17   conducted which put on notice Mr. Rosetti and others that the
18   conduct in which they were engaging was criminal.  Eight days
19   later, they resumed it and continued until the search warrant
20   was conducted on Mary Mahoney's.  So the knowledge that they
21   were committing crimes was not an adequate deterrent to stop
22   them from doing what they were doing.  Essentially, though, the
23   subject matter was fish, it's a financial fraud.  It's a way of
24   making money by deceiving others, and that's what this
25   defendant did.  And he played a significant role, as indicated

- - -

1    in the presentence report, in contributing to the fraud of

2    others by recommending particular species that would be

3    inexpensive substitutes for premium brands that were being

4    advertised and the customers thought they were buying.

5         And the questions, as the Court has raised, what is the

6    adequate deterrent here?  This is conduct that went on for a

7    long time with full knowledge that it was contrary to the law.

8    If one can make money for years and then simply face the

9    punishment of home detention briefly, there's every incentive

10   to continue engaging in that conduct and participating in the

11   fraud of customers that, essentially, in this case, extended

12   the reach of Quality Poultry and Seafood and the defendant

13   here.  They made bonuses by the value by the profits that the

14   company was making.

15        As Your Honor has pointed out a number of times, the

16   conduct here was long-standing and extensive, and a sentence

17   should be imposed that does justice to that and creates a

18   reasonable deterrent for the conduct that Your Honor has

19   described.

20        **THE COURT:**  Thank you.  I believe there's going to be

21   a recommendation made in accordance with the plea agreement; is

22   that right?

23        **MR. KORZENIK:**  That's correct, Your Honor.

24        **THE COURT:**  Government stands by that recommendation?

25        **MR. KORZENIK:**  Yes.  And, again, the leniency has

                            - - -

1    already been given here.

2              THE COURT:  Understood.  All right.

3         Mr. Rosetti, before I go any further, one thing I do need

4    to explain to you is that as part of your plea agreement in

5    this case you waived the right to appeal your conviction and

6    your sentence.  If for some reason you decided that you wanted

7    to try to appeal anyway, you can ask your attorney to file a

8    notice of appeal for you.  If for some reason he cannot or will

9    not file one, you can file one yourself.  All you have to do is

10   write on a piece of paper that you wish to appeal, sign it, and

11   then mail it in to the clerk of court, but you only have 14

12   days to do that from the date I enter a written judgment in

13   your case.  Do you understand that, sir?

14             THE DEFENDANT:  Yes, I do, Your Honor.

15             THE COURT:  Also, if for some reason you could not

16   afford to pay the costs of an appeal, you can request

17   permission to proceed on appeal without paying those costs.

18   You could also, if you wish, request that an attorney be

19   appointed for you on appeal, and if you qualify one would be

20   appointed for you.  But again, you have to put those requests

21   in writing and send them in to the clerk; do you understand

22   that?

23             THE DEFENDANT:  Yes, Your Honor.

24             THE COURT:  This matter is before the Court for

25   sentencing.  In this case, I have considered the record in this

- - -

1   matter, including the presentence investigation report, the

2   advisory sentencing guideline computations, and the record of

3   this proceeding here today, including the statements of Mr.

4   Rosetti and those of counsel for the parties.

5       I am also required to take into account the pertinent

6   statutory sentencing factors set forth by Congress at Title 18,

7   United States Code, Section 3553.  In this case, the Court

8   finds the following factors are relevant:  The nature and

9   circumstances of the offense and history and characteristics of

10  the defendant.

11      This is an offense involving misbranding of seafood

12  specifically fish.  Mr. Rosetti pled guilty to a violation of

13  Title 21, United States Code, Section 331(k), a misdemeanor

14  offense.  During an inspection of Quality Poultry and Seafood,

15  Incorporated, in May of 2017, Mississippi DMR inspectors

16  observed some boxes of what appeared to be mislabeled fish.

17  And investigators later received confidential information from

18  an informant that Quality was engaged in adulteration of its

19  products as a routine practice.  This led to the FDA initiating

20  a criminal investigation.  And as part of that investigation, a

21  number of undercover purchases were made from Quality, and it

22  was determined that Quality was, in fact, selling misbranded

23  fish, a lower-quality fish and representing it to be locally

24  caught and more expensive Gulf fish, both to its retail and

25  wholesale customers.

- - -

1    Mr. Rosetti was the sales manager and supervisor of all

2    sales people and was instructing staff to mislabel and misbrand

3    seafood.   Indeed, when other employees would make attempts to

4    properly label products, he would circumvent that and use his

5    position as a supervisor to override that and mislabel

6    products.

7    A search warrant was eventually executed on the premises

8    in September of 2018 by federal agents, and Mr. Rosetti was

9    interviewed and initially denied that any misbranding was

10   taking place.   According to the presentence report, when he was

11   reminded that lying to a federal officer was a felony and that

12   the search warrant was not a random event, he became more

13   forthcoming and provided truthful information to agents about

14   the mislabeling that was taking place, and he indicated that he

15   was aware that they were misleading their customers.

16   The investigation and statements of other employees

17   indicate that this activity had been going on for an extensive

18   period of time, perhaps as far back as 1999, and that some 200

19   to 300 customers of Quality, wholesale and retail customers,

20   including restaurants and casinos, were being misled about the

21   nature of the product they were purchasing, all of this in

22   order to financially benefit the defendants in this matter.

23   Mr. Rosetti has been held accountable under the sentencing

24   guidelines as a manager or supervisor.   That increased his

25   guideline range because he was the ultimate authority in this

- - -

1  scheme.  He was the driving force, the one that made it happen

2  and made it continue to happen and directed others in these

3  activities.  And as indicated by counsel for the government,

4  what is particularly egregious about this case is that even

5  after the search warrant was executed and Mr. Rosetti was on

6  notice that this activity was criminal, it continued.  The

7  presentence report documented, I believe, some 93 sales to Mary

8  Mahoney's alone after the date of the execution of the search

9  warrant.

10  The sentencing factor here, of course, is the

11  circumstances of the offense, which the Court has just

12  described.  This is a very serious offense, and that's another

13  factor the Court takes into account.

14  Mr. Rosetti is in a criminal history category of a I.

15  He's a zero-point offender.  And the government has recommended

16  a sentence in the lower half of the guideline range, which the

17  Court will accept, for the record; however, that is mooted by

18  the fact that the guideline range is 12 months.

19  The sentence needs to promote respect for the law.  The

20  conduct in this case, in the Court's view, shows zero respect

21  for the law, not just the initiation of this scheme, the fact

22  that it was ongoing for so long, it took advantage of so many

23  individuals and entities, but that it then continued after the

24  search warrant had been executed on the property.

25  The need to afford adequate deterrence to criminal conduct

- - -

1   is another factor as well.  The need to deter Mr. Rosetti from
2   engaging in this type of behavior in the future, but also to
3   deter others who may be inclined to engage in it.  This type of
4   conduct is difficult to detect and investigate, so a deterrent
5   effect is important.
6       It needs to protect the public.  In this case, although
7   the Court has determined it's too difficult to identify and
8   notify them, there were at least 200 to 300 wholesale and
9   retail customers over the years that were victimized by this
10  conduct, most completely unaware of what was taking place.
11      They were then, in turn, selling this misbranded fish to
12  their own customers who became victims as well.  And it has
13  cast a cloud of suspicion over other restaurants and casinos
14  who were, as far as they knew, operating on honestly.
15      They took advantage of the fishermen, took advantage of
16  customers.  And it is arguably called into question the
17  reputation of a number of unsuspecting customers who now have a
18  cloud of suspicion over them simply because of what's happened
19  here, even though they had no knowledge this was going on.  The
20  sentence needs to protect the public for those reasons.  And it
21  needs to take into account the avoidance of unwanted
22  disparities in sentencing, roles, relative responsibility, and
23  the relative roles individuals played in this conspiracy are
24  factors the Court takes into account.
25      With respect to Mahoney's, who has been sentenced, they

- - -

 1  were, of course, held accountable for their own purchases and
 2  sales to their own customers.  What Quality was doing was more
 3  far-reaching and extensive, went on for longer and was far more
 4  widespread, and indeed blatant because it continued after the
 5  execution of the search warrant.  Mr. Rosetti was the train
 6  driving a lot of that.  So that's another factor the Court
 7  takes into account.
 8      And for all of those reasons the Court will impose
 9  sentence as follows.  The Court has considered the advisory
10  sentencing guideline computations and the sentencing factors
11  found at Title 18, United States Code, Section 3553.  And it is
12  hereby the judgment of this court that the defendant, Todd
13  Anthony Rosetti, is hereby committed to the custody of the
14  Bureau of Prisons for a term of eight months as to Count 1 of
15  the bill of information.  This sentence constitutes a downward
16  variance from the guideline imprisonment range, but the Court
17  finds it to be appropriate in light of the 3553 factors as the
18  Court has just discussed them on the record here today,
19  including the history and characteristics of the defendant, the
20  nature and circumstances of the offense, to reflect the
21  seriousness of the offense, to promote respect for the law, to
22  afford a just punishment, and to afford adequate deterrence to
23  others who wish to engage in similar criminal conduct.
24      The variance is appropriate in light of mitigating
25  factors, including the defendant's lack of prior criminal

- - -

1    history and his acceptance of responsibility once charged in

2    this case.

3         The Court does find, however, that further reduction to a

4    sentence of probation would not be warranted in light of the

5    3553 factors as the Court has discussed them, including, but

6    not limited to, his continued criminal conduct following the

7    notice of a federal criminal investigation and his role as the

8    manager or supervisor in the offense.  For all these reasons,

9    the Court finds the sentence to be appropriate.

10        It is further ordered that the defendant pay a fine in the

11   amount of $1,000, which is the cap under the guidelines.

12   Payment of the fine is due immediately and must be paid in full

13   no later than 30 days after entry of judgment in this case.

14   Payment of the fine shall be made to the U.S. District Court

15   clerk for the Southern District of Mississippi.

16        Upon release from imprisonment, the defendant shall be

17   placed on supervised release for a term of one year as to Count

18   1 of the bill of information.

19        Within 72 hours of release from the custody of the Bureau

20   of Prisons, the defendant shall report in person to the

21   probation office in the district to which he is released.

22        While on supervised release, the defendant shall comply

23   with the mandatory conditions of supervision set forth at Title

24   18, United States Code, Section 3583(d).  Further, the Court

25   finds the standard conditions of supervision listed on the

- - -

1    judgment order, which have been adopted by the Court and have

2    not been objected to by the defendant, are reasonably related

3    to the factors set forth at Title 18, United States Code,

4    Section 3553(a)(1), (a)(2)(A), (B), (C) and (D), and involve no

5    greater deprivation of liberty than reasonably necessary for

6    the purposes set forth in that section.

7         Further, in the Court's view, these conditions are

8    consistent with the policy statements issued by the Sentencing

9    Commission pursuant to Title 28, United States Code, Section

10   994(a).  Therefore, the defendant shall comply with the

11   standard conditions of supervision listed on the judgment

12   order, and this includes a prohibition on the possession of a

13   firearm.

14        In addition, the following special conditions are imposed:

15        Number 1, the defendant shall be placed on home detention

16   for a period of 180 days to be monitored by RF monitoring

17   equipment, and shall abide by all technology requirements of

18   the location monitoring program.  As part of this program, the

19   defendant shall be restricted to his approved residence at all

20   times, except for employment, education, religious services,

21   medical, substance use or mental health treatment, attorney

22   visits, court appearances, court-ordered obligations, or

23   essential leave activities as preapproved by the U.S. Probation

24   Office.

25        The defendant shall pay all or part of the costs of

- - -

1    participation in the location monitoring program, including

2    equipment loss and damage as directed by the Court and/or his

3    supervising probation officer.  The Court finds this to be an

4    appropriate condition in light of an alternative to a longer

5    term of imprisonment.  This will serve to add a measure of

6    punishment to the sentence in this case.

7          Number 2, the defendant shall complete 100 hours of

8    community service work during the term of supervision.  The

9    defendant shall perform the community service work at specific

10   times agreed upon with the approved community service agency

11   and U.S. Probation Office.  The defendant is responsible for

12   providing verification of completed hours to the U.S. Probation

13   Office.

14         This condition is imposed in light of the fine in this

15   case, that it's far below what the ordinary guideline fine

16   range would have been, and also to afford the defendant an

17   opportunity to give something back to the community.

18         Number 3, the defendant shall not incur new credit charges

19   or open additional lines of credit without the approval of the

20   probation office until such time as the fine is paid in full.

21         Number 4, the defendant shall provide the probation office

22   with access to any requested financial information, and must

23   notify the Court of any changes in economic circumstances which

24   may affect the ability to pay the imposed financial penalties.

25         Number 5, the defendant shall pay all criminal monetary

- - -

1    penalties imposed by the Court in accordance with the schedule

2    of payments as outlined in the judgment.

3        These three conditions are imposed in light of the fine in

4    this case, to ensure the defendant remains in compliance with

5    that part of the sentence, and to facilitate probation office

6    supervision regarding same.

7        The Court further orders the defendant pay a mandatory

8    special assessment of $25, which is due immediately.

9        Further, in light of the facts and circumstances of this

10   case, the Court will not impose restitution, as doing so would

11   unduly burden and complicate the sentencing process and

12   needlessly prolong it for the reasons the Court has stated

13   previously.

14       The Court recommends that the defendant be designated to a

15   facility closest to his home for which he is eligible to

16   facilitate family visitation.  And the defendant is ordered to

17   surrender for service of his sentence at the institution

18   designated by the Bureau of Prisons as instructed or to the

19   U.S. Marshal Service for later than 60 days from date of

20   sentencing.

21       So that will be the judgment of the Court.  Anything

22   further at this time?

23            **MS. JONES:**  No, Your Honor.

24            **THE COURT:**  Anything else?

25            **MR. HOLLOMON:**  No, Your Honor.

- - -

1          **THE COURT:**  In that case, counsel, you are excused.

2    Court stands in recess.

3                    (HEARING CONCLUDED)

4                        -  -  -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                         -  -  -

1

2                  CERTIFICATE OF COURT REPORTER

3

4          I, Sherri L. Penny, RPR, FCRR, Official Court Reporter

5    for the United States District Court for the Southern District

6    of Mississippi, appointed pursuant to the provisions of Title

7    28, United States Code, Section 753, do hereby certify that the

8    foregoing is a correct transcript of the proceedings reported

9    by me using the stenotype reporting method in conjunction with

10   computer-aided transcription, and that same is a true and

11   correct transcript to the best of my ability and understanding.

12         I further certify that the transcript fees and format

13   comply with those prescribed by the Court and the Judicial

14   Conference of the United States.

15

16

17
                           *S/ Sherri L. Penny*
18                      OFFICIAL COURT REPORTER

19

20

21

22

23

24

25


                              - - -

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION



UNITED STATES OF AMERICA

v.

MARY MAHONEY'S OLD FRENCH HOUSE, INC.

CRIMINAL NO. 1:24cr 45 HSO-RPM

18 U.S.C. § 371
18 U.S.C. § 1343
21 U.S.C. § 331(k)
21 U.S.C. § 333(a)(2)

**The United States Attorney charges:**

At all times relevant to the allegations of this Information:

1. Defendant, **MARY MAHONEY'S OLD FRENCH HOUSE ("MAHONEY'S")**, established in 1962, was a Mississippi corporation operating as a restaurant in Biloxi, Mississippi, prominently advertising that it served local seafood to its customers.

2. Co-conspirator No. 1 was a co-owner of Defendant **MAHONEY'S** and purchased fish and other food that **MAHONEY'S** prepared and served to its customers.

3. Co-conspirator No. 2 was a Mississippi corporation operating in Biloxi as a wholesale supplier of poultry and seafood to restaurants, casinos, and retail markets. It also sold poultry and seafood to the general public from its retail outlet and served meals to customers at its cafe.



1

4. Co-conspirator No. 3 became Co-conspirator No. 2's Business Manager in 2014 after working at Co-conspirator No. 2 for about six years. He was a certified public accountant and oversaw all of Co-conspirator No. 2's businesses and its approximately thirty-five employees. In that position Co-conspirator No. 3 managed Co-conspirator No. 2's purchases of seafood from its suppliers and monitored the prices that Co-conspirator No. 2's charged its wholesale and retail customers.

5. Co-conspirator No. 4 was Co-conspirator No. 2's sales manager, supervising the company's sales staff. He has been employed at Co-conspirator No. 2 since 1993. Co-conspirator No. 4 was responsible for overseeing Co-conspirator No. 2's sales to restaurants, casinos, and other wholesale customers both directly and through the salesmen of Co-conspirator No. 2 whom he managed.

### One-Count Conspiracy To Profit by Fraudulently Misbranding Seafood and Using Interstate Wire Transmissions to Execute the Scheme to Defraud

6. At a time no later than 2012, and as early as 2002, and continuing through November 2019, **Mahoney's,** Co-conspirator No. 1, Co-conspirator No. 2, Co-conspirator No. 3, Co-conspirator No. 4, and others, knowingly and willfully agreed and conspired to commit the following criminal offenses against the United States:

a. With the intent to defraud, mislead consumers, and thereby to profit, the conspirators knowingly received imported fish that they held for sale after shipment in interstate commerce to facilitate its misbranding and sale as a premium higher priced local species, in violation of Title 21, United States Code, Sections 331(k) and 333(a)(2). A food is misbranded if its labeling and description is false and misleading in any particular. Title 21, United States Code, Section 343(a).

2

b. To advance their scheme to defraud, the conspirators knowingly made use of interstate wire transmissions to facilitate the sale of misbranded fish, in violation of Title 18, United States Code, Section 1343.

### The Purpose of the Conspiracy

7. It was the objective of the conspirators and the purpose of their conspiracy to benefit financially by misbranding and by aiding and facilitating the misrepresentation of the species of fish they and others sold, often representing as locally sourced premium fish, species that were neither the species identified on the menu, for which customers were charged nor, as represented, locally caught in the Mississippi Gulf.

### Manner and Means of the Conspiracy

8. The following were among the means and methods employed by the defendant Mahoney and its coconspirators to carry out the conspiracy and to achieve its unlawful objectives:

a. Defendant **MAHONEY'S** and co-conspirators 1, 2, 3, and 4, and others working as their employees and agents, by using interstate wire transmissions, purchased frozen seafood sourced from foreign countries and waters that were not those of the Mississippi Gulf, with the intent to advertise and sell them to Co-conspirator No. 2's retail customers, Mississippi restaurants, and to the customers of Mississippi restaurants as local premium species when they were neither local nor the species they were advertised to be. The conspirators thereby benefitted from the sale of seafood that would not have been as marketable nor as profitably sold if its actual species and origin had been known.

3

b. Defendant **MAHONEY'S** and Co-conspirator No. 1, and others, advertised and sold to their customers seafood they purchased from Co-conspirator No. 2, the wholesale supplier of poultry and seafood, and from other seafood suppliers, falsely claiming it to be fresh locally sourced premium species, including Red Snapper, Snapper, and Redfish, when they knew full well it was neither the species it was represented to be on **MAHONEY'S** menu nor sourced from local waters, as advertised. The conspirators thereby benefitted from the sale of seafood that would not have been as marketable nor as profitably sold if its actual species and origin had been known.

c. Defendant **MAHONEY'S** advertised its menu and misbranded seafood on the website https://www.yelp.com. The **MAHONEY'S** menu on this website and elsewhere stated, "all of our seafood is caught in our bountiful gulf waters," to appeal to customers seeking local Gulf Coast seafood.

### Overt Acts in Furtherance of the Conspiracy

9. In furtherance of this conspiracy and to achieve its objectives, at least one of the conspirators identified above, in the Southern District of Mississippi, committed at least one of the following overt acts:

### I. Co-conspirator 2's Sales to Restaurants of Fish Species Not Appearing on Their Menus

(1) On January 26, 2015, Co-conspirator No. 3 emailed the following text to Co-conspirator No. 4: "We need to raise the price of perch on Mary Mahoney's perch we are getting 7%."

(2) On or about November 4, 2016, Co-conspirator No. 2 sold Triggerfish to local restaurant A for use as a substitute for premium local fish.

4

(3)  In a text message dated July 5, 2017, co-conspirator No. 4 wrote to co-conspirator No. 1 of Mahoney's: "Still have no triple tail I'm sending you trigger-style fish 8 – 10 to use till we get it back in stock.  An employee of [Co-conspirator No. 2] is using it already instead of triple tail at the [local restaurant] and said he has used it for grouper snapper and triple tail with no complaints. And it's cheaper than triple tail."   Co-conspirator No. 1 responded, "Ok."

(4)  On or about July 25, 2017, Co-conspirator No. 2 sold fish it represented on its menu to be the local premium fish Red Snapper which was determined by genetic analysis not to be to be Red Snapper but an imported species of lesser value.

(5)  On or about September 29, 2017, Co-conspirators No. 4  and No. 2 sold Triggerfish to local restaurant A for use as a substitute for premium local fish.

(6)  In a January 19, 2018 email, a purchasing agent employed by Co-conspirator No. 2, notified Co-conspirators No. 3 and No. 4, and other employees of Co-conspirator No. 2, "Due to the shortage on snapper we will be substituting triple tail for all snapper." Triple tail was not a local fish but was imported by Co-conspirator No. 2 from Suriname in South America.

(7)  In an April 16, 2018 email, Co-conspirator No. 3 sent the following instructions to Co-conspirator No. 4 and other members of the Co-conspirator No. 2's sales staff:

"I don't understand why we are giving Perch away [African Lake Victoria Perch "LVP"].  This is a replacement for the triple tail which were selling at $8.99 and $9.99. Now we are selling perch at $5.69 if we can't get at least $6.99 or $7.99 then it's not worth bringing it in here. This is a product that no one else has and it is versatile. Raise the price and make money where we can make money!"

5

(8) Co-conspirator No. 4 replied to Co-conspirator No. 1's September 19, 2018, text order for LVP with the text, "Tomorrow FDA here today." Co-conspirator No. 1 responded, "Ok."

## II. Efforts to Conceal the Conspiracy: False Denials

(9) When questioned by Food and Drug Administration ("FDA") agents during their September 19, 2018 search of the premises of Co-conspirator No. 2, Co-conspirator No. 3 told the agents that if anyone in Co-conspirator No. 2's retail market was labeling a fish with a name other than its true name, it was done without his approval and without his knowledge.

(10) When questioned by federal agents during their September 19, 2018 search of the premises of Co-conspirator No. 2, Co-conspirator No. 3 told the agents that Co-conspirator No. 2 does not ship any fish outside of the State of Mississippi.

(11) When questioned by federal agents during their September 19, 2018 search of Co-conspirator No. 2, Co-conspirator No. 3 told the agents that Co-conspirator No. 2 had sold fish to Mary **MAHONEY'S** restaurant in Biloxi, Mississippi, but not much anymore.

(12) When questioned by federal agents during their September 19, 2018, search of the poultry and seafood wholesaler, Co-conspirator No. 3 of Co-conspirator No.2, told the agents that he was not aware of any restaurant customer mislabeling and selling fish bought from Co-conspirator No. 2 as something other than what it was, such as selling a cheap fish as an expensive one.

(13) When questioned by federal agents during their September 19, 2018 search of the premises of Co-conspirator No. 2, Co-conspirator No. 4 told the agents that any

mislabeling of fish by Co-conspirator No. 2 was inadvertent and he did not know of any mislabeling of fish by the restaurants to which Co-conspirator No. 2 sold seafood.

### III. Co-conspirator No. 2's Seafood Sales to Mahoney's
### During and After the September 19, 2018 Federal Search Warrant at premises of
### Co-conspirator No. 2

(14) On September 19, 2018, while an authorized federal search of the premises of Co-conspirator No. 2 was underway, Co-conspirator No. 1 sent an electronic text message to Co-conspirator No. 4 ordering the imported frozen African freshwater fish, LVP, which his restaurant, Defendant Mahoney's, regularly mislabeled and sold to customers as local Mississippi Gulf Coast Snapper.

(15) Eight days after FDA's search of the premises of Co-conspirator No. 2, in a September 27, 2018 text to Co-conspirator No. 4, Co-conspirator No. 1 ordered 150 pounds of LVP in order to sell it to customers of Defendant **MAHONEY'S** restaurant as Snapper.

(16) About a month after FDA's search of the premises of Co-conspirator No. 2 in an October 18, 2018, text to Co-conspirator No. 4, Co-conspirator No. 1 ordered 60 pounds of LVP for sale by Defendant **MAHONEY'S** restaurant as Snapper.

(17) In an October 18, 2018 text, after Co-conspirator No. 4 informed him that the wholesalers Co-conspirator No. 2 was unlikely to obtain more LVP, "Perch about to be nonexistant," Co-conspirator No. 1 instructed him to "Get all they have."

(18) In a February 21, 2019 text, Co-conspirator No. 4 told to Co-conspirator No. 1, "We have 110 cases of perch left when that is gone there is no more. FYI we are looking for alternatives. Unicorn, triple tail and parrot fish are always good alternatives."

(19)  In a responsive February 21, 2019 text, Co-conspirator No. 1 told Co-conspirator No. 4, not to sell the remaining cases of LVP to any other customers, "I will buy them."  Co-conspirator No. 4 responded, "You come bring me a check and I will set it aside for you."

## IV. Additional 2019 Sales from Co-conspirator No. 2 to Mahoney's Of Fish Not Appearing on MAHONEY'S Menu

| Overt Act | Date | Invoice # | Fish Sold as a Premium Local Species | Pounds Sold | Pounds Delivered | Price per Pound | Total |
|---|---|---|---|---|---|---|---|
| 20 | 01/07/19 | 01-305315 | Lake Perch - Africa | 120.0 | | $5.95 | $714.00 |
| 21 | 01/11/19 | 01-305620 | Lake Perch - Africa | 80.0 | | $5.95 | $476.00 |
| 22 | 01/15/19 | 01-305792 | Lake Perch - Africa | 100.0 | | $5.95 | $595.00 |
| 23 | 01/21/19 | 01-306128 | Lake Perch - Africa | 60.0 | | $5.95 | $357.00 |
| 24 | 01/25/19 | 01-306393 | Lake Perch - Africa | 100.0 | | $5.95 | $595.00 |
| 25 | 01/31/19 | 01-306697 | Lake Perch - Africa | 80.0 | | $5.95 | $476.00 |
| 26 | 02/05/19 | 01-306984 | Lake Perch - Africa | 120.0 | | $5.95 | $714.00 |
| 27 | 02/08/19 | 01-307209 | Lake Perch - Africa | 60.0 | | $5.95 | $357.00 |
| 28 | 02/13/19 | 01-307475 | Lake Perch - Africa | 200.0 | | $5.95 | $1,190.00 |
| 29 | 02/20/19 | 01-307927 | Lake Perch - Africa | 140.0 | | $5.95 | $833.00 |
| 30 | 02/21/19 | 01-307993 | Lake Perch - Africa | 1,080.0 | | $5.95 | $6,426.00 |
| 31 | 02/26/19 | 01-308276 | Lake Perch - Africa | | 100.0 | | |
| 32 | 03/04/19 | 01-308678 | Lake Perch - Africa | | 100.0 | | |
| 33 | 03/07/19 | 01-308827 | Lake Perch - Africa | | 80.0 | | |
| 34 | 03/13/19 | 01-309236 | Lake Perch- Africa | | 100.0 | | |
| 35 | 03/16/19 | 01-309509 | Lake Perch - Africa | | 100.0 | | |
| 36 | 03/19/19 | 01-309645 | Triple Tail - Suriname | 2,000.0 | | $7.99 | $15,980.00 |
| 37 | 03/20/19 | 01-309694 | Lake Perch - Africa | | 60.0 | | |
| 38 | 03/22/19 | 01-309903 | Lake Perch - Africa | | 100.0 | | |
| 39 | 03/27/19 | 01-310191 | Lake Perch - Africa | | 200.0 | | |

| Overt Act | Date | Invoice # | Fish Sold as a Premium Local Species | Pounds Sold | Pounds Delivered | Price per Pound | Total |
|-----------|------|-----------|--------------------------------------|-------------|------------------|-----------------|-------|
| 40 | 04/01/19 | 01-310525 | Lake Perch - Africa | | 100.0 | | |
| 41 | 04/05/19 | 01-310837 | Lake Perch - Africa | | 100.0 | | |
| 42 | 04/10/19 | 01-311145 | Lake Perch - Africa | | 100.0 | | |
| 43 | 04/15/19 | 01-311451 | Triple Tail - Suriname | | 100.0 | | |
| 44 | 04/18/19 | 01-311707 | Triple Tail - Suriname | | 100.0 | | |
| 45 | 04/25/19 | 01-312136 | Triple Tail - Suriname | | 100.0 | | |
| 46 | 05/02/19 | 01-312640 | Triple Tail - Suriname | | 50.0 | | |
| 47 | 05/07/19 | 01-312938 | Triple Tail - Suriname | | 100.0 | | |
| 48 | 05/10/19 | 01-313166 | Triple Tail - Suriname | | 50.0 | | |
| 49 | 05/15/19 | 01-313455 | Triple Tail - Suriname | | 100.0 | | |
| 50 | 05/20/19 | 01-313783 | Triple Tail - Suriname | | 100.0 | | |
| 51 | 05/28/19 | 01-314272 | Triple Tail - Suriname | | 100.0 | | |
| 52 | 06/03/19 | 01-314630 | Triple Tail - Suriname | | 100.0 | | |
| 53 | 06/05/19 | 01-314769 | Triple Tail - Suriname | | 100.0 | | |
| 54 | 06/10/19 | 01-315053 | Triple Tail - Suriname | | 100.0 | | |
| 55 | 06/11/19 | 01-315150 | Triple Tail - Suriname | | 100.0 | | |
| 56 | 06/12/19 | 01-315209 | Triple Tail - Suriname | | 100.0 | | |
| 57 | 06/18/19 | 01-315583 | Triple Tail - Suriname | | 100.0 | | |
| 58 | 06/20/19 | 01-315747 | Triple Tail - Suriname | | 100.0 | | |
| 59 | 06/20/19 | 01-315748 | Triple Tail - Suriname | 500.0 | | $8.29 | $4,145.00 |
| 60 | 06/24/19 | 01-315963 | Triple Tail- Suriname | | 100.0 | | |
| 61 | 06/28/19 | 01-316279 | Triple Tail - Suriname | | 100.0 | | |
| 62 | 07/02/19 | 01-316459 | Triple Tail - Suriname | | 100.0 | | |
| 63 | 07/09/19 | 01-316811 | Triple Tail - Suriname | | 100.0 | | |
| 64 | 07/15/19 | 01-317168 | Triple Tail - Suriname | | 100.0 | | |
| 65 | 07/18/19 | 01-317377 | Triple Tail - Suriname | | 100.0 | | |
| 66 | 07/22/19 | 01-317556 | Triple Tail - Suriname | | 100.0 | | |

| Overt Act | Date | Invoice # | Fish Sold as a Premium Local Species | Pounds Sold | Pounds Delivered | Price per Pound | Total |
|---|---|---|---|---|---|---|---|
| 67 | 07/26/19 | 01-317857 | Triple Tail - Suriname | | 100.0 | | |
| 68 | 07/30/19 | 01-318016 | Triple Tail - Suriname | | 100.0 | | |
| 69 | 08/05/19 | 01-318333 | Triple Tail - Suriname | | 100.0 | | |
| 70 | 08/08/19 | 01-318527 | Triple Tail - Suriname | | 60.0 | | |
| 71 | 08/13/19 | 01-318773 | Unicorn-India | 150.0 | | $7.99 | $1,198.50 |
| 72 | 08/15/19 | 01-318913 | Unicorn-India | 50.0 | | $7.99 | $399.50 |
| 73 | 08/22/19 | 01-319526 | Unicorn-India | 100.0 | | $7.99 | $799.00 |
| 74 | 08/23/19 | 01-319385 | Unicorn-India | 50.0 | | $6.99 | $349.50 |
| 75 | 08/27/19 | 01-319547 | Unicorn-India | 100.0 | | $6.99 | $699.00 |
| 76 | 09/03/19 | 01-319898 | Unicorn-India | 100.0 | | $6.99 | $699.00 |
| 77 | 09/06/19 | 01-320138 | Unicorn-India | 100.0 | | $6.99 | $699.00 |
| 78 | 09/16/19 | 01-320622 | Triple Tail- Suriname | 100.0 | | $8.95 | $895.00 |
| 79 | 09/19/19 | 01-320845 | Triple Tail - Suriname | 100.0 | | $8.95 | $895.00 |
| 80 | 09/24/19 | 01-321115 | Triple Tail - Suriname | 100.0 | | $8.95 | $895.00 |
| 81 | 09/27/19 | 01-321304 | Triple Tail - Suriname | 100.0 | | $8.95 | $895.00 |
| 82 | 10/04/19 | 01-321715 | Triple Tail - Suriname | 100.0 | | $8.95 | $895.00 |
| 83 | 10/08/19 | 01-321890 | Triple Tail - Suriname | 50.0 | | $8.95 | $447.50 |
| 84 | 10/11/19 | 01-322091 | Triple Tail - Suriname | 100.0 | | $8.95 | $895.00 |
| 85 | 10/16/19 | 01-322337 | Triple Tail - Suriname | 50.0 | | $8.95 | $447.50 |
| 86 | 10/24/19 | 01-322810 | Triple Tail - Suriname | 50.0 | | $8.95 | $447.50 |
| 87 | 10/23/19 | 01-322721 | Triple Tail - Suriname | 100.0 | | $8.95 | $895.00 |
| 88 | 10/29/19 | 01-323056 | Triple Tail - Suriname | 60.0 | | $8.95 | $537.00 |
| 89 | 10/31/19 | 01-323175 | Triple Tail - Suriname | 100.0 | | $8.95 | $895.00 |
| 90 | 11/07/19 | 01-323565 | Triple Tail - Suriname | 60.0 | | $8.95 | $537.00 |
| 91 | 11/12/19 | 01-323832 | Triple Tail - Suriname | 60.0 | | $8.95 | $537.00 |
| 92 | 11/15/19 | 01-324064 | Triple Tail - Suriname | 100.0 | | $8.95 | $895.00 |

### V. Sales Facilitated by Interstate Wire Transmissions

(93)  Between May 26 and August 16, 2019, and longer, Defendant Mary

**MAHONEY'S** posted its menu on the website www.yelp advertising the sale of premium local

species for which the defendant substituted imported frozen fish of a lesser value.

### VI . Summary of Co-conspirator No. 2's Sales of Fish that MAHONEY'S Misbranded and Served

10.  Between December 2013 and November 2019, the Defendant **MAHONEY'S** and

other co-conspirators, with the intent to mislead and defraud consumers, knowingly and willfully

arranged for Co-conspirator No. 2 to supply to Defendant **MAHONEY'S** approximately 58,750

pounds (over 29 tons) of imported Lake Victoria Perch, Trigger Fish, Triple Tail, and Unicorn

Filefish.  These species did not appear on the Defendant **MAHONEY'S** menu nor on its website

but were fraudulently sold to **MAHONEY'S** customers under the names and at the higher prices

of local premium fish.

All in violation of Title 18, United States Code, Section 371.

### NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE

13.  As a result of committing the offense as alleged in this Information, the defendant shall

forfeit to the United States all property involved in or traceable to property involved in the offenses,

including but not limited to all proceeds obtained directly or indirectly from the offenses, and all

property used to facilitate the offenses.  Further, if any property described above, as a result of any

act or omission of the defendant: (a) cannot be located upon the exercise of due diligence; (b) has

been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the

jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been

commingled with other property, which cannot be divided without difficulty, then it is the intent

of the United States to seek a judgment of forfeiture of any other property of the defendant, up to the value of the property described in this notice or any bill of particulars supporting it.

Specifically, a monetary forfeiture amount of $1,350,000.

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1); and Title 28, United States Code, Section 2461.

TODD W. GEE
United States Attorney

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI

**F I L E D**

May 30 2024

ARTHUR JOHNSTON, CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

UNITED STATES OF AMERICA

v.                                                    CRIMINAL NO. 1:24cr45-HSO-RPM

MARY MAHONEY'S OLD FRENCH HOUSE, INC.

### PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the United

States of America, and defendant Mary Mahoney's Old French House, Inc. ("Mahoney's")

through their undersigned attorneys agree as follows:

### I. Obligations of the Parties

1. Defendant Mahoney's agrees to plead guilty to a felony Information charging the

corporation with participating in a Title 18, United States Code, Section 371, conspiracy to defraud

its customers by marketing mislabeled seafood, in violation of Title 21, United States Code,

Sections 331(k) and 333(a)(2), and in having used interstate wire transmissions to facilitate the

fraud, in violation of Title 18, United States Code, Section 1343.

2. Defendant Mahoney's acknowledges that it understands the nature and elements of the

offense to which it agrees to plead guilty. The defendant waives its right to have a separate sealed

plea supplement as provided by Local Rule 49.1(B)(2).

3. Defendant Mahoney's agrees to pay the forfeitures, and costs set forth herein and

otherwise to fulfill the sentence proposed in this Agreement if so ordered by the Court.

4. The United States Attorney's Office for the Southern District of Mississippi and the

Environmental Crimes Section of United States Department of Justice ("the Government") will: (a)

recommend that the Court accept the defendant's plea of guilty; (b) recommend that the Court



PLAINTIFF'S
EXHIBIT
**1.6**

sentence the defendant as set forth below; (c) inform the United States Probation Office and the

Court of this Agreement, the nature and extent of the defendant's activities with respect to this case

and all other activities of the defendant the government or the Court deems relevant to sentencing.

## II. Conditions and Waivers

5. Defendant Mahoney's acknowledges that the sentence the parties propose to the Court

in this Plea Agreement is only a recommendation that the Court may accept or reject and that the

Court may impose some other sentence that it determines to be just.

6. Defendant Mahoney's understands that the penalty that may be imposed for its plea of

guilty to the Information is to be determined according to the factors set forth in Title 18, United

States Code, Sections 3553 and 3572. If a penalty is imposed it is to be determined under Title

18, United States Code, Section 3571(c)(1) and (d), with the maximum penalty being Probation

not more than five (5) years, Supervised release of not more than three (3) years, and a $500,000

fine pursuant to Title 18, United States Code, Section 3571(c), or not more than the greater of twice

the gross gain or twice the gross loss pursuant to Title 18, United States Code, Section 3571(d),

whichever is greater.

7. Defendant Mahoney's acknowledges that in pleading guilty, it is giving up the right: (a)

to plead not guilty and to persist in that plea; (b) to have its guilt or innocence determined by a

jury after it has considered the evidence presented at trial; (c) to confront and cross-examine

adverse witnesses; (d) to testify and to present evidence; (e) and to compel the attendance and

testimony of witnesses.

8. The Information setting forth the charges is incorporated by reference into this Plea

Agreement. By entering into this Plea Agreement, Mahoney's admits to the facts alleged in the

Information and that it is in fact guilty of these offenses.

9. If the guilty plea is entered and defendant Mahoney's fulfills all of the terms of this Plea

Agreement, the United States will not file any additional criminal charges against the defendant arising from the facts set forth in the Information.

10. Defendant Mahoney's understands and acknowledges that it is entering into this Plea Agreement and is pleading guilty freely and voluntarily because it is guilty and that its plea has not been induced by any threat, coercion, or intimidation of any kind. Defendant Mahoney's acknowledges complete satisfaction with the representation of its counsel and the advice it has received in connection with this Plea Agreement.

11. Having agreed to plead guilty to the one-count Information, defendant Mahoney's acknowledges that it is not a prevailing party as defined in Title 18, United States Code, Section 3006A (statutory note captioned "Attorney Fees and Litigation Expenses to Defense") and hereby expressly waives its right to sue the United States for its prosecution in this case.

12. No additional promises, agreements, or conditions have been made concerning this matter other than those expressly set forth herein, and none will be made unless in writing and signed by all parties to this Agreement.

13. Defendant Mahoney's and its officers agree to continue to provide truthful and complete information to federal authorities concerning all matters pertaining to the charges to which it has agreed to plead guilty and agree to cooperate fully with the government in providing assistance and truthful information and testimony in any investigation and prosecution the government undertakes relating to the charges at issue here.

14. Defendant Mahoney's understands that this Agreement does not protect it or any of its officers or employees from prosecution for perjury should an authorized representative of Mahoney's testify untruthfully or for making false statements nor does it protect these parties from prosecution for other crimes or offenses which the United States discovers by independent investigation. Further, should the defendant fail to comply fully with the terms and conditions set

forth herein, this Agreement is voidable at the election of the United States, and the defendant may be subject to prosecution as if the Agreement had never been made.

### III. Recommended Sentence

15. The parties hereby agree to recommend the following sentence that the parties submit is just and equitable and an appropriate punishment for the crimes set forth in the accompanying Information to which defendant Mahoney's has agreed to plead guilty:

(a) Defendant Mahoney's agrees to forfeit $1,350,000 which it will pay to the United States Marshals Service, as directed by the U.S. Attorney's Office, within five business days of the Court's entry of the judgment and conviction.

(b) Defendant Mahoney's and the government agree that the forfeiture payment represents a fair and just resolution of all issues associated with loss and fine calculations.

(c) In consideration of the Defendant's forfeiture payment, the Government agrees to recommend that a fine of $150,000 be imposed.

(d) Consistent with Title 18, United States Code, Section 3561(c)(1), defendant Mahoney's shall be subject to five years of probation, which shall include the following conditions:

(i) The defendant shall not commit another federal, state, or local crime.

(ii) The defendant shall maintain for no less than five years records describing the species, sources, and cost of the seafood it acquires for sale to its customers. The defendant shall make these records available to any federal, state, or local governmental authority that regulates or monitors the service and distribution of food for human consumption and to any such agency that regulates the harvesting, storage, labeling, or sale of seafood.

(iii) The defendant shall answer truthfully any inquiry from any

governmental agency and from any customer as to the species, source, and cost of any seafood it prepares, serves, sells, or advertises for sale.

(e) The Courts shall maintain jurisdiction over this case for a period sufficient to assure compliance with this sentence.

16.    Prior to or at the time of sentencing, defendant Mahoney's will pay a special assessment of $400 per count as required in Title 18, United States Code, Section 3013(a)(2)(B). This payment shall be made to the United States District Court, at the United States Clerk's Office, 2012 15th Street, Suite 403, Gulfport, Mississippi 39501. The defendant will furnish to the Government a receipt or other evidence of payment at the time of sentencing.

TODD W. GEE
United States Attorney
Southern District of Mississippi

_Andrea C Jones_

ANDREA C. JONES
Assistant United States Attorney
Southern District of Mississippi

Date: _5/30/24_

TODD KIM
Assistant Attorney General
Environment and Natural Resource Division
United States Department of Justice

_Jeremy F Korzenik_

JEREMY F. KORZENIK
Senior Trial Attorney
Environmental Crimes Section

Date: _5/30/2024_

_Ellen Mahoney Gill_

[NAME]
Authorized Agent for Mary
Mahoney's Old French House, Inc.

Date: _5/30/2024_

_Arthur J. Madden III_

Arthur J. Madden III
Attorney for Defendant Mahoney's
Old French House, Inc.

Date: _May 30, 2024_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI

**F I L E D**

May 30 2024

Arthur Johnston, Clerk

# ACTION BY UNANIMOUS WRITTEN CONSENT WITHOUT A MEETING
## THE BOARD OF DIRECTORS OF MARY MAHONEY'S INC.

The undersigned, being all of the directors of Mary Mahoney's, Inc., a Mississippi Corporation ("Corporation") in good standing with the office of the Secretary of State of Mississippi, acting by written consent without a meeting, do hereby consent to the adoption of the following resolution and direct that this Unanimous Written Consent ("Consent") be filed with the minutes of the proceedings of the Board of Directors ( the "Board of Directors") of the Corporation:

WHEREAS the Board of Directors wish to provide their unanimous written consent for the Corporation on the following corporate matters (the "Matters"):

1. Authorize Eileen Mahoney Ezell, Director and Vice-President of the Corporation to appear on the behalf of the Corporation as Corporate Representative to enter a plea in the matter styled United States of America v. Mary Mahoney's Old French House Inc. Cause No. 1: 24cr45 at the Federal Courthouse in Gulfport on May 30, 2024 in accordance with the Plea Agreement attached to this Resolution.

WHEREAS each individual director has had the opportunity to fully research, analyze and discuss the Matters as necessary to fulfill the Directors' fiduciary obligations:

NOW THEREFORE, it is hereby RESOLVED that the Board of Directors and each individually consent to authorize Eileen Mahoney Ezell to appear as authorized representative of the Company to appear and enter a plea on behalf of the Corporation as stated in paragraph No. 1.

IN WITNESS WHEREOF, the undersigned directors have duly executed this Consent to be effective as of the 29th day of May 2024.

Date: May 29, 2024.

_____
Robert F. Mahoney, Jr., Director

_____
Eileen Mahoney Ezell, Director

_____
Andrea Cvitanovich Osman

**PLAINTIFF'S EXHIBIT**
**1. H**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

UNITED STATES OF AMERICA

v.                                                    CRIMINAL NO. 1:24cr45-HSO-RPM

MARY MAHONEY'S OLD FRENCH HOUSE, INC.

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the United

States of America, and defendant Mary Mahoney's Old French House, Inc. ("Mahoney's")

through their undersigned attorneys agree as follows:

### I.  Obligations of the Parties

1.  Defendant Mahoney's agrees to plead guilty to a felony Information charging the

corporation with participating in a Title 18, United States Code, Section 371, conspiracy to defraud

its customers by marketing mislabeled seafood, in violation of Title 21, United States Code,

Sections 331(k) and 333(a)(2), and in having used interstate wire transmissions to facilitate the

fraud, in violation of Title 18, United States Code, Section 1343.

2.  Defendant Mahoney's acknowledges that it understands the nature and elements of the

offense to which it agrees to plead guilty.  The defendant waives its right to have a separate sealed

plea supplement as provided by Local Rule 49.1(B)(2).

3.  Defendant Mahoney's agrees to pay the forfeitures, and costs set forth herein and

otherwise to fulfill the sentence proposed in this Agreement if so ordered by the Court.

4.  The United States Attorney's Office for the Southern District of Mississippi and the

Environmental Crimes Section of United States Department of Justice ("the Government") will: (a)

recommend that the Court accept the defendant's plea of guilty; (b) recommend that the Court

sentence the defendant as set forth below; (c) inform the United States Probation Office and the

Court of this Agreement, the nature and extent of the defendant's activities with respect to this case

and all other activities of the defendant the government or the Court deems relevant to sentencing.

## II. Conditions and Waivers

5. Defendant Mahoney's acknowledges that the sentence the parties propose to the Court

in this Plea Agreement is only a recommendation that the Court may accept or reject and that the

Court may impose some other sentence that it determines to be just.

6. Defendant Mahoney's understands that the penalty that may be imposed for its plea of

guilty to the Information is to be determined according to the factors set forth in Title 18, United

States Code, Sections 3553 and 3572. If a penalty is imposed it is to be determined under Title

18, United States Code, Section 3571(c)(1) and (d), with the maximum penalty being Probation

not more than five (5) years, Supervised release of not more than three (3) years, and a $500,000

fine pursuant to Title 18, United States Code, Section 3571(c), or not more than the greater of twice

the gross gain or twice the gross loss pursuant to Title 18, United States Code, Section 3571(d),

whichever is greater.

7. Defendant Mahoney's acknowledges that in pleading guilty, it is giving up the right: (a)

to plead not guilty and to persist in that plea; (b) to have its guilt or innocence determined by a

jury after it has considered the evidence presented at trial; (c) to confront and cross-examine

adverse witnesses; (d) to testify and to present evidence; (e) and to compel the attendance and

testimony of witnesses.

8. The Information setting forth the charges is incorporated by reference into this Plea

Agreement. By entering into this Plea Agreement, Mahoney's admits to the facts alleged in the

Information and that it is in fact guilty of these offenses.

9. If the guilty plea is entered and defendant Mahoney's fulfills all of the terms of this Plea

Agreement, the United States will not file any additional criminal charges against the defendant arising from the facts set forth in the Information.

10. Defendant Mahoney's understands and acknowledges that it is entering into this Plea Agreement and is pleading guilty freely and voluntarily because it is guilty and that its plea has not been induced by any threat, coercion, or intimidation of any kind. Defendant Mahoney's acknowledges complete satisfaction with the representation of its counsel and the advice it has received in connection with this Plea Agreement.

11. Having agreed to plead guilty to the one-count Information, defendant Mahoney's acknowledges that it is not a prevailing party as defined in Title 18, United States Code, Section 3006A (statutory note captioned "Attorney Fees and Litigation Expenses to Defense") and hereby expressly waives its right to sue the United States for its prosecution in this case.

12. No additional promises, agreements, or conditions have been made concerning this matter other than those expressly set forth herein, and none will be made unless in writing and signed by all parties to this Agreement.

13. Defendant Mahoney's and its officers agree to continue to provide truthful and complete information to federal authorities concerning all matters pertaining to the charges to which it has agreed to plead guilty and agree to cooperate fully with the government in providing assistance and truthful information and testimony in any investigation and prosecution the government undertakes relating to the charges at issue here.

14. Defendant Mahoney's understands that this Agreement does not protect it or any of its officers or employees from prosecution for perjury should an authorized representative of Mahoney's testify untruthfully or for making false statements nor does it protect these parties from prosecution for other crimes or offenses which the United States discovers by independent investigation. Further, should the defendant fail to comply fully with the terms and conditions set

forth herein, this Agreement is voidable at the election of the United States, and the defendant may be subject to prosecution as if the Agreement had never been made.

## III. Recommended Sentence

15. The parties hereby agree to recommend the following sentence that the parties submit is just and equitable and an appropriate punishment for the crimes set forth in the accompanying Information to which defendant Mahoney's has agreed to plead guilty:

(a) Defendant Mahoney's agrees to forfeit $1,350,000 which it will pay to the United States Marshals Service, as directed by the U.S. Attorney's Office, within five business days of the Court's entry of the judgment and conviction.

(b) Defendant Mahoney's and the government agree that the forfeiture payment represents a fair and just resolution of all issues associated with loss and fine calculations.

(c) In consideration of the Defendant's forfeiture payment, the Government agrees to recommend that a fine of $150,000 be imposed.

(d) Consistent with Title 18, United States Code, Section 3561(c)(1), defendant Mahoney's shall be subject to five years of probation, which shall include the following conditions:

(i) The defendant shall not commit another federal, state, or local crime.

(ii) The defendant shall maintain for no less than five years records describing the species, sources, and cost of the seafood it acquires for sale to its customers. The defendant shall make these records available to any federal, state, or local governmental authority that regulates or monitors the service and distribution of food for human consumption and to any such agency that regulates the harvesting, storage, labeling, or sale of seafood.

(iii) The defendant shall answer truthfully any inquiry from any

governmental agency and from any customer as to the species, source, and cost of any seafood it prepares, serves, sells, or advertises for sale.

(e) The Courts shall maintain jurisdiction over this case for a period sufficient to assure compliance with this sentence.

16. Prior to or at the time of sentencing, defendant Mahoney's will pay a special assessment of $400 per count as required in Title 18, United States Code, Section 3013(a)(2)(B). This payment shall be made to the United States District Court, at the United States Clerk's Office, 2012 15th Street, Suite 403, Gulfport, Mississippi 39501. The defendant will furnish to the Government a receipt or other evidence of payment at the time of sentencing.

TODD W. GEE
United States Attorney
Southern District of Mississippi

*Andrea C Jones*

Date: 5/30/24

ANDREA C. JONES
Assistant United States Attorney
Southern District of Mississippi

TODD KIM
Assistant Attorney General
Environment and Natural Resource Division
United States Department of Justice

*Jeremy F Korzenik*

Date: 5/30/2024

JEREMY F. KORZENIK
Senior Trial Attorney
Environmental Crimes Section

*Ellen Mary Gill*

Date: 5/30/2024

[NAME]
Authorized Agent for Mary
Mahoney's Old French House, Inc.

*Arthur J. Madden III signature*

Date: May 30, 2024

Arthur J. Madden III
Attorney for Defendant Mahoney's
Old French House, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
FILED

APR 26 2024

ARTHUR JOHNSTON
BY_____ DEPUTY

UNITED STATES OF AMERICA

v.

ANTHONY CHARLES CVITANOVICH

CRIMINAL NO. 1.24 cr 410 HSO-BMR

21 U.S.C. § 331(k)
21 U.S.C. § 333(a)(2)

**The United States Attorney charges:**

At all times relevant to the allegations of this Information:

1. Defendant ANTHONY CHARLES CVITANOVICH ("Cvitanovich") was a co-owner of Mary Mahoney's Old French House, ("Mahoney's"), a Mississippi corporation operating as a restaurant in Biloxi, Mississippi, prominently advertising on its menu in the Southern Division of the Southern District of Mississippi, and elsewhere, that it served local seafood to its customers. Defendant Cvitanovich purchased fish that his restaurant advertised, described on its menu, and sold to its customers.

2. It is a felony violation of Title 21, United States Code, Sections 331(k) and 333(a)(2), knowingly to cause the misbranding of fish held for sale after shipment in interstate commerce in order to facilitate its fraudulent sale as a premium higher priced local species. A food is misbranded if its labeling and description is false and misleading.

3. On September 19, 2018, a federal search warrant was executed upon ANTHONY CHARLES CVITANOVICH's chief seafood supplier from whom he purchased inexpensive imported fish for his restaurant to sell as higher priced local premium species. While they were arranging such a sale, the supplier's sales manager informed the Defendant Cvitanovich of the

1



PLAINTIFF'S
EXHIBIT
1. I

presence of federal investigators and suggested that they postpone their further discussion of seafood sales until federal agents departed. Thereafter, Defendant Cvitanovich knowingly and willfully continued to purchase imported and other inexpensive seafood from the same supplier and then to advertise and sell it at his restaurant as premium local species when they were neither premium nor local.

4. During 2018 and 2019, with the intent to mislead and defraud consumers, and thereby to profit, Defendant CVITANOVICH knowingly and willfully caused the mislabeling of approximately 17,190 pounds of the following fish held for sale after shipment in interstate commerce in order to facilitate its fraudulent sale as a premium higher priced local species: Lake Victoria Perch from Africa; Triple Tail from Suriname; and Unicorn Filefish from India.

All in violation of Title 21, United States Code, Sections 331(k) and 333(a)(2).

TODD W. GEE
United States Attorney

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI

# PLEA AGREEMENT

**F I L E D**

| Subject **United States v. Anthony Charles Cvitanovich** **Criminal No. 1:24cr46-HSO-BWR** | Date **March 7, 2024** May 30 2024 ARTHUR JOHNSTON, CLERK |
|---|---|

**To:**
Tim C. Holleman
Boyce Holleman & Associates
1720 23rd Ave./Boyce Holleman Blvd
Gulfport, MS 39501

**From:**
Jeremy F. Korzenik
Senior Trial Attorney
Environmental Crimes Sec.
U.S. Dept. of Justice
Washington, DC 20044

Andrea C. Jones
Asst. U.S. Attorney
Southern Dist. of MS
Criminal Division
Gulfport, MS 39201

Anthony Charles Cvitanovich, Defendant herein, and Tim C. Holleman, attorney for the Defendant, have been notified and understand and agree to the items contained herein, as well as in the Plea Supplement, and that:

1.    **Count of Conviction.**  It is understood that, as of the date of this plea agreement, Defendant and Defendant's attorney have indicated that Defendant desires to plead guilty to the one-count Information charging him with mislabeling of inexpensive imported seafood as local premium species to profit from its fraudulent sale in violation of Title 21, United States Code, Sections 331(k) and 333(a)(2).

2.    **Sentence.**  Defendant understands that the penalty for the offense in the Information to which the Defendant will plead guilty is imprisonment for not more than three years, or a fine of not more than $10,000, or both, and a term of supervised release of not more than one year. Defendant further understands that a term of supervised release will be imposed, and that the term will be in addition to any prison sentence imposed. If any of the terms of supervised release are violated, the Defendant may be returned to prison for the entire term of supervised release without any credit for any time already served on the term of supervised



PLAINTIFF'S EXHIBIT
1. J

release prior to the Defendant's violation of those conditions. Defendant also understands that the Court may require Defendant to pay restitution in this matter in accordance with applicable law. Defendant further understands that Defendant is liable to make restitution for the full amount of the loss determined by the Court, to include relevant conduct, which amount is not limited to the count of conviction. Defendant further understands that if the Court orders Defendant to pay restitution, restitution payments cannot be made to the victim directly but must be made to the Clerk of Court, Southern District of Mississippi.

3.    **Determination of Sentencing Guidelines.** It is further understood that the United States Sentencing Guidelines are advisory only and that Defendant and Defendant's attorney have discussed the fact that the Court must review the Guidelines in reaching a decision as to the appropriate sentence in this case, but the Court may impose a sentence other than that indicated by the Guidelines if the Court finds that another sentence would be more appropriate. Defendant specifically acknowledges that Defendant is not relying upon anyone's calculation of a particular Guideline range for the offense to which Defendant is entering this plea and recognizes that the Court will make the final determination of the sentence and that Defendant may be sentenced up to the maximum penalties set forth above.

4.    **Breach of This Agreement and Further Crimes.** It is further understood that should Defendant fail or refuse as to any part of this plea agreement or commit any further crimes, then, at its discretion, the U.S. Attorney may treat such conduct as a breach of this plea agreement and Defendant's breach shall be considered sufficient grounds for the pursuit of any prosecutions which the U.S. Attorney has not sought as a result of this plea agreement, including

any such prosecutions that might have been dismissed or otherwise barred by the Double Jeopardy Clause, and any federal criminal violation of which this office has knowledge.

    **5.**    **Financial Obligations.** It is further understood and specifically agreed to by Defendant that, at the time of the execution of this document or at the time the plea is entered, Defendant will then and there pay over the special assessment of $100.00 per count required by Title 18, United States Code, Section 3013, to the Office of the United States District Court Clerk; Defendant shall thereafter produce proof of payment to the U.S. Attorney or the U.S. Probation Office. If the Defendant is adjudged to be indigent, payment of the special assessment at the time the plea is entered is waived, but Defendant agrees that it may be made payable first from any funds available to Defendant while Defendant is incarcerated. Defendant understands and agrees that, pursuant to Title 18, United States Code, Section 3613, whatever monetary penalties are imposed by the Court will be due and payable immediately and subject to immediate enforcement by the United States as provided in Section 3613. Furthermore, Defendant agrees to complete a Department of Justice Financial Statement no later than the day the guilty plea is entered and provide same to the undersigned AUSA. Defendant also agrees to provide all of Defendant's financial information to the Probation Office and, if requested, to participate in a pre-sentencing debtor's examination. If the Court imposes a schedule of payments, Defendant understands that the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment. If Defendant is incarcerated, Defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program regardless of whether the Court specifically directs participation or imposes a schedule of payments. Defendant understands and

agrees that Defendant shall participate in the Treasury Offset Program until any and all monetary penalties are satisfied and paid in full by Defendant.

6. **Transferring and Liquidating Assets.** Defendant understands and agrees that Defendant is prohibited from transferring or liquidating any and all assets held or owned by Defendant as of the date this Plea Agreement is signed. Defendant must obtain prior written approval from the U.S. Attorney's Financial Litigation Program prior to the transfer or liquidation of any and all assets after this Plea Agreement is signed and if Defendant fails to do so the Defendant understands and agrees that an unapproved transfer or liquidation of any asset shall be deemed a fraudulent transfer or liquidation and a violation of this agreement.

7. **Future Direct Contact With Defendant.** Defendant and Defendant's attorney acknowledge that if forfeiture, restitution, a fine, or special assessment or any combination of forfeiture, restitution, fine, and special assessment is ordered in Defendant's case that this will require regular contact with Defendant during any period of incarceration, probation, supervised release, and possibly thereafter. Further, Defendant and Defendant's attorney understand that it is essential that defense counsel contact the U.S. Attorney's Financial Litigation Program immediately after sentencing in this case to confirm in writing whether defense counsel will continue to represent Defendant in this case and in matters involving the collection of the financial obligations imposed by the Court. If the U.S. Attorney does not receive any written acknowledgment from defense counsel within two weeks from the date of the entry of Judgment in this case, the U.S. Attorney will presume that defense counsel no longer represents Defendant and the Financial Litigation Program will communicate directly with Defendant regarding collection of the financial obligations imposed by the Court. Defendant and Defendant's attorney understand and agree that such direct contact with Defendant shall not be deemed an

improper *ex parte* contact with Defendant if defense counsel fails to notify the U.S. Attorney of any continued legal representation within two weeks after the date of entry of the Judgment in this case.

   8.    **Waivers.**  Defendant, knowing and understanding all of the matters aforesaid, including the maximum possible penalty that could be imposed, and being advised of Defendant's rights to remain silent, to trial by jury, to subpoena witnesses on Defendant's own behalf, to confront the witnesses against Defendant, and to appeal the conviction and sentence, in exchange for the U.S. Attorney entering into this plea agreement and accompanying plea supplement, hereby expressly waives the following rights (except that Defendant reserves the right to raise ineffective assistance of counsel claims):

   a.    the right to appeal the conviction and sentence imposed in this case, or the manner in which that sentence was imposed, on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever; provided, however, that the Defendant retains the right to exercise a direct appeal of the sentence imposed if the Court departs from the sentencing guidelines.

   b.    the right to contest the conviction and sentence or the manner in which the sentence was imposed in any post-conviction proceeding, including but not limited to a motion brought under Title 28, United States Code, Section 2255, and any type of proceeding claiming double jeopardy or excessive penalty as a result of any forfeiture ordered or to be ordered in this case, and

   c.    any right to seek attorney fees and/or costs under the "Hyde Amendment," Title 18, United States Code, Section 3006A, and the Defendant acknowledges that the

government's position in the instant prosecution was not vexatious, frivolous, or in bad faith, and

      d.     all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought by Defendant or by Defendant's representative under the Freedom of Information Act, set forth at Title 5, United States Code, Section 552, or the Privacy Act of 1974, at Title 5, United States Code, Section 552a.

      e.     Defendant further acknowledges and agrees that any factual issues regarding the sentencing will be resolved by the sentencing judge under a preponderance of the evidence standard, and Defendant waives any right to a jury determination of these sentencing issues. Defendant further agrees that, in making its sentencing decision, the district court may consider any relevant evidence without regard to its admissibility under the rules of evidence applicable at trial.

**Defendant waives these rights in exchange for the United States Department of Justice entering into this plea agreement and accompanying plea supplement.**

      9.    **Complete Agreement.** It is further understood that this plea agreement and the plea supplement completely reflect all promises, agreements and conditions made by and between the United States Attorney's Office for the Southern District of Mississippi and the United States Department of Justice's Environmental Crimes Section and Defendant.

Defendant and Defendant's attorneys of record declare that the terms of this plea agreement have been:

1. READ BY OR TO DEFENDANT;
2. EXPLAINED TO DEFENDANT BY DEFENDANT'S ATTORNEY;
3. UNDERSTOOD BY DEFENDANT;
4. VOLUNTARILY ACCEPTED BY DEFENDANT; and
5. AGREED TO AND ACCEPTED BY DEFENDANT.

WITNESS OUR SIGNATURES, as set forth below.

WITNESS OUR SIGNATURES, as set forth below.

TODD W. GEE
United States Attorney

_Andrea C. Jones_        _5-30-24_
Andrea C. Jones               Date
Assistant United States Attorney

TODD KIM
Assistant Attorney General
Environmental and Natural Resources Division

_Jeremy F. Korzenik_       _5/30/2024_
Jeremy F. Korzenik            Date
Senior Trial Attorney
Environmental Crimes Section
United States Department of Justice

_[signature]_           _3-20-24_
Anthony Charles Cvitanovich     Date
Defendant

_[signature]_           _3/20/24_
Tim C. Holleman           Date
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION



SOUTHERN DISTRICT OF MISSISSIPPI
FILED

JUL 31 2024

ARTHUR JOHNSTON
BY _____ DEPUTY

UNITED STATES OF AMERICA

v.

QUALITY POULTRY AND SEAFOOD, INC.,

CRIMINAL NO. 1:24cr89 HSO-RPM

18 U.S.C. § 371
21 U.S.C. § 331(k)
21 U.S.C. § 333(a)(2)
18 U.S.C. § 1343

**The United States Attorney charges:**

At all times relevant to the allegations of this Indictment:

### Defendants

1. Defendant **QUALITY POULTRY AND SEAFOOD ("QPS")** was a Mississippi corporation operating in Biloxi as a wholesale supplier of poultry and seafood to restaurants, casinos, and retail markets. It also sold poultry and seafood to the general public from its retail outlet and served meals to customers at its cafe.

2. Individual #1 was **QPS's** Sales Manager, supervising the company's sales staff. He has been employed at **QPS** since 1993. Individual #1, the son of one of QPS's co-owners, was responsible for overseeing **QPS's** sales to restaurants, casinos, and other wholesale customers both directly and through the **QPS** salesmen he managed.

3. Individual #2 became **QPS's** Business Manager in 2014 after working at QPS for about six years. He was a certified public accountant and oversaw all of **QPS's** businesses and its approximately thirty-five employees. In that position Individual #2 managed **QPS's** purchases of seafood from its suppliers and monitored the prices that **QPS** charged its wholesale and retail customers.

1

PLAINTIFF'S
EXHIBIT
**1. K**

4. Coconspirator #1 was a Mississippi corporation operating as a restaurant in Biloxi prominently advertising that it served local seafood to its customers.

5. Individual #3 was a co-owner of Coconspirator #1 and purchased fish and other food that the restaurant prepared and served to its customers.

### Applicable Laws

6. The Federal Food, Drug, and Cosmetic Act, Title 21 United States Code Sec. 301, et seq. regulates the production and marketing of food, drugs, and cosmetics transported and sold in interstate commerce. Title 21, United States Code, Section 331(k), prohibits the alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, tobacco product, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded. A food is misbranded if its labeling and description is false and misleading in any particular and if it is offered for sale under the name of another food. Title 21, United States Code, Section 343(a) and (b).

7. It is a felony to misbrand a food and to violate any provision of Title 21, United States Code, Section 331, with the intent to defraud or mislead. Title 21, United States Code, Section 333(a)(2).

8. It is a felony for any person having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals,

pictures, or sounds for the purpose of executing such scheme or artifice. Title 18, United States Code, Section 1343.

## COUNT 1

### Conspiracy to Misbrand Seafood and to
### Use Interstate Wire Transmissions to Execute a Scheme to Defraud

9. At a time no later than 2015, and as early as 1999, and continuing through November 2019, defendant **QPS**, Coconspirator #1, and others, knowingly and willfully agreed and conspired to commit the following criminal offenses against the United States:

a. With the intent to defraud and mislead consumers, the conspirators knowingly received fish that they held for sale after shipment in interstate commerce to facilitate its misbranding by offering it for sale under the name of another food, specifically, premium higher priced local fish species, in violation of Title 21, United States Code, Sections 331(k) and 333(a)(2).

b. To advance their scheme to defraud, the conspirators knowingly transmitted and caused interstate wire transmissions of writings, signs, signals, and pictures to facilitate the sale of misbranded fish, in violation of Title 21, United States Code, Sections 331(k) and 333(a)(2), and in violation of Title 18, United States Code, Section 1343.

### The Purpose of the Conspiracy

10. It was the purpose of the conspirators and the objective of their conspiracy to benefit financially by misrepresenting and by facilitating the misrepresentation of the fish they and others sold as locally-sourced premium fish, when, as the conspirators well knew, they were not the local popular species advertised and identified on menus and for which customers were charged.

3

## Manner and Means of the Conspiracy

11. The following are among the means and methods employed by the defendant and its coconspirators to carry out the conspiracy and to achieve its unlawful objectives:

      a. Defendant **QPS,** Conspirator #1, and others, working as their employees and agents, purchased frozen seafood from foreign countries and from waters that were not the Mississippi Gulf, with the intent to advertise and sell them to **QPS** retail customers, Mississippi restaurants, and to the customers of Mississippi restaurants as local premium species when they were not local and not the species they were advertised to be. The conspirators thereby benefitted from the sale of seafood that would not have been as marketable or as profitable if its actual species and origin had been truthfully identified.

      b. Defendant **QPS** and others working as their employees and agents, recommended and sold to Conspirator #1, and others, inexpensive fish that, by taste and appearance, could be substituted for the premium local species advertised with little likelihood of detection. The conspirators thereby benefitted from the sale of seafood that would not have been as marketable or as profitable if its actual species and origin had been known.

      c. Conspirator #1, advertised Conspirator #1's menu of misbranded seafood on a publicly accessible website hosted on a server outside of Mississippi. To appeal to customers seeking local Gulf Coast seafood, the menu on their website and elsewhere stated, "all of our seafood is caught in our bountiful gulf waters"

      d. Coconspirators **QPS** and Conspirator #1 obtained payment, directly and indirectly, through interstate wire transmissions generated by credit card sales of their fraudulently misbranded seafood.

4

## Overt Acts in Furtherance of the Conspiracy

12. In furtherance of this conspiracy and to achieve its objectives, at least one of the conspirators identified above, in the Southern District of Mississippi, committed at least one of the following overt acts:

### I. QPS's Sales to Restaurants of Fish Species Not Appearing on Their Menus

(1) On January 26, 2015, Individual #2 sent the following text to Individual #1: "We need to raise the price of perch on [Conspirator #1's] perch we are getting 7%."

(2) In or around 2015 while standing inside Defendant **QPS's** large freezer containing boxes of imported frozen seafood, Individual #1 handed to Individual #3 packages of three different fish suggesting that Individual #3 sample each and decide which would best substitute for the local premium species on Conspirator #1's menu.

(3) On or about November 4, 2016, Defendant **QPS** sold Triggerfish to local Restaurant A for use as a substitute for premium local fish.

(4) In a text message dated July 5, 2017, Individual #1 of **QPS** wrote to Individual #3: "Still have no triple tail I'm sending you trigger-style fish 8 – 10 to use till we get it back in stock. [Employee of Restaurant A] is using it already instead of triple tail at the [Restaurant A] and said he has used it for grouper snapper and triple tail with no complaints. And it's cheaper than triple tail...." Individual #3 responded, "Ok".

(5) On or about July 25, 2017, Defendant **QPS** sold fish to a customer that **QPS** represented to be the local premium fish Red Snapper which was determined by genetic analysis not to be Red Snapper but was instead an imported species of lesser value.

(6) On or about September 29, 2017, Defendant **QPS** and Individual #1 sold Triggerfish to local Restaurant A for use as a substitute for premium local fish.

(7) In a January 19, 2018 email, a **QPS** seafood purchasing agent notified Individuals #1 and #2, and other **QPS** employees, "Due to the shortage on snapper we will be substituting triple tail for all snapper." Triple tail was not a local fish but was imported by **QPS** from Suriname in South America.

(8) In an April 16, 2018, email, Individual #2 sent the following instructions to Individual #1 and other members of the **QPS** sales staff: "I don't understand why we are giving Perch away [African Lake Victoria Perch "LVP"]. This is a replacement for the triple tail which were selling at $8.99 and $9.99. Now we are selling perch at $5.69 if we can't get at least $6.99 or $7.99 then it's not worth bringing it in here. This is a product that no one else has and it is versatile. Raise the price and make money where we can make money!"

(9) During the September 19, 2018, execution of a search warrant by the U.S. Food and Drug Administration ("FDA") at **QPS**, Individual #1 replied to Individual #3's text order for LVP, "Tomorrow[,] FDA here today." Individual #3 responded, "Ok."

## II. *Efforts to Conceal the Conspiracy: False Denials*

(10) When questioned by FDA agents during their September 19, 2018, search of **QPS**, Individual #2 falsely told the agents that if anyone in **QPS**'s retail market was labeling a fish with a name other than its true name, it was done without his approval and without his knowledge.

(11) When questioned by federal agents during their September 19, 2018, search of QPS, Individual #2 told the agents that **QPS** does not ship any fish outside of the State of Mississippi.

(12) When questioned by federal agents during their September 19, 2018, search of **QPS**, Individual #2 told the agents that **QPS** had, in the past, sold fish to Conspirator #1's restaurant in Biloxi, Mississippi, but not much anymore.

(13) When questioned by federal agents during their September 19, 2018, search of **QPS**, Individual #2 falsely told the agents that he was not aware of any restaurant customer mislabeling and selling fish bought from **QPS** as something other than what it was, such as selling a cheap fish as an expensive one.

(14) When questioned by federal agents during their September 19, 2018, search of **QPS**, Individual #1 falsely told the agents that any mislabeling of fish by **QPS** was inadvertent and he did not know of any mislabeling of fish by the restaurants to which **QPS** sold seafood.

### III. QPS's Seafood Sales to Coconspirator #1 During and After the September 19, 2018, Federal Search at QPS

(15) On September 19, 2018, while an authorized federal search of **QPS** was underway, Individual #3 sent an electronic text message to Individual #1 ordering LVP, which his restaurant, Conspirator #1, regularly mislabeled and sold to customers as local Mississippi Gulf Coast Snapper.

(16) Eight days after FDA's search of **QPS**, in a September 27, 2018, text to Individual #1, Individual #3 ordered 150 pounds of LVP in order to sell it to customers of Conspirator #1's restaurant as Snapper.

(17) About a month after FDA's search of Defendant **QPS**, in an October 18, 2018, text to Individual #1, Individual #3 ordered 60 pounds of LVP for sale by Conspirator #1's restaurant as Snapper.

7

(18)  In an October 18, 2018, text, after Individual #1 informed him that **QPS** was unlikely to obtain more LVP, "Perch about to be nonexistant," Individual #3 instructed him to "Get all they have."

(19)  In a February 21, 2019, text, Individual #1 told to Individual #3,  "We have 110 cases of perch left when that is gone there is no more.  FYI we are looking for alternatives. Unicorn, triple tail and parrot fish are always good alternatives."

(20)  In a responsive February 21, 2019, text, Individual #3 told Individual #1, not to sell the remaining cases of LVP to any other customers, "I will buy them."  Individual #1 responded, "You come bring me a check and I will set it aside for you."

### IV. Additional 2019 QPS Sales to Conspirator #1
### Of Fish Misbranded on Conspirator #1's Menu

Fish not delivered when sold was held by **QPS** for delivery at Conspirator #1's Request

The Overt Acts below are the individual deliveries by **QPS** and Individual #1 to Conspirator #1 of fish species not identified on Conspirator #1's Menu

| Overt Act | Date | Invoice # | Fish Sold as a Premium Local Species | Pounds Sold | Pounds Delivered | Price per Pound | Total |
|---|---|---|---|---|---|---|---|
| 21 | 01/07/19 | 01-305315 | Lake Perch - Africa | 120 | 120 | $5.95 | $714.00 |
| 22 | 01/11/19 | 01-305620 | Lake Perch - Africa | 80 | 80 | $5.95 | $476.00 |
| 23 | 01/15/19 | 01-305792 | Lake Perch - Africa | 100 | 100 | $5.95 | $595.00 |
| 24 | 01/21/19 | 01-306128 | Lake Perch - Africa | 60 | 60 | $5.95 | $357.00 |
| 25 | 01/25/19 | 01-306393 | Lake Perch - Africa | 100 | 100 | $5.95 | $595.00 |
| 26 | 01/31/19 | 01-306697 | Lake Perch - Africa | 80 | 80 | $5.95 | $476.00 |
| 27 | 02/05/19 | 01-306984 | Lake Perch - Africa | 120 | 120 | $5.95 | $714.00 |
| 28 | 02/08/19 | 01-307209 | Lake Perch - Africa | 60 | 60 | $5.95 | $357.00 |
| 29 | 02/13/19 | 01-307475 | Lake Perch - Africa | 200 | 200 | $5.95 | $1,190.00 |
| 30 | 02/20/19 | 01-307927 | Lake Perch - Africa | 140 | 140 | $5.95 | $833.00 |

8

| Overt Act | Date | Invoice # | Fish Sold as a Premium Local Species | Pounds Sold | Pounds Delivered | Price per Pound | Total |
|---|---|---|---|---|---|---|---|
| 31 | 02/21/19 | 01-307993 | Lake Perch - Africa | 1,080 | | $5.95 | $6,426.00 |
| 32 | 02/26/19 | 01-308276 | Lake Perch - Africa | | 100 | | |
| 33 | 03/04/19 | 01-308678 | Lake Perch - Africa | | 100 | | |
| 34 | 03/07/19 | 01-308827 | Lake Perch - Africa | | 80 | | |
| 35 | 03/13/19 | 01-309236 | Lake Perch- Africa | | 100 | | |
| 36 | 03/16/19 | 01-309509 | Lake Perch - Africa | | 100 | | |
| 37 | 03/19/19 | 01-309645 | Triple Tail - Suriname | 2,000 | | $7.99 | $15,980.00 |
| 38 | 03/20/19 | 01-309694 | Lake Perch - Africa | | 60 | | |
| 39 | 03/22/19 | 01-309903 | Lake Perch - Africa | | 100 | | |
| 40 | 03/27/19 | 01-310191 | Lake Perch - Africa | | 200 | | |
| 41 | 04/01/19 | 01-310525 | Lake Perch - Africa | | 100 | | |
| 42 | 04/05/19 | 01-310837 | Lake Perch - Africa | | 100 | | |
| 43 | 04/10/19 | 01-311145 | Lake Perch - Africa | | 100 | | |
| 44 | 04/15/19 | 01-311451 | Triple Tail - Suriname | | 100 | | |
| 45 | 04/18/19 | 01-311707 | Triple Tail - Suriname | | 100 | | |
| 46 | 04/25/19 | 01-312136 | Triple Tail - Suriname | | 100 | | |
| 47 | 05/02/19 | 01-312640 | Triple Tail - Suriname | | 50 | | |
| 48 | 05/07/19 | 01-312938 | Triple Tail - Suriname | | 100 | | |
| 49 | 05/10/19 | 01-313166 | Triple Tail - Suriname | | 50 | | |
| 50 | 05/15/19 | 01-313455 | Triple Tail - Suriname | | 100 | | |
| 51 | 05/20/19 | 01-313783 | Triple Tail - Suriname | | 100 | | |
| 52 | 05/28/19 | 01-314272 | Triple Tail - Suriname | | 100 | | |
| 53 | 06/03/19 | 01-314630 | Triple Tail - Suriname | | 100 | | |
| 54 | 06/05/19 | 01-314769 | Triple Tail - Suriname | | 100 | | |
| 55 | 06/10/19 | 01-315053 | Triple Tail - Suriname | | 100 | | |
| 56 | 06/11/19 | 01-315150 | Triple Tail - Suriname | | 100 | | |
| 57 | 06/12/19 | 01-315209 | Triple Tail - Suriname | | 100 | | |

| Overt Act | Date | Invoice # | Fish Sold as a Premium Local Species | Pounds Sold | Pounds Delivered | Price per Pound | Total |
|---|---|---|---|---|---|---|---|
| 58 | 06/18/19 | 01-315583 | Triple Tail - Suriname | | 100 | | |
| 59 | 06/20/19 | 01-315747 | Triple Tail - Suriname | | 100 | | |
| 60 | 06/20/19 | 01-315748 | Triple Tail - Suriname | 500 | | $8.29 | $4,145.00 |
| 61 | 06/24/19 | 01-315963 | Triple Tail- Suriname | | 100 | | |
| 62 | 06/28/19 | 01-316279 | Triple Tail - Suriname | | 100 | | |
| 63 | 07/02/19 | 01-316459 | Triple Tail - Suriname | | 100 | | |
| 64 | 07/09/19 | 01-316811 | Triple Tail - Suriname | | 100 | | |
| 65 | 07/15/19 | 01-317168 | Triple Tail - Suriname | | 100 | | |
| 66 | 07/18/19 | 01-317377 | Triple Tail - Suriname | | 100 | | |
| 67 | 07/22/19 | 01-317556 | Triple Tail - Suriname | | 100 | | |
| 68 | 07/26/19 | 01-317857 | Triple Tail - Suriname | | 100 | | |
| 69 | 07/30/19 | 01-318016 | Triple Tail - Suriname | | 100 | | |
| 70 | 08/05/19 | 01-318333 | Triple Tail - Suriname | | 100 | | |
| 71 | 08/08/19 | 01-318527 | Triple Tail - Suriname | | 60 | | |
| 72 | 08/13/19 | 01-318773 | Unicorn-India | 150 | 150 | $7.99 | $1,198.50 |
| 73 | 08/15/19 | 01-318913 | Unicorn-India | 50 | 50 | $7.99 | $399.50 |
| 74 | 08/22/19 | 01-319526 | Unicorn-India | 100 | 100 | $7.99 | $799.00 |
| 75 | 08/23/19 | 01-319385 | Unicorn-India | 50 | 50 | $6.99 | $349.50 |
| 76 | 08/27/19 | 01-319547 | Unicorn-India | 100 | 100 | $6.99 | $699.00 |
| 77 | 09/03/19 | 01-319898 | Unicorn-India | 100 | 100 | $6.99 | $699.00 |
| 77 | 09/06/19 | 01-320138 | Unicorn-India | 100 | 100 | $6.99 | $699.00 |
| 79 | 09/16/19 | 01-320622 | Triple Tail- Suriname | 100 | 100 | $8.95 | $895.00 |
| 80 | 09/19/19 | 01-320845 | Triple Tail - Suriname | 100 | 100 | $8.95 | $895.00 |
| 81 | 09/24/19 | 01-321115 | Triple Tail - Suriname | 100 | 100 | $8.95 | $895.00 |
| 82 | 09/27/19 | 01-321304 | Triple Tail - Suriname | 100 | 100 | $8.95 | $895.00 |
| 83 | 10/04/19 | 01-321715 | Triple Tail - Suriname | 100 | 100 | $8.95 | $895.00 |
| 84 | 10/08/19 | 01-321890 | Triple Tail - Suriname | 50 | 100 | $8.95 | $447.50 |

| Overt Act | Date | Invoice # | Fish Sold as a Premium Local Species | Pounds Sold | Pounds Delivered | Price per Pound | Total |
|---|---|---|---|---|---|---|---|
| 85 | 10/11/19 | 01-322091 | Triple Tail - Suriname | 100 | 100 | $8.95 | $895.00 |
| 86 | 10/16/19 | 01-322337 | Triple Tail - Suriname | 50 | 100 | $8.95 | $447.50 |
| 87 | 10/24/19 | 01-322810 | Triple Tail - Suriname | 50 | 100 | $8.95 | $447.50 |
| 88 | 10/23/19 | 01-322721 | Triple Tail - Suriname | 100 | 100 | $8.95 | $895.00 |
| 89 | 10/29/19 | 01-323056 | Triple Tail - Suriname | 60 | 100 | $8.95 | $537.00 |
| 90 | 10/31/19 | 01-323175 | Triple Tail - Suriname | 100 | 100 | $8.95 | $895.00 |
| 91 | 11/07/19 | 01-323565 | Triple Tail - Suriname | 60 | 100 | $8.95 | $537.00 |
| 92 | 11/12/19 | 01-323832 | Triple Tail - Suriname | 60 | 100 | $8.95 | $537.00 |
| 93 | 11/15/19 | 01-324064 | Triple Tail - Suriname | 100 | 100 | $8.95 | $895.00 |

## V. Sales Facilitated by Interstate Wire Transmissions

(94) Between May 26, 2019, and August 16, 2019, Conspirator #1 posted its menu on the publicly-accessible website www.marymahoney.com, which was hosted outside of Mississippi, advertising the sale of premium local species for which Defendant **QPS**, Conspirator #1, Individual #3, and Individual #1, and Individual #2, substituted imported frozen fish of lesser value.

(95) On or about August 16, 2019, Conspirator #1 processed a credit card transaction causing an interstate wire transmission. The transaction was for payment of seafood purchased by a customer from Conspirator #1. Defendant **QPS**, Individual #1, and Individual #2, supplied the misbranded seafood that Conspirator #1 sold to their customer, falsely representing it to be the local premium species, Snapper.

11

### VI. Summary of QPS's Sales of Fish to
### Conspirator #1 for Misbranding and Sale

13. Between December 2013 and November 2019, the defendant **QPS** and other

conspirators, with the intent to defraud and mislead consumers, knowingly and willfully arranged

for Defendant **QPS** to supply to Conspirator #1, approximately 58,750 pounds (over 29 tons) of

imported Lake Victoria Perch, Trigger Fish, Triple Tail, and Unicorn Filefish for sale under the

names of other more popular species. The accurate species names did not appear on Conspirator

#1's menu nor on its website and instead were fraudulently sold to its customers under the names

and at the higher prices of local premium fish.

All in violation of Title 18, United States Code, Section 371.

### NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE

14. As a result of committing the offenses as alleged in this Indictment, the defendant shall

forfeit to the United States all property involved in or traceable to property involved in the offenses,

including but not limited to all proceeds obtained directly or indirectly from the offenses, and all

property used to facilitate the offenses. Further, if any property described above, as a result of any

act or omission of the defendant: (a) cannot be located upon the exercise of due diligence; (b) has

been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the

jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been

commingled with other property, which cannot be divided without difficulty, then it is the intent

of the United States to seek a judgment of forfeiture of any other property of the defendant, up to

the value of the property described in this notice or any bill of particulars supporting it.

12

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1); and Title 28, United States Code, Section 2461.

_Ari O. Chalk_
for TODD W. GEE
United States Attorney

_Jeremy F. Kongeník_ for
TODD KIM                    by A. Jones
Assistant Attorney General       AUSA
Environment & Natural Resources Division

13




UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI

**F I L E D**

Aug 27 2024

**ARTHUR JOHNSTON, CLERK**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

UNITED STATES OF AMERICA

v.                                                          CRIMINAL NO. 1:24cr89-HSO-RPM

QUALITY POULTRY AND SEAFOOD, INC.

### PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the United

States of America, and defendant Quality Poultry and Seafood, Inc. (QPS) through their

undersigned attorneys agree as follows:

### I. Obligations of the Parties

1. Defendant QPS agrees to plead guilty to a felony Information charging the corporation

with participating in a Title 18, United States Code, Section 371, conspiracy to defraud its

customers by marketing mislabeled seafood, in violation of Title 21, United States Code, Sections

331(k) and 333(a)(2), and in having used interstate wire transmissions to facilitate the fraud, in

violation of Title 18, United States Code, Section 1343.

2. Defendant QPS acknowledges that it understands the nature and elements of the offense

to which it agrees to plead guilty. The defendant waives its right to have a separate sealed plea

supplement as provided by Local Rule 49.1(B)(2).

3. Defendant QPS agrees to pay the forfeitures, and costs set forth herein and otherwise to

fulfill the sentence proposed in this Agreement if so ordered by the Court.

U.S. v. Quality Poultry and Seafood, Inc.
1:24cr89-HSO-RPM
Page 1 of 6



PLAINTIFF'S
EXHIBIT

1. L

4. The United States Attorney's Office for the Southern District of Mississippi and the Environmental Crimes Section of United States Department of Justice ("the Government") will: (a) recommend that the Court accept the defendant's plea of guilty; (b) recommend that the Court sentence the defendant as set forth below; (c) inform the United States Probation Office and the Court of this Agreement, the nature and extent of the defendant's activities with respect to this case and all other activities of the defendant the government or the Court deems relevant to sentencing.

## II. Conditions and Waivers

5. Defendant QPS acknowledges that the sentence the parties propose to the Court in this Plea Agreement is only a recommendation that the Court may accept or reject and that the Court may impose some other sentence that it determines to be just.

6. Defendant QPS understands that the penalty that may be imposed for its plea of guilty to the Information is to be determined according to the factors set forth in Title 18, United States Code, Sections 3553 and 3572. If a penalty is imposed it is to be determined under Title 18, United States Code, Section 3571(c)(1) and (d), with the maximum penalty being Probation not more than five (5) years, Supervised release of not more than three (3) years, and a $500,000 fine pursuant to Title 18, United States Code, Section 3571(c), or not more than the greater of twice the gross gain or twice the gross loss pursuant to Title 18, United States Code, Section 3571(d), whichever is greater.

7. Defendant QPS acknowledges that in pleading guilty, it is giving up the right: (a) to plead not guilty and to persist in that plea; (b) to have its guilt or innocence determined by a jury after it has considered the evidence presented at trial; (c) to confront and cross-examine adverse witnesses; (d) to testify and to present evidence; (e) and to compel the attendance and testimony of witnesses.

8. The Information setting forth the charges is incorporated by reference into this Plea Agreement. By entering into this Plea Agreement, QPS admits to the facts alleged in the Information and that it is in fact guilty of these offenses.

9. If the guilty plea is entered and defendant QPS fulfills all of the terms of this Plea Agreement, the United States will not file any additional criminal charges against the defendant arising from the facts set forth in the Information.

10. Defendant QPS understands and acknowledges that it is entering into this Plea Agreement and is pleading guilty freely and voluntarily because it is guilty and that its plea has not been induced by any threat, coercion, or intimidation of any kind. Defendant QPS acknowledges complete satisfaction with the representation of its counsel and the advice it has received in connection with this Plea Agreement.

11. Having agreed to plead guilty to the one-count Information, defendant QPS acknowledges that it is not a prevailing party as defined in Title 18, United States Code, Section 3006A (statutory note captioned "Attorney Fees and Litigation Expenses to Defense") and hereby expressly waives its right to sue the United States for its prosecution in this case.

12. No additional promises, agreements, or conditions have been made concerning this matter other than those expressly set forth herein, and none will be made unless in writing and signed by all parties to this Agreement.

13. Defendant QPS and its officers agree to continue to provide truthful and complete information to federal authorities concerning all matters pertaining to the charges to which it has agreed to plead guilty and agree to cooperate fully with the government in providing assistance and

truthful information and testimony in any investigation and prosecution the government undertakes relating to the charges at issue here.

14. Defendant QPS understands that this Agreement does not protect it or any of its officers or employees from prosecution for perjury should an authorized representative of QPS testify untruthfully or for making false statements nor does it protect these parties from prosecution for other crimes or offenses which the United States discovers by independent investigation. Further, should the defendant fail to comply fully with the terms and conditions set forth herein, this Agreement is voidable at the election of the United States, and the defendant may be subject to prosecution as if the Agreement had never been made.

15. Defendant, knowing and understanding all of the matters aforesaid, including the maximum possible penalty that could be imposed, and being advised of Defendant's rights, in exchange for the U.S. Attorney entering into this plea agreement, hereby expressly waives the right to appeal the conviction and sentence imposed in this case, or the manner in which that sentence was imposed, on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever.

### III. Recommended Sentence

16. The parties hereby agree to recommend the following sentence that the parties submit is just and equitable and an appropriate punishment for the crimes set forth in the accompanying Information to which defendant QPS has agreed to plead guilty:

(a) Defendant QPS agrees to forfeit $1,000,000 which it will pay to the United States Marshals Service, as directed by the U.S. Attorney's Office, within five business days of the Court 's entry of the judgment and conviction.

(b) Defendant QPS and the government agree that the forfeiture payment represents a fair and just resolution of all issues associated with loss and fine calculations.

(c) In consideration of the Defendant's forfeiture payment, the Government agrees to recommend that a fine of $150,000 be imposed.

(d) Consistent with Title 18, United States Code, Section 3561(c)(1), defendant QPS shall be subject to five years of probation, which shall include the following conditions:

(i) The defendant shall not commit another federal, state, or local crime.

(ii) The defendant shall maintain for no less than five years records describing the species, sources, and cost of the seafood it acquires for sale to its customers. The defendant shall make these records available to any federal, state, or local governmental authority that regulates or monitors the service and distribution of food for human consumption and to any such agency that regulates the harvesting, storage, labeling, or sale of seafood.

(iii) The defendant shall answer truthfully any inquiry from any governmental agency and from any customer as to the species, source, and cost of any seafood it prepares, serves, sells, or advertises for sale.

(e) The Courts shall maintain jurisdiction over this case for a period sufficient to assure compliance with this sentence.

16.  Prior to or at the time of sentencing, defendant QPS will pay a special assessment of $400 per count  as required in Title 18, United States Code, Section 3013(a)(2)(B).  This payment shall be made to the United States District Court, at the United States Clerk's Office,

2012 15th Street, Suite 403, Gulfport, Mississippi 39501. The defendant will furnish to the

Government a receipt or other evidence of payment at the time of sentencing.

WITNESS OUR SIGNATURES:

TODD W. GEE
United States Attorney
Southern District of Mississippi

_Andrea C. Jones_        Date: _8/27/2024_

ANDREA C. JONES
Assistant United States Attorney
Southern District of Mississippi

TODD KIM
Assistant Attorney General
Environment and Natural Resource Division
United States Department of Justice

_Jeremy F. Korzenik_        Date: _8/27/2024_

JEREMY F. KORZENIK
Senior Trial Attorney
Environmental Crimes Section

_[signature]_        _7/29/24_

[NAME]
Authorized Agent for Quality
Poultry and Seafood, Inc.

_Wm P M_        _7/29/24_

BILLY GIBBENS
Attorney for Defendant Quality
Poultry and Seafood, Inc. Date:

_Wayne L. Hengen_        _7-29-24_

WAYNE L. HENGEN
ATTORNEY FOR DEFENDANT
QUALITY POULTRY AND
SEAFOOD, INC.



SOUTHERN DISTRICT OF MISSISSIPPI
FILED

JUL 31 2024

ARTHUR JOHNSTON
BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

UNITED STATES OF AMERICA

v.

CRIMINAL NO. 1:24cr88 HSO-RPM

JAMES WILLIAM GUNKEL

21 U.S.C. § 331

**The United States Attorney charges:**

At all times relevant to this Information, in the Southern Division of the Southern District

of Mississippi and elsewhere:

1. Beginning in or around 2008, defendant **JAMES WILLIAM GUNKEL**

("**GUNKEL**") was employed by Quality Poultry and Seafood of Biloxi ("QPS"), a Mississippi

Gulf Coast wholesale supplier of seafood to restaurants, casinos, and other institutions. As an

accountant, he oversaw the company's finances. In or around 2014 he became QPS's Business

Manager reporting directly to QPS's two owners.

2. As QPS's Business Manager, defendant **GUNKEL** supervised the company's sale of

seafood and participated in setting the prices at which QPS would purchase and sell the various

species of fish it marketed.

3. In addition to its wholesale business, QPS, also sold seafood to the public from its

retail store. Defendant **GUNKEL** supervised its operation, instructing its employees as to which

fish species to order and sell, how to label them, and at what price to sell them.

4. Beginning in or around 2014 and continuing through November 2019, as QPS's

Business Manager, defendant **GUNKEL,** oversaw the marketing of seafood to restaurants and

other retail establishments that facilitated the misbranding of fish, specifically suggesting



PLAINTIFF'S
EXHIBIT

1. M

inexpensive, imported frozen fish as substitutes for the more expensive fresh premium local species identified by the retail market or advertised on the restaurant's menu. Through such sales of seafood, defendant **GUNKEL** generated higher proceeds for his customers, his employer, and himself than would have been obtained had the seafood QPS sold been accurately identified and sold at its true market value.

### Applicable Laws

5. Title 21, United States Code Section 331(k), prohibits the alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, tobacco product, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded. A food is misbranded if its labeling and description is false and misleading in any particular or if it is offered for sale under the name of another food. Title 21, United States Code, Section 343(a) and (b).

### Sale of Inexpensive Imported Seafood Falsely Labeled as a Premium Local Species

6. On September 19, 2018, a federal search warrant was executed at the premises of defendant **GUNKEL's** employer, QPS, by agents of the Federal Food and Drug Administration. Defendant **GUNKEL** was interviewed by federal agents and warned that the sale of mislabeled seafood was a serious criminal violation of federal law.

7. From July 2019 continuing through November 2019, the acts of defendant **GUNKEL** resulted in the misbranding of no less than 3,150 pounds of inexpensive imported fish held for sale after shipment in interstate commerce in order to facilitate its sale as a premium higher priced local species at one of QPS's numerous wholesale customers. The fish misbranded and

sold as premium local species included Triple Tail from Suriname and Unicorn filefish from India.

All in violation of Title 21, United States Code, Sections 331(k), 343(a) and (b), and 333(a)(1).


_for_ TODD W. GEE
United States Attorney


_for_ TODD KIM _by A.C. Tunes AUSA_
Assistant Attorney General
Environment & Natural Resources Division

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI

# F I L E D

Aug 27 2024

ARTHUR JOHNSTON, CLERK

## PLEA AGREEMENT

| Subject<br>**United States v. James William Gunkel**<br>**Criminal No. 1:24cr88-HSO-RPM** | Date<br>**July 24, 2024** |
|---|---|

| To:<br>Joe Sam Owen<br>Owen and Owen, PPLC<br>1414-25th Avenue<br>Gulfport, MS 39501 | From:<br>Jeremy F. Korzenik<br>Senior Trial Attorney<br>Environmental Crimes Sec.<br>U.S. Dept. of Justice<br>Washington, DC 20044 | Andrea C. Jones<br>Asst. U.S. Attorney<br>Southern Dist. of MS<br>Criminal Division<br>Gulfport, MS 39201 |
|---|---|---|

James William Gunkel, Defendant herein, and Joe Sam Owen, attorney for the
Defendant, have been notified and understand and agree to the items contained herein, as well as
in the Plea Supplement, and that:

1.    **Count of Conviction.** It is understood that, as of the date of this plea agreement,
Defendant and Defendant's attorney have indicated that Defendant desires to plead guilty to the
one-count Information charging him with acts resulting in misbranding of inexpensive imported
seafood as local premium species in violation of Title 21, United States Code, Sections 331(k)
and 333(a)(1).

2.    **Sentence.** Defendant understands that the penalty for the offense in the
Information to which the Defendant will plead guilty is imprisonment for not more than one year
or a fine of not more than $1,000, or both, and a term of supervised release of not more than one
year. Defendant further understands that a term of supervised release will be imposed, and that
the term will be in addition to any prison sentence imposed. If any of the terms of supervised



PLAINTIFF'S
EXHIBIT

1. N

release are violated, the Defendant may be returned to prison for the entire term of supervised release without any credit for any time already served on the term of supervised release prior to the Defendant's violation of those conditions. Defendant also understands that the Court may require Defendant to pay restitution in this matter in accordance with applicable law. Defendant further understands that Defendant is liable to make restitution for the full amount of the loss determined by the Court, to include relevant conduct, which amount is not limited to the count of conviction. Defendant further understands that if the Court orders Defendant to pay restitution, restitution payments cannot be made to the victim directly but must be made to the Clerk of Court, Southern District of Mississippi.

3.   **Determination of Sentencing Guidelines.** It is further understood that the United States Sentencing Guidelines are advisory only and that Defendant and Defendant's attorney have discussed the fact that the Court must review the Guidelines in reaching a decision as to the appropriate sentence in this case, but the Court may impose a sentence other than that indicated by the Guidelines if the Court finds that another sentence would be more appropriate. Defendant specifically acknowledges that Defendant is not relying upon anyone's calculation of a particular Guideline range for the offense to which Defendant is entering this plea and recognizes that the Court will make the final determination of the sentence and that Defendant may be sentenced up to the maximum penalties set forth above.

4.   **Breach of This Agreement and Further Crimes.** It is further understood that should Defendant fail or refuse as to any part of this plea agreement or commit any further crimes, then, at its discretion, the U.S. Attorney may treat such conduct as a breach of this plea agreement and Defendant's breach shall be considered sufficient grounds for the pursuit of any prosecutions which the U.S. Attorney has not sought as a result of this plea agreement, including

any such prosecutions that might have been dismissed or otherwise barred by the Double

Jeopardy Clause, and any federal criminal violation of which this office has knowledge.

5.   **Financial Obligations.** It is further understood and specifically agreed to by

Defendant that, at the time of the execution of this document or at the time the plea is entered,

Defendant will then and there pay over the special assessment of $ 25.00 per count required by

Title 18, United States Code, Section 3013(a)(1)(A)(iii), to the Office of the United States

District Court Clerk; Defendant shall thereafter produce proof of payment to the U.S. Attorney or

the U.S. Probation Office. If the Defendant is adjudged to be indigent, payment of the special

assessment at the time the plea is entered is waived, but Defendant agrees that it may be made

payable first from any funds available to Defendant while Defendant is incarcerated. Defendant

understands and agrees that, pursuant to Title 18, United States Code, Section 3613, whatever

monetary penalties are imposed by the Court will be due and payable immediately and subject to

immediate enforcement by the United States as provided in Section 3613. Furthermore,

Defendant agrees to complete a Department of Justice Financial Statement no later than the day

the guilty plea is entered and provide same to the undersigned AUSA. Defendant also agrees to

provide all of Defendant's financial information to the Probation Office and, if requested, to

participate in a pre-sentencing debtor's examination. If the Court imposes a schedule of

payments, Defendant understands that the schedule of payments is merely a minimum schedule

of payments and not the only method, nor a limitation on the methods, available to the United

States to enforce the judgment. If Defendant is incarcerated, Defendant agrees to participate in

the Bureau of Prisons' Inmate Financial Responsibility Program regardless of whether the Court

specifically directs participation or imposes a schedule of payments. Defendant understands and

agrees that Defendant shall participate in the Treasury Offset Program until any and all monetary penalties are satisfied and paid in full by Defendant.

6. **Transferring and Liquidating Assets.** Defendant understands and agrees that Defendant is prohibited from transferring or liquidating any and all assets held or owned by Defendant as of the date this Plea Agreement is signed. Defendant must obtain prior written approval from the U.S. Attorney's Financial Litigation Program prior to the transfer or liquidation of any and all assets after this Plea Agreement is signed and if Defendant fails to do so the Defendant understands and agrees that an unapproved transfer or liquidation of any asset shall be deemed a fraudulent transfer or liquidation and a violation of this agreement.

7. **Future Direct Contact With Defendant.** Defendant and Defendant's attorney acknowledge that if forfeiture, restitution, a fine, or special assessment or any combination of forfeiture, restitution, fine, and special assessment is ordered in Defendant's case that this will require regular contact with Defendant during any period of incarceration, probation, supervised release, and possibly thereafter. Further, Defendant and Defendant's attorney understand that it is essential that defense counsel contact the U.S. Attorney's Financial Litigation Program immediately after sentencing in this case to confirm in writing whether defense counsel will continue to represent Defendant in this case and in matters involving the collection of the financial obligations imposed by the Court. If the U.S. Attorney does not receive any written acknowledgment from defense counsel within two weeks from the date of the entry of Judgment in this case, the U.S. Attorney will presume that defense counsel no longer represents Defendant and the Financial Litigation Program will communicate directly with Defendant regarding collection of the financial obligations imposed by the Court. Defendant and Defendant's attorney understand and agree that such direct contact with Defendant shall not be deemed an

improper *ex parte* contact with Defendant if defense counsel fails to notify the U.S. Attorney of any continued legal representation within two weeks after the date of entry of the Judgment in this case.

8.      **Waivers**. Defendant, knowing and understanding all of the matters aforesaid, including the maximum possible penalty that could be imposed, and being advised of Defendant's rights to remain silent, to trial by jury, to subpoena witnesses on Defendant's own behalf, to confront the witnesses against Defendant, and to appeal the conviction and sentence, in exchange for the U.S. Attorney entering into this plea agreement and accompanying plea supplement, hereby expressly waives the following rights (except that Defendant reserves the right to raise ineffective assistance of counsel claims):

a.      the right to appeal the conviction and sentence imposed in this case, or the manner in which that sentence was imposed, on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever; and

b.      the right to contest the conviction and sentence or the manner in which the sentence was imposed in any post-conviction proceeding, including but not limited to a motion brought under Title 28, United States Code, Section 2255, and any type of proceeding claiming double jeopardy or excessive penalty as a result of any forfeiture ordered or to be ordered in this case, and

c.      any right to seek attorney fees and/or costs under the "Hyde Amendment," Title 18, United States Code, Section 3006A, and the Defendant acknowledges that the government's position in the instant prosecution was not vexatious, frivolous, or in bad faith, and

d.      all rights, whether asserted directly or by a representative, to request or

receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought by Defendant or by Defendant's representative under the Freedom of Information Act, set forth at Title 5, United States Code, Section 552, or the Privacy Act of 1974, at Title 5, United States Code, Section 552a.

   e. Defendant further acknowledges and agrees that any factual issues regarding the sentencing will be resolved by the sentencing judge under a preponderance of the evidence standard, and Defendant waives any right to a jury determination of these sentencing issues. Defendant further agrees that, in making its sentencing decision, the district court may consider any relevant evidence without regard to its admissibility under the rules of evidence applicable at trial.

**Defendant waives these rights in exchange for the United States Department of Justice entering into this plea agreement and accompanying plea supplement.**

   9. **Complete Agreement**. It is further understood that this plea agreement and the plea supplement completely reflect all promises, agreements and conditions made by and between the United States Attorney's Office for the Southern District of Mississippi and the United States Department of Justice's Environmental Crimes Section and Defendant.

Defendant and Defendant's attorneys of record declare that the terms of this plea agreement have been:

1. READ BY OR TO DEFENDANT;
2. EXPLAINED TO DEFENDANT BY DEFENDANT'S ATTORNEY;
3. UNDERSTOOD BY DEFENDANT;
4. VOLUNTARILY ACCEPTED BY DEFENDANT; and
5. AGREED TO AND ACCEPTED BY DEFENDANT.

WITNESS OUR SIGNATURES, as set forth below.


TODD W. GEE
United States Attorney

_Andrea C. Jones_                          _8/27/2024_
Andrea C. Jones                            Date
Assistant United States Attorney


TODD KIM
Assistant Attorney General
Environmental and Natural Resources Division

_Jeremy F. Korzenik_                       _8/27/2024_
Jeremy F. Korzenik                         Date
Senior Trial Attorney
Environmental Crimes Section
United States Department of Justice


_James W. Gunkel_                          _7/27/2024_
James William Gunkel                       Date
Defendant

_Joe Sam Owen_                             _7/29/2024_
Joe Sam Owen                               Date
Attorney for Defendant


Page 7 of 7
U.S. v. Gunkel
1:24cr88-HSO-RPM

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION



SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

JUL 31 2024

ARTHUR JOHNSTON
BY _____ DEPUTY

UNITED STATES OF AMERICA

v.

TODD ANTHONY ROSETTI

CRIMINAL NO. 1:24cr 90H50-BWR

21 U.S.C. § 331(k)

**The United States Attorney charges:**

At all times relevant to the allegations of this Information in the Southern Division of the Southern District of Mississippi and elsewhere:

1. The defendant, **TODD ANTHONY ROSETTI** ("ROSETTI") was the sales manager of Quality Poultry and Seafood of Biloxi ("QPS"), a wholesale supplier of poultry and seafood to restaurants, casinos, and retail markets on the Mississippi Gulf Coast and elsewhere. Defendant **ROSETTI** is the son of one of the two owners of QPS and has worked there since 1993. Defendant **ROSETTI** participated in setting the prices at which QPS would purchase and sell the various species of fish it marketed and was responsible for overseeing QPS's wholesale business directly through customer contacts and through the QPS salesmen he managed.

2. Beginning at a time no later than 2012, and as early as 1999, and continuing through November 2019, defendant **ROSETTI** marketed seafood to restaurants and other retail establishments to facilitate the misbranding of fish, specifically, suggesting inexpensive, imported frozen fish as substitutes for the more expensive fresh premium local species identified by the retail market or advertised on the restaurant's menu. Through such sales of misbranded seafood, defendant **ROSETTI** generated higher proceeds for his customers, his employer, and himself than would have been obtained had the seafood he arranged to sell been accurately identified and sold at its true market value.



PLAINTIFF'S
EXHIBIT
1.0

## Applicable Laws

3. Title 21, United States Code Section 331(k), prohibits the alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, tobacco product, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded. A food is misbranded if its labeling and description is false and misleading in any particular or if it is offered for sale under the name of another food. Title 21, United States Code, Section 343(a) and (b).

## Various Acts Resulting in Misbranding

4. In and through the course of dealings with restaurants in the Gulf Coast area, ROSETTI selected frozen imported fish to be substituted for premium species fish by local restaurants. Specifically, in or about 2016 and 2017, while standing inside Defendant QPS's large freezer containing boxes of imported frozen seafood, defendant **ROSETTI** selected for a restaurant owner a fish to be substituted for the local premium species on the restaurant's menu.

5. On or about November 4, 2016, defendant **ROSETTI** facilitated for his employer QPS a sale of Triggerfish to a local restaurant for use as a substitute for premium local fish.

6. In a text message dated July 5, 2017, defendant **ROSETTI** of QPS texted to a restaurant customer: "Still have no triple tail I'm sending you trigger-style fish 8 – 10 to use till we get it back in stock. [employee of Restaurant A] is using it already instead of triple tail at…[Restaurant A] and said he has used it for grouper snapper and triple tail with no complaints. And it's cheaper than triple tail". Co-conspirator Individual #3 responded, "Ok".

7. On or about September 29, 2017, Rosetti sold Triggerfish to local Restaurant A for use as a substitute for premium local fish.

2

8.  In a January 19, 2018, email, a QPS seafood purchasing agent notified defendant **ROSETTI** and other QPS employees that "Due to the shortage on snapper we will be substituting triple tail for all snapper." Triple tail was not a local fish but was imported by QPS from Suriname in South America.

9.  On September 19, 2018, a federal search warrant was executed at defendant **ROSETTI's** employer, QPS, by agents of the United States Food and Drug Administration ("FDA"). Defendant **ROSETTI** was interviewed by federal agents and warned that the sale of mislabeled seafood was a serious criminal violation of federal law.

10.  During the September 19, 2018, execution of a search warrant by the FDA at QPS, defendant **ROSETTI** replied to a purchasing agent for a restaurant in response to a text order for Lake Victoria Perch (LVP), "Tomorrow[,] FDA here today." The customer responded, "Ok."

11.  Approximately eight days after FDA's search of QPS, defendant **ROSETTI** arranged to sell 150 pounds of LVP to an employee of a restaurant that purchased fish from QPS, which resulted in the misbranding and selling of the LVP as Snapper to the restaurant's customers.

12.  About a month after FDA's search of QPS, via an October 18, 2018 text to defendant **ROSETTI** from an employee of a co-conspirator of QPS, defendant **ROSETTI** took an order of 60 pounds of LVP for sale by a customer restaurant as Snapper.

13.  On October 18, 2018, Rosetti informed a restaurant customer that QPS was unlikely to obtain more LVP by stating "Perch about to be nonexistant," The customer instructed defendant **ROSETTI** to "Get all they have."

14.  In a February 21, 2019 text, defendant **ROSETTI** told an employee of a seafood restaurant "We have 110 cases of perch left when that is gone there is no more. FYI we are

3

looking for alternatives. Unicorn, triple tail and parrot fish are always good alternatives." In response, the employee told defendant **ROSETTI** not to sell the remaining cases of LVP to any other customers, saying: "I will buy them." Defendant **ROSETTI** responded "You come bring me a check and I will set it aside for you."

15. From June continuing through November of 2019, the acts of defendant **ROSETTI** resulted in the misbranding of no less than 3,150 pounds of inexpensive imported fish held for sale after shipment in interstate commerce in order to facilitate its sale as a premium higher priced local species at one of QPS's numerous wholesale customers. The fish misbranded and sold as premium local species included LVP, Triple Tail, and Unicorn Filefish.

All in violation of Title 21, United States Code, Sections 331(k), 343(a) and (b), and 333(a)(1).


for _Ari D. Clark_

TODD W. GEE
United States Attorney


for _Jeremy F. Korzenik_ by A.C. Jones AUSA

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division


4




UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI

**F I L E D**

Aug 27 2024

ARTHUR JOHNSTON, CLERK

## PLEA AGREEMENT

| Subject<br>**United States v. Todd Anthony Rosetti**<br>**Criminal No. 1:24cr90-HSO-BWR** | Date<br>**June 24, 2024** |
|---|---|

| To:<br>Joe M. Hollomon<br>Joe M. Hollomon & Associates, P.A.<br>Post Office Box 22683<br>Jackson, MS 39225-2683 | From:<br>Jeremy F. Korzenik<br>Senior Trial Attorney<br>Environmental Crimes Sec.<br>U.S. Dept. of Justice<br>Washington, DC 20044 | Andrea C. Jones<br>Asst. U.S. Attorney<br>Southern Dist. of MS<br>Criminal Division<br>Gulfport, MS 39201 |

Todd Anthony Rosetti, Defendant herein, and Joe M. Hollomon, attorney for the

Defendant, have been notified and understand and agree to the items contained herein, as well as

in the Plea Supplement, and that:

1.      **Count of Conviction.**  It is understood that, as of the date of this plea agreement,

Defendant and Defendant's attorney have indicated that Defendant desires to plead guilty to the

one-count Information charging him with acts resulting in misbranding of inexpensive imported

seafood as local premium species in violation of Title 21, United States Code, Sections 331(k)

and 333(a)(1).

2.      **Sentence.**  Defendant understands that the penalty for the offense in the

Information to which the Defendant will plead guilty is imprisonment for not more than one year

or a fine of not more than $1,000, or both, and a term of supervised release of not more than one

year. Defendant further understands that a term of supervised release will be imposed, and that

the term will be in addition to any prison sentence imposed.  If any of the terms of supervised



PLAINTIFF'S
EXHIBIT

1. P

release are violated, the Defendant may be returned to prison for the entire term of supervised release without any credit for any time already served on the term of supervised release prior to the Defendant's violation of those conditions. Defendant also understands that the Court may require Defendant to pay restitution in this matter in accordance with applicable law. Defendant further understands that Defendant is liable to make restitution for the full amount of the loss determined by the Court, to include relevant conduct, which amount is not limited to the count of conviction. Defendant further understands that if the Court orders Defendant to pay restitution, restitution payments cannot be made to the victim directly but must be made to the Clerk of Court, Southern District of Mississippi.

   3.     **Determination of Sentencing Guidelines.** It is further understood that the United States Sentencing Guidelines are advisory only and that Defendant and Defendant's attorney have discussed the fact that the Court must review the Guidelines in reaching a decision as to the appropriate sentence in this case, but the Court may impose a sentence other than that indicated by the Guidelines if the Court finds that another sentence would be more appropriate. Defendant specifically acknowledges that Defendant is not relying upon anyone's calculation of a particular Guideline range for the offense to which Defendant is entering this plea and recognizes that the Court will make the final determination of the sentence and that Defendant may be sentenced up to the maximum penalties set forth above.

   4.     **Breach of This Agreement and Further Crimes.** It is further understood that should Defendant fail or refuse as to any part of this plea agreement or commit any further crimes, then, at its discretion, the U.S. Attorney may treat such conduct as a breach of this plea agreement and Defendant's breach shall be considered sufficient grounds for the pursuit of any prosecutions which the U.S. Attorney has not sought as a result of this plea agreement, including

any such prosecutions that might have been dismissed or otherwise barred by the Double Jeopardy Clause, and any federal criminal violation of which this office has knowledge.

5.    **Financial Obligations.** It is further understood and specifically agreed to by Defendant that, at the time of the execution of this document or at the time the plea is entered, Defendant will then and there pay over the special assessment of $ 25.00 per count required by Title 18, United States Code, Section 3013(a)(1)(A)(iii), to the Office of the United States District Court Clerk; Defendant shall thereafter produce proof of payment to the U.S. Attorney or the U.S. Probation Office. If the Defendant is adjudged to be indigent, payment of the special assessment at the time the plea is entered is waived, but Defendant agrees that it may be made payable first from any funds available to Defendant while Defendant is incarcerated. Defendant understands and agrees that, pursuant to Title 18, United States Code, Section 3613, whatever monetary penalties are imposed by the Court will be due and payable immediately and subject to immediate enforcement by the United States as provided in Section 3613. Furthermore, Defendant agrees to complete a Department of Justice Financial Statement no later than the day the guilty plea is entered and provide same to the undersigned AUSA. Defendant also agrees to provide all of Defendant's financial information to the Probation Office and, if requested, to participate in a pre-sentencing debtor's examination. If the Court imposes a schedule of payments, Defendant understands that the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment. If Defendant is incarcerated, Defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program regardless of whether the Court specifically directs participation or imposes a schedule of payments. Defendant understands and

agrees that Defendant shall participate in the Treasury Offset Program until any and all monetary penalties are satisfied and paid in full by Defendant.

6. **Transferring and Liquidating Assets.** Defendant understands and agrees that Defendant is prohibited from transferring or liquidating any and all assets held or owned by Defendant as of the date this Plea Agreement is signed. Defendant must obtain prior written approval from the U.S. Attorney's Financial Litigation Program prior to the transfer or liquidation of any and all assets after this Plea Agreement is signed and if Defendant fails to do so the Defendant understands and agrees that an unapproved transfer or liquidation of any asset shall be deemed a fraudulent transfer or liquidation and a violation of this agreement.

7. **Future Direct Contact With Defendant.** Defendant and Defendant's attorney acknowledge that if forfeiture, restitution, a fine, or special assessment or any combination of forfeiture, restitution, fine, and special assessment is ordered in Defendant's case that this will require regular contact with Defendant during any period of incarceration, probation, supervised release, and possibly thereafter. Further, Defendant and Defendant's attorney understand that it is essential that defense counsel contact the U.S. Attorney's Financial Litigation Program immediately after sentencing in this case to confirm in writing whether defense counsel will continue to represent Defendant in this case and in matters involving the collection of the financial obligations imposed by the Court. If the U.S. Attorney does not receive any written acknowledgment from defense counsel within two weeks from the date of the entry of Judgment in this case, the U.S. Attorney will presume that defense counsel no longer represents Defendant and the Financial Litigation Program will communicate directly with Defendant regarding collection of the financial obligations imposed by the Court. Defendant and Defendant's attorney understand and agree that such direct contact with Defendant shall not be deemed an

improper *ex parte* contact with Defendant if defense counsel fails to notify the U.S. Attorney of any continued legal representation within two weeks after the date of entry of the Judgment in this case.

8.    <u>Waivers</u>.  Defendant, knowing and understanding all of the matters aforesaid, including the maximum possible penalty that could be imposed, and being advised of Defendant's rights to remain silent, to trial by jury, to subpoena witnesses on Defendant's own behalf, to confront the witnesses against Defendant, and to appeal the conviction and sentence, in exchange for the U.S. Attorney entering into this plea agreement and accompanying plea supplement, hereby expressly waives the following rights (except that Defendant reserves the right to raise ineffective assistance of counsel claims):

a.    the right to appeal the conviction and sentence imposed in this case, or the manner in which that sentence was imposed, on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever; and

b.    the right to contest the conviction and sentence or the manner in which the sentence was imposed in any post-conviction proceeding, including but not limited to a motion brought under Title 28, United States Code, Section 2255, and any type of proceeding claiming double jeopardy or excessive penalty as a result of any forfeiture ordered or to be ordered in this case, and

c.    any right to seek attorney fees and/or costs under the "Hyde Amendment," Title 18, United States Code, Section 3006A, and the Defendant acknowledges that the government's position in the instant prosecution was not vexatious, frivolous, or in bad faith, and

d.    all rights, whether asserted directly or by a representative, to request or

receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought by Defendant or by Defendant's representative under the Freedom of Information Act, set forth at Title 5, United States Code, Section 552, or the Privacy Act of 1974, at Title 5, United States Code, Section 552a.

     e.     Defendant further acknowledges and agrees that any factual issues regarding the sentencing will be resolved by the sentencing judge under a preponderance of the evidence standard, and Defendant waives any right to a jury determination of these sentencing issues. Defendant further agrees that, in making its sentencing decision, the district court may consider any relevant evidence without regard to its admissibility under the rules of evidence applicable at trial.

**Defendant waives these rights in exchange for the United States Department of Justice entering into this plea agreement and accompanying plea supplement.**

     9.     **Complete Agreement.** It is further understood that this plea agreement and the plea supplement completely reflect all promises, agreements and conditions made by and between the United States Attorney's Office for the Southern District of Mississippi and the United States Department of Justice's Environmental Crimes Section and Defendant.

Defendant and Defendant's attorneys of record declare that the terms of this plea agreement have been:

1. READ BY OR TO DEFENDANT;
2. EXPLAINED TO DEFENDANT BY DEFENDANT'S ATTORNEY;
3. UNDERSTOOD BY DEFENDANT;
4. VOLUNTARILY ACCEPTED BY DEFENDANT; and
5. AGREED TO AND ACCEPTED BY DEFENDANT.

WITNESS OUR SIGNATURES, as set forth below.

TODD W. GEE
United States Attorney

_Andrea C. Jones_                                8/27/2024
Andrea C. Jones                                  Date
Assistant United States Attorney


TODD KIM
Assistant Attorney General
Environmental and Natural Resources Division

_Jeremy F. Korzenik_                             8/27/2024
Jeremy F. Korzenik                               Date
Senior Trial Attorney
Environmental Crimes Section
United States Department of Justice


_Todd A. Rosetti_                                7/29/24
Todd Anthony Rosetti                             Date
Defendant

_Joe M. Hollomon_                                7/29/24
Joe M. Hollomon                                  Date
Attorney for Defendant


Page 7 of 7
U.S. v. Rosetti
1:24cr90-HSO-BWR